# In The Matter Of:

*Unique S. Butler  vs.*
*PP&G, Inc., et al.*

---

*Walter Alexander Robinson, III*

*Vol. 1*

*August 9, 2013*

---

*Gore Brothers Reporting & Videoconferencing*

*20 South Charles Street, Suite 901*

*Baltimore, MD 21201*

*410-837-3027*

*www.gorebrothers.com*



Since 1961 - Serving MD, DC & VA - Worldwide

Min-U-Script® with Word Index

1

1           UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3

4   UNIQUE S. BUTLER

5            Plaintiff

6   vs.                        Civil Action No.

7   PP&G, INC., et al.          1:2013cv00430

8            Defendant

9   _____/

10

11

12           The deposition of WALTER ALEXANDER

13   ROBINSON, III was held on Friday, August 9, 2013,

14   commencing at 11:56 a.m., at the Law Offices of

15   Themelis Firm, LLC, 610 Eastern Avenue, Baltimore,

16   Maryland 21224, before Janet A. Colman, Notary Public.

17

18

19

20

21   REPORTED BY:  Janet A. Colman

2

1  APPEARANCES:

2                    ON BEHALF OF THE PLAINTIFF:

3                    J. WIGGS, ESQUIRE

4                        The Wiggs Law Group

5                        9701 Apollo Drive, Suite 301

6                        Upper Marlboro, Maryland 20774

7                        Telephone: 240-326-3711

8                        Facsimile: 240-525-0320

9                        Email: j@wiggslawgroup.com

10

11                   ON BEHALF OF THE DEFENDANTS:

12                   JOHN C. THEMELIS, ESQUIRE

13                       Themelis Firm, LLC

14                       4610 Eastern Avenue

15                       Baltimore, Maryland 21224

16                       Telephone: 410-467-3400

17                       Facsimile: 410-438-3000

18                       Email: jct@themelisfirm.com

19

20  ALSO PRESENT:  UNIQUE S. BUTLER

21                     LISA DIANE IRELAND

3

<pre>
 1                         INDEX

 2        Deposition of Walter Alexander Robinson, III

 3                     August 9, 2013

 4

 5   Examination By:                               Page

 6   Mr. Wiggs                        4, 63, 66, 82

 7   Mr. Themelis                     55, 65, 68, 85

 8

 9   Exhibit No.                                  Marked

10   Exhibit 1    Board of Liquor License          65

11                Commissioners for Baltimore City

12                Rules and Regulations Governing

13                the Operation of Adult Entertainment

14                Establishments in Baltimore City

15   Exhibit 2    Entertainer's Application        67

16

17

18

19

20

21
</pre>

4

1                        STIPULATION

2            It is stipulated and agreed by and between

3    counsel for the respective parties that the reading and

4    signing of the deposition by the witness be and the

5    same is hereby waived.

6                    -  -  -  -  -

7                     PROCEEDINGS

8    Whereupon,

9            WALTER ALEXANDER ROBINSON, III,

10   called as a witness, having been first duly sworn to

11   tell the truth, the whole truth, and nothing but the

12   truth, was examined and testified as follows:

13            EXAMINATION BY MR. WIGGS:

14       Q    How are you doing?

15       A    Fine.  How you doing?

16       Q    I'm attorney J. Wiggs, and I represent

17   Unique Butler, the Plaintiff in Unique Butler versus

18   PP&G, Inc.

19            I'm going to ask you some questions.  If

20   you don't understand the question, please let me know.

21   I'll try to clarify the question for you.

5

1              Please give verbal responses, too, you

2    know.  Please don't shake your head or say uh-huh or

3    unh-unh.

4         A    Right.

5         Q    And just a reminder that your testimony

6    today is under oath.

7         A    Yes.

8              MR. THEMELIS:  And you have to speak loud

9    enough.

10             THE WITNESS:  Yes, I will.

11   BY MR. WIGGS:

12        Q    Approximately -- I'm sorry.  What is your

13   name?

14        A    My name is Walter Alexander Robinson, III.

15        Q    And what's your date of birth?

16        A    10/30/1981.

17        Q    And do you have any criminal convictions?

18        A    No.

19        Q    And how long have you been employed at

20   Norma Jean's?

21        A    It's been like five years.  Like a little

6

1  more than five years.

2        Q      And what is your position?

3        A      I'm a general manager.

4        Q      And what are your duties?

5        A      Pretty much my duties are to, you know,

6  hire our employees, you know, the bartenders, security.

7  I manage the contractors, where as they -- you know,

8  basically they have to be told about the Maryland State

9  laws.

10        Q      Who are you referring to?

11        A      Dancers.

12        Q      Who told you that they were contractors?

13        A      When I was hired, I was told they were

14  contractors.

15        Q      Who told you that?

16        A      My -- the guy that hired me.  I mean

17  that --

18        Q      Who was that?

19        A      His name was -- we called him Mac.  But I

20  believe his real name -- I forget his full name.  He's

21  the one who -- he was training me on how to --

7

1            MR. THEMELIS:  Mr. Wiggs, the name was
2   Garrett MacMillion.
3            LISA IRELAND:  MacMillion.
4       A    MacMillion.  I'm sorry.  We called him Mac
5   for short.
6            LISA IRELAND:  M-A-C-M-I-L-L-I-O-N.
7            MR. THEMELIS:  Is that correct, sir?
8            THE WITNESS:  That's correct.
9   BY MR. WIGGS:
10      Q    He was your supervisor?
11      A    Yeah.  He's the guy that trained me, told
12  me what my job duties were.
13      Q    Okay.  And do you know who hired him?
14      A    Yes.
15      Q    Who?
16      A    Lisa Ireland.
17      Q    And who hired you?
18      A    Lisa Ireland.
19      Q    And you said it was part of your job -- or
20  part of your duties was to hire people?
21      A    Was to hire -- we have like employees such

8

1  as like bartenders, security, you know.  And, you know,

2  that's pretty much it.

3          But my job is to make sure we hire the

4  right bartenders, the right amount of bartenders, they

5  have the right qualifications.

6          You know, I do things like make sure that

7  the bar is managed, like a regular bar manager.  I look

8  at, you know, inventory.  You know what I mean?

9      Q     Do you have the authority to fire people?

10     A     Yeah.  As a manager of my employees, I do

11  fire employees.

12     Q     Okay.

13     A     Or hire employees.

14     Q     And were you the one that -- you were the

15  one that fired Miss Butler, correct?

16     A     No, I didn't fire Miss Butler.

17     Q     You told her not to come back to the club?

18     A     No.  I told her to come back within a

19  month.

20     Q     Okay.  Didn't you state in your

21  Interrogatories that you fired her because of a fight?

1     A    I didn't fire her because of a fight.  I

2    suspended her contract.  And when girls have fights

3    like this, we usually suspend them for a matter of two

4    weeks.

5              But in Mrs. Butler's case, in particular,

6    she had many, many like problems with other girls.  You

7    know what I mean?  This was not the first situation.

8    So like after you have --

9     Q    How long -- how long -- so you're saying

10   that she wasn't fired?

11    A    She wasn't fired.  She was suspended for a

12   month.

13    Q    For a month.

14             Did you put that in writing?

15    A    No.  We spoke when she was suspended.

16    Q    So there's no written documentation of

17   that?

18    A    No.

19    Q    Okay.  There was no one else present?  Was

20   anyone else present?

21    A    It was just me and her in the office.

10

1        Q     Okay.

2        A     And I told her several times.  She came

3    back to, you know, try and get in back early.  You know

4    what I mean?  And I told her to come back in a month.

5        Q     Okay.  So when did you speak to Miss -- I

6    think her name was Oduyoye?  Keyna.

7        A     I didn't really -- I speak to her like on

8    the same basis I speak to all the contractors there.

9    But --

10       Q     But when did you speak to her in regards to

11   Miss Butler's employment?

12       A     I spoke with Lisa.  Lisa, you know,

13   informed me that there was a -- you know, maybe there

14   was some kind of misunderstanding and that, you know,

15   maybe I could be of service.  But it never happened.

16       Q     What never happened?

17       A     The meeting or whatever was supposed to

18   happen.  And I was informed that, you know, maybe there

19   was -- you know, I was going to meet Miss Butler and

20   explain that she wasn't fired, you know.

21       Q     Where was this supposed to take place?

11

1        A      I believe it was the Windsor Inn where
2   Miss -- Keyna is employed.
3        Q      And whose idea was this meeting?
4        A      I don't know.
5        Q      You don't know whose idea it was?
6        A      No.
7        Q      Well, who --
8        A      I mean from -- I really don't know.
9        Q      Miss Ireland came to you?
10       A      She just said that the girl wanted to --
11   you know, thought it was a misunderstanding and she
12   wanted her job.
13             I mean, we don't -- we give girls times
14   off, but we don't leave -- I mean, we don't keep them
15   out forever.  It's just a time period, you know.
16             After the incident, I didn't speak to her
17   again.  I told her a month.  She came back before the
18   month was out, you know.  So I told her again, it's a
19   month, you know.  And I didn't hear from her again.
20   But she did clean out her --
21       Q      She never contacted you again?

12

1      A      No, she never contacted me.

2      Q      So she didn't give you a call several

3   times?

4      A      No.  No.

5      Q      Didn't she come to the club?

6      A      Not while I was there.

7      Q      Not while you were there?

8      A      No.  But she did tell me when this

9   situation happened, that she would be contacting a

10  lawyer, she would be suing the club.  You know, when

11  she was suspended.  She made it very clear that she was

12  proceeding with legal matters.

13     Q      Just answer the questions.

14     A      Okay.

15     Q      Thank you.  And why was she suspended?

16     A      Just tell the story of why she was

17  suspended?

18     Q      Not a story.  Just, I mean, what was the

19  reason?

20     A      I mean, she was fighting.

21     Q      She was fighting?

13

1          A     Um-hum.

2          Q     So she was --

3          A     And numerous -- there was occasions of her

4    like arguing and creating a negative -- you know,

5    having a negative problem with other dancers and

6    contractors.  So she just needed a break, you know.  We

7    do this all the time with girls.

8          Q     So it's your policy to suspend these women

9    any time someone assaults them?

10         A     Whenever someone has a -- has like a

11   negative attitude and having a problem, they get home,

12   they're bringing some of it with them to work, you

13   know, it's best for them to, you know --

14         Q     So you don't have -- you don't ever not

15   allow anybody to come back?

16         A     No.

17         Q     Okay.  So you just suspend them?

18         A     Yeah.  Just take a little break, you know.

19         Q     So at what point would you not allow

20   someone to some back?  What would they have to do?

21         A     Break the law in a way that -- you know,

14

1  it's all based on State laws or Liquor Board rules,

2  things like this.  You know what I mean?  We've never

3  stopped someone from coming back before.

4        Q     So you're saying they would have to break a

5  State law?

6        A     Like we've never done that before.  It

7  would have to be something like they would have to kill

8  somebody or something, something new that we haven't

9  dealt with before.

10       Q     Okay.  So you've been working at the club

11  for five years?

12       A     Yes, sir.

13       Q     Okay.  And Miss Butler worked for the club

14  as a dancer from 2007 through 2012?

15       A     I remember after 2010.  I don't remember

16  2007.

17       Q     You don't have any records?

18       A     I have a form that she filled out when she

19  started with us.

20       Q     Okay.  Do you have that?

21             MR. THEMELIS:  I've got it.  I'll be

15

1  introducing it probably through cross.  I'll also go

2  over these (indicating) so you know what he can and

3  what he can't answer, if you like, on cross.  It's up

4  to you.

5           Your last question was Lisa contacting him

6  once or words to that effect.  Or that might be the

7  answer.  That's what I wrote down.

8           MR. WIGGS:  Oh, no.  I asked him about the

9  time period she was a dancer.

10           MR. THEMELIS:  Yes.  Okay.  You're

11  absolutely correct.

12  BY MR. WIGGS:

13       Q    Now, when I refer to the Defendant, I'm

14  talking about Norma Jean's or PP&G, Inc.

15       A    Um-hum.

16       Q    The Defendant is a limited liability

17  company formed under the laws of the State of Maryland

18  with the principal place of business in Baltimore,

19  Maryland, correct?

20       A    Yes, sir.

21       Q    The Defendant is in the business of

16

1   operating a nightclub and bar known as Norma Jean's

2   Nightclub?

3       A    Say that one more time.  I'm sorry.

4       Q    I said:  The Defendant is in the business

5   of operating a nightclub and a bar known as Norma

6   Jean's Nightclub?

7       A    Correct.

8       Q    Okay.  And they feature semi-nude and nude

9   exotic dancers?

10      A    That's one of the features, yes.

11      Q    Okay.  And Unique Butler, the Plaintiff,

12  worked as an exotic dancer for the Defendant, and the

13  Defendant never once paid Plaintiff any wages for work

14  duties performed?

15      A    See, when we started like --

16      Q    That's a yes or no.  You never paid her

17  any --

18      A    No.  Independent contractors don't get

19  paid.

20      Q    Okay.  And at all times the Plaintiff

21  worked as an exotic dancer for the Defendant, Defendant

17

1    controlled every aspect of Plaintiff's work

2    relationship with the Defendant?

3         A     The question you're asking is not true.

4    She didn't work for us.

5         Q     You're saying, she didn't work for you?

6         A     No.  She didn't work for me.  She worked

7    for herself.  She's an independent contractor.

8         Q     She didn't work at the club?

9         A     She worked at the club, but she didn't work

10   for us.  I mean -- she didn't work for us.  She works

11   for herself.  She's her own boss at the club.

12        Q     So -- well, just answer that question.

13        A     So, no.  No.

14        Q     Okay.  And at no time while the Plaintiff

15   worked as an exotic dancer for the Defendant, did

16   Plaintiff enjoy any opportunity for profit or loss in

17   the business of Norma Jean's Nightclub?

18        A     Can you say that question in a different

19   way?

20        Q     She didn't have the opportunity to enjoy in

21   the profit or loss of the business of Norma Jean's

18

1    Nightclub?

2         A    No.

3         Q    So the profits or the losses --

4         A    Yeah.  She wasn't involved with the profits

5    or losses at Norma Jean's.

6         Q    And at no time while Plaintiff worked as an

7    exotic dancer for Defendant, did Plaintiff ever make a

8    financial investment with Norma Jean's Nightclub?

9         A    I mean --

10        Q    She never invested financially with the

11   club?

12        A    Let me understand.  There is a maintenance

13   fee that the girls pay sometimes, you know.

14        Q    That's a fee, though.  I mean, a financial

15   investment.

16        A    Yeah.  Yeah.  No investment.

17        Q    Okay.  At all times while Plaintiff worked

18   as an exotic dancer for Defendant, Plaintiff's

19   work-related services were an integral part of

20   Defendant's business?

21        A    It's part of the business, not integral

19

1   part.

2          Q     So exotic dancer is not an integral part?

3          A     No.

4          Q     Okay.

5          A     We are a sports bar.  We do pool tables.

6   We have lots of different, you know, draws.

7          Q     Okay.

8          A     It's one of the --

9          Q     But you have exotic dancers?

10         A     We do have exotic dancers, yeah.

11         Q     Every night?

12         A     Every night.

13         Q     Okay.  How many hours is that?

14         A     From 12:00 p.m. 'til 2:00 a.m. in the

15   morning.

16         Q     And you have a lot of exotic dancers

17   dancing?

18         A     Yes.

19         Q     Approximately how many?

20         A     Hundreds.

21         Q     You have hundreds?

20

1        A        Hundreds.  Yeah.

2        Q        Okay.  So I would say that's -- you

3   wouldn't say that's an integral part?  If you have a

4   hundred --

5        A        Let me explain my answer.  There's hundreds

6   of girls, you know.  Some girls work today.  Some girls

7   work six months from now.  They're all over the

8   country.

9        Q        At what time --

10       A        Right now we only have 30 girls tonight.

11       Q        Thirty girls at one time?

12       A        Tonight.  At one time.

13       Q        Okay.

14       A        But we --

15       Q        So -- so -- so you have 30 girls working as

16   exotic dancers at one time?

17       A        Yes.

18       Q        Okay.

19       A        But independent contractors, we have

20   hundreds.

21       Q        Okay.

21

1        A      At any time.

2        Q      But I mean at one time.

3        A      Yeah.  At one day, yes, 30 girls.

4        Q      Okay.

5        A      Forty girls.

6        Q      And what are your hours of operation?

7        A      12:00 p.m. 'til 2:00 a.m. in the morning.

8        Q      Okay.  So you offer exotic dancing the

9   whole time you're open?

10       A      Um-hum.

11       Q      Okay.  So let me ask the question again.

12              At all times while Plaintiff worked as an

13   exotic dancer for the Defendant, Plaintiff's

14   work-related services were an integral part of

15   Defendant's business?

16       A      I mean, the pool tables are open all day,

17   too.

18       Q      It can be more than one integral part.

19       A      I don't understand the "integral", what

20   that means.  Can you give me another word?

21       Q      Relevant.

22

1       A      Just relevant?

2       Q      Yeah.

3       A      Okay.

4       Q      Very relevant?

5       A      She was relevant to it, yes.

6       Q      Okay.  And the Defendant fined the
7  Plaintiff?

8       A      No.

9       Q      Never fined the Plaintiff?

10      A      No.  Never.

11      Q      Defendant took deductions?

12      A      No.

13      Q      Never took deductions?

14      A      No.  Deduction meaning -- can you explain
15  deduction?

16      Q      Meaning you withheld money from her tips?

17      A      No.

18      Q      Okay.  Defendant has no record of ever
19  paying wages or otherwise compensating Plaintiff for
20  work duties performed?  You never paid her wages?

21      A      Never paid her, no.

23

1     Q     Okay.  You charged her fees?

2     A     No.  We didn't charge her -- it's a tip.

3  It's like a gratuity.  It keeps the place clean.  It

4  pays for fresh towels and soap and all the things that

5  the girls use.

6     Q     You --

7     A     It keeps the lights on.

8     Q     You set and control the Plaintiff's work

9  schedule?

10    A     No.

11    Q     So she could come in at any time?

12    A     That's why I said hundreds of girls because

13 100 girls could show up tonight if they wanted to.

14    Q     And you as the Defendant had ability to

15 discipline the Plaintiff by taking her off the

16 schedule?

17    A     Only if she was --

18    Q     Yes or no.

19    A     Say the question again.

20          MR. THEMELIS:  I'll object as to form.

21    Q     Did you have the ability to discipline the

24

1   Plaintiff by taking her off the schedule?  Either you

2   had the ability or you --

3         A     Yes.

4               MR. THEMELIS:  Well -- okay.  I'm sorry.

5         Q     Did you, the Defendant, set the club rules

6   and standards for who could and could not be hired to

7   work at Norma Jean's Nightclub?

8         A     As employees, as far as security and

9   bartenders, yes, but as far as contractors, it's by

10  State law.  So if you're eighteen and older.

11        Q     So anybody can be an exotic dancer?

12        A     If you're 18 and older and you're a female

13  and you have a positive attitude.

14        Q     So you did set the club standards?  You

15  just said, if you have a positive attitude.

16        A     And that's what we look for in regards to

17  the contract, a positive attitude.

18        Q     Okay.  So you set the club rules and

19  standards for who could and could not be hired and work

20  for Norma Jean's Nightclub?

21        A     Yes.

25

1      Q      Okay.  The Defendant -- you, the Defendant,
2  set a disciplinary schedule, which included firings for
3  violation of Norma Jean's Nightclub's rules?
4      A      No.
5      Q      So if someone arrives after 10:00 p.m.,
6  isn't there a $60 charge to work?
7      A      No.
8      Q      So no $60 charge?
9      A      No.
10     Q      What's the charge to work at the club?
11     A      It's -- there is no charge.  There's a tip
12  at the end of the night if you make $45 to pay to help
13  keep the place clean.  You know what I mean?  It helps
14  keep the lights on.
15     Q      So it's a tip-out?
16     A      Yeah.  It's a tip.
17     Q      For $40?
18     A      Forty-five dollars.
19     Q      Forty-five dollars.
20     A      Yeah.  It doesn't matter what time you get
21  there --

26

1                    MR. THEMELIS:  Pardon me.  You have to

2    listen to his question.  And if it's not consistent

3    with your knowledge, then correct it.

4                    THE WITNESS:  Okay.

5                    MR. THEMELIS:  Could you repeat that

6    question, please?

7    BY MR. WIGGS:

8         Q     So you required her to pay a $45 tip-out?

9         A     I didn't require it.

10        Q     What do you mean?

11        A     It's a tip, man.  It's gratuity.  They're

12   not required.  The customers are not required to pay

13   the girls tips for dances.

14        Q     So the dancers can come and work and then

15   not have to pay the $45?

16        A     They can leave and come back.  We don't

17   make the girls pay.

18        Q     So who set the $45 tip out?

19        A     That was just there when I got there.  It

20   was always $45.

21        Q     Who told you about it?

27

1        A      When I was hired.  The guy who trained me,

2   Mac.

3        Q      Okay.  So there's a $45 tip-out, but it's

4   optional?

5        A      Yeah, it's optional.

6        Q      So if they don't pay it then --

7        A      What you going to do?

8        Q      Do you keep records?

9        A      No.  You mean, records of what?

10       Q      Of the tip-out collected?

11       A      No.

12       Q      So who do they give it to?

13       A      There's a bartender, and she just, you

14   know, collects it, puts it in an envelope.  That's it.

15       Q      And she doesn't put who pays or anything?

16       A      No.

17       Q      So why would anybody pay?

18       A      They make lots of money.  They want the

19   place to stay open.

20       Q      So it's required?

21       A      No, it's not.

28

1       Q    You're saying they want the place to stay

2  open, and if they don't pay it, then the place won't

3  stay open.

4       A    I mean, I don't think so.  I think people

5  are going to pay.  It's fine.  We make our money off

6  liquor.

7       Q    So did you tell them that that was required

8  to keep the place open?

9       A    No.

10      Q    To keep the place running?

11      A    No.

12      Q    So then why would they pay it?

13      A    I don't know, man.

14      Q    You don't know why they would pay it?

15      A    I mean --

16      Q    You instructed them to pay it?  Someone

17  instructed them?

18      A    I tell people when they come in that if

19  they make their money, they can pay a $45 tip-out.

20  This is very common.  It's a maintenance fee.  We

21  explain that when the girls are hired.

29

1      Q     It's a maintenance fee?

2      A     Independent contractors.  When we contract

3   them --

4      Q     So it's a fee?

5      A     It's not a fee.  It a tip.

6      Q     You just said, it's a maintenance fee.

7      A     We call it a maintenance, but it's a tip.

8   We explain it to them when they start.

9      Q     Okay.

10      A     It's very important to explain it

11   correctly.  There's many times Miss Butler didn't pay

12   it.

13      Q     And you charged her; you told her she had

14   to pay extra?

15      A     No.

16      Q     The $45 maintenance fee doesn't double if

17   you don't pay?

18      A     No.

19      Q     The Plaintiff, Miss Butler, has not

20   invested money in Defendant, nor does Plaintiff hold a

21   membership or ownership interest in Norma Jean's

30

1  Nightclub?

2          A      I'm not -- let me understand the question

3  better, please.

4                  MR. THEMELIS:  I object.  It's also a

5  compound question.

6          Q      The Plaintiff has not invested money into

7  Norma Jean's Nightclub?

8          A      No.

9          Q      And the Plaintiff doesn't hold any

10  membership or ownership interest in Norma Jean's

11  Nightclub?

12          A      No.

13          Q      And the Plaintiff's earnings at Norma

14  Jean's Nightclub came only from her tips?

15          A      Yes.

16          Q      The Defendant is responsible for

17  advertising, location, business hours, maintenance of

18  facility, aesthetics, and inventory of beverages and

19  food?

20          A      Yes.  There's no food.

21          Q      You never sell food?

31

1        A       No.

2        Q       So basically, it's a bar?

3        A       Yeah.

4        Q       It's a bar, and then you have exotic
5   dancers?

6        A       It's -- yeah.  We're -- it's -- we have a
7   sports bar, basically, where there's dancers.

8        Q       Okay.  The ability of an exotic dancer to
9   entice her customers to give large tips is known in the
10  industry as hustling?

11       A       I don't understand.

12       Q       Are you familiar with the term "hustle"?

13       A       I've heard it used in illegal terms.  I
14  wouldn't use that for what they're doing.

15       Q       Okay.  You didn't -- the Defendant did not
16  provide Plaintiff with a W-2 or 1099 for tax year in --

17       A       No.  She was -- all the contractors are
18  explained that they have to file their own taxes and
19  are responsible for their own taxes when they're
20  contracted.

21       Q       So you didn't provide Plaintiff with W-2 or

32

1   1099 for tax year 2009?

2        A      No.

3        Q      You didn't provide Plaintiff with a W-2 or

4   a 1099 for tax year 2010?

5        A      No.

6        Q      You didn't provide Plaintiff with a W-2 or

7   1099 for tax year 2011?

8        A      No.

9        Q      You didn't provide the Plaintiff with a W-2

10  or 1099 for tax year 2012?

11       A      No.

12       Q      Okay.  The Plaintiff's income for Norma

13  Jean's Nightclub was based wholly on receipt of tips

14  from Defendant's customers, correct?

15       A      Yes.

16       Q      The Plaintiff was at all times wholly

17  dependent on Defendant to provide a facility and

18  amenities to be able to perform her job duties while

19  working at Norma Jean's Nightclub, correct?

20       A      Can you say that again?  I didn't

21  understand.

33

1        Q     At all times, the Plaintiff was wholly

2   dependent on the Defendant to provide a facility, as

3   well as amenities to perform her job duties while

4   working at Norma Jean's Nightclub?

5        A     Yes.

6        Q     Okay.  The Plaintiff's employment with

7   Defendant was dependent on Defendant's financial savvy

8   and business know-how to keep Defendant's business

9   financially sound so as to keep the doors open and

10  afford Plaintiff the opportunity to work at Norma

11  Jean's Nightclub?

12       A     Yes.

13       Q     Okay.  The Defendant did not require any

14  level of education or previous certification such as by

15  way of example completion of a pole dance class to work

16  at Norma Jean's Nightclub?

17       A     No skill was necessary.  No skill was

18  required.

19       Q     Okay.  The Plaintiff performed a duty that

20  is central and integral to Defendant's business,

21  correct?

34

1        A      Say that again.  I'm sorry.

2        Q      The Plaintiff performed a duty that is

3    central and integral to the Defendant's business,

4    correct?

5        A      Integral, meaning -- say that in another

6    word for integral again.

7        Q      Central and integral.

8        A      I don't understand what integral means.

9        Q      Meaning, it's an important part.

10       A      Important part?

11       Q      Important part of the business.

12       A      I mean, we don't --

13       Q      You said --

14       A      We don't make our money from --

15       Q      Well, you said you have dancers in the bar.

16       A      But see -- no.  Let me clarify it.  We

17   don't make our money from the dancers.  We make our

18   money from the pool tables.  We make our money from

19   sporting events.  We make our money from liquor.

20       Q      But the dancers are a draw, though,

21   correct?  They draw more customers than you would if

35

1  you didn't have them, correct?  That's why you have

2  them?

3        A     I mean -- yes.

4        Q     Okay.  So the Plaintiff performed a duty

5  that are central and integral to Defendant's business?

6        A     No.  It's not central.  It's not integral.

7        Q     Okay.  So if you --

8        A     We have --

9        Q     If you didn't have --

10        A     We would still be open.

11        Q     You would make the same amount of money?

12        A     Yes.

13        Q     You would make the same amount without

14  them?

15        A     Yes.

16        Q     So what's the purpose of having them?

17        A     Entertainment.  You know what I mean?  It's

18  fun.  It's extra.  I mean, why not.

19        Q     But earlier you said that it was an

20  important part.  So are you changing?

21        A     I'm not saying -- see, that's why -- this

36

1    integral word is the one word I'm having a problem

2    with.

3          Q     It's important to the business?

4          A     It's not important to the business.

5          Q     So now it's not important?

6          A     It's only -- it's only -- it's -- we only

7    make our money from the liquor and from the pool

8    tables.  If we didn't have dancers, we would still make

9    money.  You know what I mean?  It's not like we would

10   be -- our club doors would close down if there were no

11   dancers.

12         Q     Okay.  But you --

13         A     You know what I mean?

14         Q     Okay.  But you make more money; you use

15   them to make more money?

16         A     We use the TVs to make more money, too,

17   because they watch football games --

18         Q     So you use the dancers to make more money?

19         A     Yes.

20         Q     Okay.

21         A     But they're not the central reason why

37

1   we're at work.

2        Q     Okay.  The Defendant paid Plaintiff no

3   wages for her hours worked?

4        A     Say it again.  I'm sorry.

5        Q     The Defendant paid Plaintiff no wages for

6   her hours worked?

7        A     No.

8        Q     Plaintiff never signed a document

9   authorizing Defendant to take deductions for the cost

10  of Norma Jean's Nightclub, correct?

11       A     No.

12       Q     Defendant did not rely on any U.S.

13  Department of Labor opinion in your decision not to pay

14  Plaintiff wages as required by law?

15       A     I don't understand this question.

16       Q     You didn't rely on any cases or any laws or

17  opinions by the U.S. Department of Labor?

18       A     Not myself, no.

19       Q     Okay.  And Defendant did not rely on

20  Maryland Department of Labor opinion in your decision

21  not to pay Plaintiff wages as required by law, correct?

38

```
 1        A      Say that again.  I'm sorry.

 2        Q      You did not rely on any Maryland Department

 3   of Labor opinion?  The last question was U.S.  This one

 4   is Maryland.

 5        A      Okay.

 6        Q      In your decision not to pay wages as

 7   required --

 8        A      No, not myself personally.

 9        Q      Okay.  And Defendant did not rely on any

10   Fourth Circuit Court opinion in your decision not to

11   pay Plaintiff wages as required by law, correct?

12        A      (Nodding head.)

13        Q      Okay.  Defendant did not rely on any

14   Maryland Court opinion in your decision not to pay

15   Plaintiff wages as required by law?

16        A      No.

17        Q      Defendant cannot produce any document or

18   evidence that it relied on any legal opinion,

19   Department of Labor opinion, or other written guidance

20   to mitigate its failure to pay wages as required by

21   law?
```

39

1          You can't rely on any legal authority or

2     opinion, any Department of Labor opinion, or other

3     written guidance to mitigate its failure to pay -- your

4     failure to pay wages as required by law?

5          A     No.

6          Q     Okay.  And Defendant made over $500,000 in

7     gross revenue in 2009?

8          A     The Defendant?  What did you say?  I'm

9     sorry.

10          Q     The Defendant, meaning Norma Jean's

11     Nightclub, made over $500,000 gross revenue in 2009?

12          A     I wouldn't know.

13          Q     Are you familiar with the gross revenue for

14     2010?

15          A     No.

16          Q     Okay.  Miss Butler never authorized in

17     writing for the Defendant to make deductions from her

18     wages?

19          A     No.

20          Q     Okay.  The Defendant made deductions from

21     Plaintiff's pay by way of charges, fees, and fines

40

1  mandated by Defendant to be paid by Plaintiff to the

2  Defendant?

3          A     No.

4          Q     Defendant made deductions from Plaintiff's

5  pay by way of charges mandated by Defendant to be paid

6  by Plaintiff to Defendant?

7          A     No.

8                MR. THEMELIS:  I can't hear you.

9                Can you hear him?

10                THE COURT REPORTER:  Yes.  It could be a

11  little louder.

12                MR. THEMELIS:  Okay.  I'm having difficulty

13  hearing you down here.

14                THE WITNESS:  Okay.

15  BY MR. WIGGS:

16          Q     The Defendant made deductions from

17  Plaintiff's pay by way of fines mandated by Defendant

18  to be paid be Plaintiff to Defendant?

19          A     No.

20          Q     The Defendant made deductions from

21  Plaintiff's wages without written permission from

41

1   Plaintiff?

2        A      No.

3        Q      Defendant has a significant role in drawing

4   customers to its nightclub?

5        A      Yes.

6               MR. THEMELIS:  Could you repeat the

7   question, please?

8        Q      The Defendant has a significant role in

9   drawing customers to its nightclub?

10              LISA IRELAND:  Defendant, meaning me?

11       A      Yes.

12              MR. THEMELIS:  What was your answer?

13              THE WITNESS:  No -- yes.  Yes, they do.

14       Q      Defendant Norma Jean's Nightclub never

15   provided Plaintiff with a W-2 or a 1099 reflecting the

16   cost of Norma Jean's Nightclub?

17              MR. THEMELIS:  Objection.  Asked and

18   answered.  You can answer.

19       A      No, we did not.

20       Q      Okay.  The Plaintiff never signed a

21   document authorizing the Defendant to take deductions

42

1   for the cost of Norma Jean's Nightclub?

2       A       No.

3       Q       Defendant is responsible for advertising

4   for Norma Jean's Nightclub?

5       A       I'm sorry.  Say that again.

6       Q       The Defendant, you guys, are responsible

7   for advertising?

8       A       Yes.

9       Q       Okay.  Defendant is responsible for the

10  location and business hours of Norma Jean's Nightclub?

11      A       Yes.

12      Q       Defendant is responsible for maintenance of

13  facilities, aesthetics, and inventory of beverages and

14  food for Norma Jean's Nightclub?

15      A       Yes, excluding food.

16      Q       And that the Federal Fair Labor Standards

17  Act 29 U.S.C. establishes the relevant statute of

18  limitations for access under the FLSA as follow:  Any

19  action commenced on or after May 14, 1947 to enforce

20  any cause of action for unpaid minimum wages, unpaid

21  overtime compensation, or liquidated damages under the

43

1   Fair Labor Standards Act of 1938 as amended, the Walsh

2   Healey Act or the Bacon Davis Act, if the cause of

3   action accrues on or after May 14, 1947 may be

4   commenced within two years after the cause of action

5   accrued, except that a cause of action arising out of a

6   willful violation may be commenced within three years

7   of the cause of action.  Correct?

8       A    Yes.

9       Q    That claims -- under the Maryland Wage

10  Payment and Collection Law, claims are governed by

11  Maryland general three-year statute of limitations,

12  correct?

13      A    I mean, I don't really know.

14      Q    You said that the dancers have a choice to

15  be independent contractors or employees.

16      A    Yeah.  We give girls an opportunity to --

17  you know, to prove income, but the girls make very -- a

18  whole lot of money.  Most chose not to.

19      Q    So you give them a choice?

20      A    Yeah.  We give them a choice.

21      Q    And was that -- did you start giving them a

44

1  choice after my client filed a lawsuit?

2        A     No.  It's been going on a long time.

3        Q     What was the date?

4        A     I don't know the date.

5        Q     Okay.

6        A     But this is many --

7        Q     Do you have any documents stating this?

8        A     A date?  I don't have a date.

9        Q     Well, I mean, do you have any documents --

10       A     It was after -- many, many clubs had

11  lawsuits like years ago.  You know what I mean?  This

12  is something that changed across --

13       Q     So are you -- but you're not familiar of

14  the date when you guys started?

15       A     No, I'm not.  I mean, like it would be a

16  while before, you know, she was gone.

17       Q     Do you have any documents stating it, that

18  you give options to dancers?

19       A     Yes.

20       Q     Do you have that with you?

21       A     Not with me.

45

1             MR. THEMELIS:  I'm going to be --

2             MR. WIGGS:  Okay.

3   BY MR. WIGGS:

4       Q     And what document do you have that is

5   signed by my client that informs her you will be taking

6   tip credit and paying her tip wages?

7       A     What she signed was independent contract.

8   The basis says that she is not going to get a W-2;

9   she's responsible for her own taxes.  That's what she

10  signed.

11      Q     No.  But I'm saying, you don't have a

12  document signed by her saying that you're going to be

13  paying her tip wages and informing her that she --

14      A     No.  We did not.

15      Q     Okay.  And you don't have a sign-in and

16  sign-out sheet that shows that she's worked?

17      A     No.  Girls come and go as they please.

18      Q     So you don't keep track of the number of

19  hours they work?

20      A     No.

21      Q     Okay.

46

1        A      It's up to them.

2        Q      And where are their work schedules?

3        A      We don't have work schedules for

4    contractors.

5        Q      You have work schedules for employees?

6        A      Yes.

7        Q      Okay.

8        A      You have to be there at a certain time,

9    have a uniform.

10       Q      All right.  So how many of your dancers are

11   considered employees?

12       A      None have -- none chose to be employees so

13   far.

14       Q      So you don't have any schedule or anything

15   showing the number of hours or what day she worked in

16   2009?

17       A      They're completely -- you know, if they're

18   independent contractors --

19       Q      You can answer the question yes or no.

20       A      No.

21       Q      What about for 2010?

47

1        A      No.

2        Q      What about for 2011?

3        A      No.

4        Q      What about for 2012?

5        A      No.

6        Q      What about sheets for fines?

7        A      No.

8        Q      What about sheets for tip-outs or tip-ins?

9        A      No.

10        Q      So you're saying that none of the dancers

11   have chosen to be employees?

12        A      To date, no.

13        Q      Okay.

14        A      But they can choose at any time, you know.

15   They can change their minds at any time if they choose.

16        Q      So I have the 2010 tax return.  So you

17   can't show me where tip credit was taken?

18        A      Whose tax return is that?

19        Q      This is for the business.  The corporate.

20        A      I don't understand the question.

21        Q      The corporate tax return.

48

1        A       Um-hum.

2        Q       You wouldn't be able to show me where the

3   tip credit was taken because none of them are

4   employees?

5        A       Yeah.  No, I wouldn't be able to show you.

6        Q       All right.

7        A       But I have receipts for cleaning people,

8   the people that clean the carpets each month, the soap,

9   the towels.

10       Q       Okay.  And -- so when you give them an

11  option of becoming an employee, they pay $5 tip-in or

12  tip-out?

13       A       Yeah.  Employees pay like an association

14  fee.  We all -- you just pay like $5.

15       Q       So they pay $5, and then they also get paid

16  minimum wage?

17       A       Yes.

18       Q       And get a tip credit?

19       A       Yes.

20       Q       And who are employees?

21       A       Security.  Bartenders.

49

1          Q      Okay.

2          A      Management.

3          Q      So their tip credit would be on their

4     taxes?

5          A      But we don't get tips.  We make our money

6     from the club.  We don't get tips.  So I don't

7     understand your question.

8          Q      What about the bartenders?  Are they

9     employees?

10         A      Yeah.  They're employees.  But they're

11    responsible for doing their -- for adding their tips.

12         Q      So can you show me where the tip credit is?

13                MR. THEMELIS:  Have you ever seen them

14    (indicating) before?

15                THE WITNESS:  What's that?

16                MR. WIGGS:  The tax returns.

17                THE WITNESS:  No, I've never seen this.

18                MR. WIGGS:  Okay.

19                LISA IRELAND:  He's not familiar.

20                MR. WIGGS:  Are you the one that's

21    familiar?

50

1              LISA IRELAND:  My bookkeeper is.  I have a
2    bookkeeper.
3              THE WITNESS:  I'm the micromanager of the
4    place.  I don't do the taxes.
5              MR. WIGGS:  So who signs off on this?  Is
6    it you sign off on them?
7              LISA IRELAND:  I sign the tax document,
8    yes.
9              MR. WIGGS:  Okay.
10   BY MR. WIGGS:
11       Q    So what's the 35 -- what's the $40
12   difference between -- why is that, the $40 difference
13   between the independent contractor and employee?
14       A    I don't know.
15       Q    You don't know?
16       A    It was like that when I started.
17       Q    Okay.
18              MR. THEMELIS:  Sir, I can't hear you.
19   Please keep your voice up.
20              THE WITNESS:  Sorry.
21   BY MR. WIGGS:

51

1        Q      Okay.  What are the lap dance fees paid by?

2        A      I don't understand.  Lap dance fees.  Fees?

3        Q      Yeah.

4        A      Would be -- she'd be paying fees to the

5   club?

6        Q      Yeah.

7        A      No.

8        Q      What are the rules that she must follow?

9        A      The Maryland State Liquor Board and Adult

10   Entertainment laws.

11        Q      How much does she have to pay the DJ?

12        A      As much as she likes.

13        Q      Did you institute a dress code?

14        A      No.

15        Q      And then, why was -- you said that she was

16   suspended for 30 days because of the fight?

17        A      The -- and also some -- like some other

18   behavioral issues prior to this.

19        Q      All right.

20        A      There was only -- it was a two-week --

21        Q      She was assaulted, though, in a fight,

52

1   correct?

2         A      They were both fighting each other.

3         Q      You didn't see the fight?

4         A      Yeah, I did.

5         Q      From the beginning?

6         A      Not -- yeah, actually.  Not the -- not

7   the -- when they were throwing the glasses at each

8   other, the glass was all over the floor already.  But

9   both girls were bloody.  Both girls were --

10        Q      So did you see who started the fight?

11        A      I saw the argument start initially on the

12   floor with the customer.

13        Q      You didn't see who threw the first punch?

14        A      No.  But when I got back to the dressing

15   room, they were both punching each other.

16        Q      Right.  So it's possible she was defending

17   herself?

18        A      It's possible.

19        Q      And you said that -- I forget.  Who

20   contacted you about the meeting with her?

21        A      Lisa.

53

1      Q     Lisa.  And what did she say exactly?

2      A     She just said that, you know, she might

3   need me to go to this place called Windsor Inn to

4   explain to Unique Butler that she could come back to

5   work.  That's all.

6      Q     All right.

7      A     That she must be misunderstanding, you

8   know.

9      Q     Is that normal for you to meet with prior

10  employees --

11     A     I mean, I think -- I think it was already

12  after the fact that we knew it was a case or something.

13  You know what I mean?  She obviously thought she was

14  being taken advantage of or something.

15     Q     Okay.

16     A     And that's not true.

17     Q     So basically, they wanted you to kind of

18  smooth things out?

19     A     I mean, no.  No.  No.  I was under the

20  understanding that she wanted to come back to work.

21  You know what I mean?

54

1        Q     Oh, you were understanding she wanted to
2   come back to work?
3        A     Yeah.  That was what I was under the
4   impression.
5        Q     And she had your contact information,
6   correct?
7        A     I mean, it's easy to get.
8        Q     Right.  She didn't call you and say she
9   wanted to come back, right?
10        A     No.
11        Q     And you said she never called you --
12        A     Not that I --
13        Q     -- about coming back?
14        A     No.
15        Q     And you never met with her at the Windsor
16   Inn?
17        A     No.
18        Q     Okay.  Did they tell you why?
19        A     No.  Just -- they just told me it wasn't
20   going to happen.  It fell through.
21               MR. WIGGS:  I think that's it.

55

1                    MR. THEMELIS:  Okay.

2                    MR. WIGGS:  She (indicating) can answer all

3     the questions?

4                    MR. THEMELIS:  Well, what I'm going to do

5     is I want to see how many of the remainder -- I was

6     keeping track of what he answered.

7                    MR. WIGGS:  Okay.

8                    MR. THEMELIS:  And I'm going to try and get

9     them in to really save time.

10                   EXAMINATION BY MR. THEMELIS:

11        Q      Mr. Robinson --

12        A      Yes.

13        Q      -- when patrons want a lap dance, who sets

14    the amount to be paid?

15        A      The dancer.

16        Q      Okay.  Is there a minimum amount -- I'm

17    sorry.  Strike that.

18               Is there an amount that is suggested?

19        A      Yeah.  By -- you know, we -- most girls use

20    like a $20 per song, you know, based on -- this way,

21    you know, one girl is not charging a different price

56

1    than another girl.  But that's strictly up to them.

2                Girls can charge what they like.  It's

3    not -- you know, they can charge a dollar for a dance

4    if they choose.

5         Q    Now, the money that is obtained as a result

6    of a lap dance, who keeps that money?

7         A    Lap dances, like we have a day shift where

8    the bartender is -- holds the money and then gives it

9    back to the girl.

10        Q    Okay.  Now, Miss Butler --

11        A    So nighttime, a girl --

12        Q    Now nighttime.

13        A    Yeah.  The nighttime girls keep their money

14   themselves.

15        Q    Okay.  Now, when the bartender holds it for

16   the day independent contractors, is that money -- what

17   happens to that money?

18        A    It's given directly back to them.

19        Q    Okay.  And is it kept or segregated from

20   all the other money?

21        A    Yeah.  The money that we -- for alcohol

57

1   sales, yes.  Definitely.

2        Q     And when is it paid to the independent

3   contractor?

4        A     When they're ready to leave.  Whenever

5   they're ready to leave for the day or night.

6        Q     Okay.  Now, you had referred to -- a

7   tip-out and a tip-in was used.

8              Now, give me your definition of what a

9   tip-in is.

10       A     In this industry, a tip-in is supposedly if

11  they make the girls pay a fee to work before they work.

12       Q     Okay.  And does PP&G require a fee to be

13  paid -- strike that.

14             Do you require a fee as general manager for

15  the independent contractors?

16       A     With a tip-in?

17       Q     That's essentially a tip-in?

18       A     No.  No.  Because if they don't make any

19  money, we can't -- you know what I mean?  It's based on

20  how well --

21       Q     Well, have you ever gotten a tip-in from

58

1  anybody?

2       A     I mean, girls have done it just because

3  they wanted to, but it's not required in any way.

4       Q     Now, explain that to me.

5       A     Like, a girl who might, you know -- say,

6  she comes in and she, you know, knows she wants to --

7  you know, I mean if she wants to just pay it in, she

8  can.  It's up to them.

9       Q     What do you mean, if she wants to pay in?

10  Who wants to pay in to go to work?

11       A     Yeah.  I mean, we don't -- we don't --

12       Q     What I asked you was:  Do you know of an

13  instance where somebody did that while you were manager

14  at PP&G?

15       A     I can't -- I mean, I can't -- I -- I -- I

16  couldn't tell you an instance, no.

17       Q     Okay.  Now, give me your definition of what

18  a payout, a tip payout is.

19       A     Usually, clubs will ask you to pay a fee,

20  and on your way out you pay this fee.

21       Q     Okay.  Now, what you referred to a

59

1    maintenance fee, define what that is related to.  In

2    other words -- strike that.

3              Explain where that money goes.

4         A    Okay.  Basically, it pays to clean the

5    carpets, to re-stock soap and toilet tissue, paper

6    towels, toiletries, lady products, ice machines,

7    maintenance on repairing, you know, everything.

8         Q    Okay.  So would you classify -- it is

9    better classified as a cleaning fee?

10        A    Yeah.  Cleaning fee.

11        Q    Uh-huh.  And has that money ever been used

12   for maintenance of the premises as opposed to cleaning?

13        A    Oh, no.  Yeah, I understand what you're

14   saying.  Yeah.  It's just for cleaning.  You know what

15   I mean?  Sweeping.  Making sure that they have clean

16   lockers.  Safe place to be.

17        Q    Okay.  But according to the definition you

18   gave us, is that a tip payout or not?

19        A    It's just -- you know, some clubs are

20   mandatory.

21        Q    Okay.  I don't give a darn about any other

60

1  club.

2       A     Okay.

3       Q     We're talking about this club that you

4  manage.

5       A     It's not mandatory, but, yes, girls tip

6  out.

7       Q     Okay.  Now, what did you tell me a minute

8  ago that a tip payout was?

9       A     A maintenance fee.

10       Q     Okay.  So you're relating that term not to

11  a mandatory fee --

12       A     No.

13       Q     -- is that correct?

14       A     No, it's not mandatory.

15       Q     But you're referring it to, quote,

16  maintenance fee, end quote, which is better described

17  as a, quote, cleaning fee?

18       A     Cleaning fee.

19       Q     Okay.  And is that -- does the entertainer

20  get full benefit with regard to towels and --

21       A     Clean showers.

61

1      Q      -- clean showers?

2      A      Towels.  Fresh soap.  Everything, yeah, for

3   the dancers.

4      Q      Okay.  So it's used for keeping the

5   premises clean with regard to the entertainers?  Is

6   that correct?

7      A      Yeah.  Dressing room.

8      Q      But also the general area, too?

9      A      Yeah.

10     Q      Is that right?

11     A      Everywhere.  Yeah.  We have to clean

12   everything.

13            MR. THEMELIS:  Now, sir, I do not have the

14   cover to this (indicating), but it was previously

15   supplied in documents, but I've got a copy for you in

16   case you didn't get it.

17            MR. WIGGS:  Okay.

18   BY MR. THEMELIS:

19     Q      Now, sir, do you recognize what that

20   document is?

21     A      Yes.

62

1        Q     What is it?

2        A     This is the Adult Entertainment License and

3   Laws and Rules.

4        Q     Okay.  And who is that issued by?

5        A     The State or City.  State.

6        Q     What agency?

7        A     This is the Adult Entertainment.

8        Q     It's the Liquor Board, right?

9        A     Liquor Board, yeah.

10        Q     Now, could I refer your attention to page 3

11   of that package?

12        A     Okay.

13        Q     And when it defines "dancer" under (b)(1),

14   small A, could you read that to us?

15        A     (Reading:) Dancer includes any hostess,

16   entertainer, bartender, or patron who appears nude or

17   partially nude.

18        Q     Could you read that again, please?

19        A     Yes.  (Reading:)  A dancer includes any

20   hostess, entertainer, bartender, or patron who appears

21   nude or partially nude.

63

1          Q     Okay.  What --

2          A     Are you saying A?  I thought you said B.

3          Q     I'm sorry.  It was A.

4          A     Okay.  (Reading:)  Dancer means any person

5     who, whether as an employee, an independent contractor,

6     or an invitee of the business provides adult

7     entertainment.

8          Q     Okay.  And had you had the opportunity to

9     review that?

10         A     Yeah.  We have this in my office.

11         Q     Um-hum.  And do you know if this was in

12    effect while you were trained by MacMillion?

13         A     Yeah.  Yes, it was.

14         Q     Okay.

15               MR. THEMELIS:  I'll mark this as an

16    exhibit.  I guess Defendant's 1.

17               Before I introduce it, do you want the

18    opportunity to cross-examine?

19               EXAMINATION BY MR. WIGGS:

20         Q     When you said it had been in effect, what

21    do you mean, it had been in effect?

64

1          A     Like the liquor license, you know, has us

2     follow these rules.  So these rules were in effect.

3     Everything in this book was in effect on how we conduct

4     business.

5          Q     So do you know what year that was?

6          A     That was almost six years ago.

7          Q     Okay.  And are you familiar with the case

8     law that's come out in the past three years, within the

9     past three years about dancers?

10         A     Could you -- I don't know what you mean.

11         Q     About them not being independent

12    contractors.

13         A     I've heard of lawsuits against other

14    states, but our business is very different than a lot

15    of these types of adult businesses that I've read in

16    these cases.

17         Q     You've read the cases?

18         A     I've seen like news reports about them.  I

19    haven't read the cases.

20         Q     Okay.

21               MR. WIGGS:  It's okay if you want to admit

65

1    it.

2             MR. THEMELIS:  Okay.  I'll mark it as

3    Defendant's 1.

4             (Defendant's Exhibit 1 was marked for

5    identification.)

6             EXAMINATION BY MR. THEMELIS:

7        Q    Do you recognize this?

8        A    (Looking at document.)

9        Q    Now, Walt, do you know what that is?

10       A    Yes.

11       Q    Okay.  What is it?

12       A    This is the Entertainer Contract Agreement

13   that we have girls sign.

14       Q    Okay.

15       A    Told them -- you know, we'd have dancers

16   sign this while we explained, you know, what they're

17   doing, about the laws, and everything else.

18       Q    Okay.  And was this part of your business

19   records?

20       A    Yes.

21       Q    The original?

66

1        A     Yes.

2        Q     Okay.

3              MR. THEMELIS:  Mr. Wiggs, what I'm going to

4    do is probably introduce that one.  So I'll give you

5    this.  That's probably a better copy.

6              Do you want to cross?

7              EXAMINATION BY MR. WIGGS:

8        Q     Did you have her sign this?

9        A     Yes.

10       Q     You saw her sign that document?

11       A     Um-hum.

12       Q     How do you know?

13       A     What's that?

14       Q     How do you recall that?

15       A     Because I was there in the room.

16       Q     Where did she sign the document?

17       A     In the office.

18       Q     You weren't a manager back then, were you,

19   in 2010?

20       A     Yes.  Yes.

21       Q     So you were a manager and you did security?

1        A     Um-hum.  I still do security.

2              MR. WIGGS:  Okay.  That's fine.

3              MR. THEMELIS:  All right, sir.

4              I'll introduce this as Defense 1 for

5    Deposition of Walter Robinson.  Defense 2.  I'm sorry.

6              (Defendant's Exhibit 2 was marked for

7    identification.)

8              MR. WIGGS:  Oh --

9              MR. THEMELIS:  Go ahead.

10   BY MR. WIGGS:

11       Q     Are you familiar with Mr. Blunt, Anthony

12   Blunt?

13       A     No.

14       Q     Okay.

15       A     Anthony Blunt?

16       Q     Wasn't he employed at the Norma Jean's

17   Nightclub?

18       A     I don't know who you mean.

19       Q     So you were the only manager at the --

20       A     Yes.  I was hired as a manager.

21       Q     But you were the only one?  You never

68

1  worked with a Mr. Blunt?

2       A    No, I never worked with Mr. Blunt.

3       Q    You never had a supervisor named Mr. Blunt?

4       A    No.

5       Q    Mr. Blunt never fired you before?

6       A    No.

7       Q    Okay.  All right.

8       A    Lisa is the only person that can fire me.

9       Q    Okay.  Lisa.

10      A    She's my only supervisor.  And since Mac

11  passed, you know, I have no other supervisor.

12           MR. THEMELIS:  Do you want me to finish?

13           MR. WIGGS:  I'm sorry.

14           EXAMINATION BY MR. THEMELIS:

15      Q    Now, sir, with regard to Plaintiff's -- the

16  hours that she worked, what governed that?

17      A    Her own will.  Whatever she decided.

18      Q    So she could come in and leave on any day

19  and at any time she wished?

20      A    Exactly.

21      Q    Okay.  Now, were there any fines whatsoever

69

1   that were charged to or paid by the Plaintiff?

2        A     No.

3        Q     Now, who, if anyone, established the work

4   schedule for the entertainers?

5        A     It's completely up to them.

6        Q     Okay.  Now, what rules are the entertainers

7   required to obey?

8        A     Only the State Liquor Board, like the laws

9   you just showed me, the rules in the Liquor Board and

10  Adult Entertainment Licensing and the State laws and

11  Federal laws.

12       Q     With respect to what?

13       A     That's it.

14       Q     Criminal law?

15       A     Yeah.  I mean, yeah, any law.

16       Q     Okay.  Now, could they work at any time?

17             MR. THEMELIS:  I'm just trying to make sure

18  I get all of them.  So I'm going down.

19  BY MR. THEMELIS:

20       Q     Could they work at any time that they

21  desired to work?

70

1      A      Yes.

2      Q      I'm sorry.  I should say:  Did they

3   entertain as an independent contractor whenever they

4   wished to come in and leave when they wanted?

5      A      Once they were contracted, there's no

6   limitation on when they could come or go or anything

7   like that.

8      Q      Um-hum.  Now, with regard to the -- who was

9   required to dance?

10     A      No one.

11     Q      Okay.  Those that were required to dance,

12   what interaction did they have with the DJ?

13     A      I mean the girls that danced -- I mean,

14   they could -- I mean, if they -- they could tip the DJ

15   if they wanted to tip the DJ, just like they could tip

16   the bartenders if they liked their drink.

17     Q      Now, if they didn't tip the DJ, were the

18   songs that were required by the independent contractor

19   still played?

20     A      Oh, yeah.  Just like drinks still get

21   served, even if you don't tip the bartender.

71

1        Q      Um-hum.  Now, who makes the music selection

2   for the entertainers?

3        A      The dancers themselves select the music.

4        Q      Okay.  Is there any type of dress code

5   required while the entertainers are engaged as

6   independent contractor at the club?

7        A      No.  No.  We often joke about how girls

8   have worn fur coats on stage.  They can wear whatever

9   they like.  They can wear a raincoat, if they like.

10       Q      And it's your testimony that there were no

11  fines whatsoever; is --

12       A      No fines.

13       Q      -- that correct?

14       A      No fines whatsoever.

15       Q      Now, when you were hired, what did Lisa

16  tell you?

17       A      She just told me that my job was there to

18  make sure that the laws were obeyed and that, you

19  know -- as far as entertainers are concerned.

20       Q      Um-hum.  And did she say you were

21  completely in charge?

72

1    A    Pretty much, yeah.

2    Q    And were there any instances when Lisa

3  Ireland said to change policy in any way?

4    A    No.  I mean, it's pretty much been the same

5  since I started.

6    Q    Okay.  So she never made any to you; is

7  that right?

8    A    No.  Not change of policy, no.

9    Q    Okay.  Did she ever direct that only

10  certain types of people be engaged as entertainers?

11    A    I mean, no.  We have all shapes and sizes,

12  ages, and types of people.

13    Q    And what was the paramount issue used in

14  your determination to hire an independent contractor?

15    A    Well, when I contract dancers, I'm mostly

16  looking for attitude.  You know, positive attitude.

17  You know what I mean?  Someone who makes you feel

18  comfortable.  Just like, you know -- that's all.

19    Q    Now, with respect to the firing of

20  employees, who is the person who does that?

21    A    I would be the person to fire employees.

73

1        Q      Um-hum.  Employees.

2               Now, how about with regard to entertainers,

3   what do you do?

4        A      We usually just suspend their contract,

5   depending on, you know, how long, you know.

6        Q      Have there been other instances where you

7   suspended a contract and took the person back?

8        A      Yeah.  Every time.

9        Q      Okay.  Now, the Defendant, PP&G, Inc., was

10  solely responsible for any investments in the business;

11  is that correct?

12       A      Correct.

13       Q      Did the entertainers as independent

14  contractors share in the profits of --

15       A      Say that one more time.  I'm sorry.

16       Q      Yes, sir.  As entertainers who were

17  independent contractors, did they share in the profits

18  of the business?

19       A      No.

20       Q      Now, the entertainer's role in the

21  Defendant's business was what?

74

1          A     The entertainer's rule in the business?  I
2    mean, other than the -- there's no other than the
3    State.  You know, that was the rule.
4          Q     Okay.  So as long as they followed.
5                Were all of the tips that an entertainer
6    who's an independent contractor gets whether it's
7    dancing or as a lap dance --
8          A     Yeah.
9          Q     -- or a drink --
10         A     Yeah.  They received the totality of all
11   the money they collect.
12         Q     Okay.  Now, with regard to the role of all
13   the entertainers, are there any of them who have
14   elected to be -- to receive wages?
15         A     To date, none.
16         Q     Okay.  How about if they wanted to move on?
17   Because none of us retain --
18         A     If anybody chooses to change their mind,
19   they're free to do so.
20         Q     Okay.  And has that happened with regard to
21   a bartender?

75

1        A      Yes.

2        Q      Um-hum.  Now, with regard to the lap

3  dances, is there any limit set by the business or you

4  on how many lap dances an entertainer can do?

5        A      There's no limitation on how many lap

6  dances or songs or anything like that.

7        Q      Um-hum.  And why did you meet with Mac,

8  Mr. MacMillion, before assuming the role of general

9  manager?

10        A      Why did I?

11        Q      Yes.

12        A      Basically, just to get me ready so that I

13  would do things the right way, you know.

14        Q      Okay.

15        A      You know, I would be in control of a lot.

16  So it was important to know the details of how to do it

17  the right way.

18        Q      And how long did he work with you?

19        A      Over six months, under a year.  It could

20  have been like eight to ten months.

21        Q      And did Miss Ireland tell you that you

1  would be completely and 100 percent in charge of what

2  happens --

3         A     Yes.

4         Q     -- in the club?

5         A     Um-hum.

6         Q     And you were supposed to learn your

7  responsibilities from Mac --

8         A     Yes.

9         Q     -- when you were hired?

10        A     That's true.

11        Q     Now, is it correct or incorrect that since

12  you became the manager of the club, general manager,

13  that you hired and suspended the contracts of

14  entertainers?

15        A     Yes.

16              MR. THEMELIS:  Did I miss anything on that

17  sheet?  I'm trying not to.

18              MR. WIGGS:  Liquor sales.

19  BY MR. THEMELIS:

20        Q     Are you familiar at all with -- you don't

21  sell food, right?

77

1        A       No.

2        Q       Are you familiar with the sale of alcohol

3    or the volume of alcohol sold on any particular day at

4    any particular week?

5        A       There's a lot of alcohol.  We sell a lot of

6    alcohol.  That's our primary source of income for the

7    business.

8        Q       Okay.

9        A       I mean, I wouldn't be able to give you an

10   amount of bottles, but, you know, we -- you know, I

11   have receipts and invoices of how much we go through in

12   a month.

13       Q       Now, earlier you had indicated that there

14   were other reasons why you had suspended the

15   Plaintiff's contract.

16               Could you share those other reasons with

17   us?

18       A       You mean Unique Butler's?

19       Q       Yes.  She's the Plaintiff.

20       A       Yeah.  She had a -- there were these --

21   sometimes these girls will -- you know, it's like, you

78

1    know, they'll get jealous of each other.  They'll get

2    angry at each other.  They're women.  You know what I

3    mean?  Sometimes they can act immature.

4              Sometimes the girls will have these, you

5    know, back and forth, you know, arguments or fights

6    that will last, you know, weeks and weeks and weeks.

7              And what is was is just when girls start to

8    have this negativity that's following with them every

9    time they come into work, you know what I mean,

10   sometimes they need some time to get whatever is right

11   so when they come back, they come back fresh.

12             So like when she was suspended, she had

13   already been involved with a bunch of, you know,

14   behavioral issues.

15             So, you know, instead of a normal two-week

16   suspension that we usually give, you know, verbatim no

17   matter what, you know, if there's a fight, usually just

18   do a two-week suspension.  She was given a month to,

19   you know, cool off.

20        Q    Now, sir, while they are -- the

21   entertainers or independent contractors with PP&G Inc,

79

1   are they allowed to work elsewhere whenever they want?

2        A    Yes.  They do all the time.

3        Q    Were any schedules retained obliging the

4   entertainers to work on certain days and certain times?

5        A    No.

6        Q    Were there any penalties imposed or any

7   fines or anything that was done if someone did not come

8   in for a period of time?

9        A    No.

10       Q    Now, when you answered that the

11  entertainers that you hired were all ages, body types,

12  and races, was it your testimony that the significant

13  part was personality and people?

14       A    Yeah.  Those -- yeah.  People skills is the

15  main -- you know, that's what we hire people based on.

16       Q    Um-hum.

17       A    It's not even the main -- it's the only --

18  because that's how we keep people entertained, is

19  positivity, nice attitude.

20       Q    Okay.  Now, when you testified you didn't

21  rely on any laws of the State or U.S. Department of

80

1   Labor, do you even know how to look that up?

2        A     I guess on the Internet.  I mean -- but I

3   don't have that stuff at my fingertips.

4        Q     Okay.

5        A     I can look it up, you know, on my phone.

6        Q     How about the cases that counsel referred

7   to?

8        A     You know, if I really, you know, worked

9   hard, I'm sure I could -- you know, if it's public

10  record, you know, I could find out.

11       Q     Okay.  But what if they weren't public

12  record?

13       A     If they weren't public record, then I

14  wouldn't be able to get it.

15       Q     Let me rephrase that because that's not

16  really accurate.  If they're public records, but a fee

17  was required to retrieve them?

18       A     Yeah.  Then that would be a complication.

19       Q     Okay.  Did you during your tenure rely on

20  that Liquor Board handout while you were being trained

21  by Mac?

81

1        A     Yes.  Like I said, I carried it around with

2   me quite a while.

3        Q     Okay.  And did you ever ask the Liquor

4   Board about the independent contractor language?

5        A     I didn't ask them, but we've had -- you

6   know, we've had no -- no one's ever had a problem with

7   it before.

8        Q     Okay.  Now, does the club require any

9   entertainer to share the tips while doing lap dances?

10       A     No.

11       Q     Does PP&G require any payment of the fee

12   charged for a lap dance from the independent

13   contractor, from the entertainer?

14       A     No.  No fee.  No fees, no.

15       Q     Now, how about with drinks at the bar?

16       A     Yeah.  All the money is given directly back

17   to the girl when she chooses to leave.

18       Q     So if a patron wanted to buy a drink for an

19   entertainer, what portion of that drink would be paid

20   to the entertainer?

21       A     We have a $20 lady's drink.  It's explained

82

1    to the girls when they're contracting.  What this is is

2    like instead of, you know, just dancing for the

3    customer, he might just want to talk to you some more

4    as a friend, you know.

5              So what we have is we have something called

6    a lady's drink.  It's a $20 drink.  Twenty dollars goes

7    back to the entertainer.  If this girl is 21 and older

8    and wants alcohol in her drink, then the customer can

9    buy her a $7 shot.

10             That's out price for the alcohol because

11   that's where we make our money is from the alcohol.

12        Q    And does the entertainer have anything --

13   any retention over that alcohol portion?

14        A    No.  No.  She gets her $20 for her

15   conversation.

16        Q    Um-hum.  Is there any mandatory dress code

17   for anything with regard to an entertainer?

18        A    Not with entertainers, no.

19        Q    Um-hum.

20             MR. THEMELIS:  I think that's all my cross.

21             EXAMINATION BY MR. WIGGS:

83

1        Q      Just briefly, you said that the dancers can
2    wear whatever they want?
3        A      Um-hum.
4        Q      So a dancer can wear a suit or anything?
5        A      Yeah.
6        Q      Isn't it a semi-nude to nude place?
7        A      Yeah.  We have girls that don't show
8    anything, just dance and entertain.
9        Q      And you said you have televisions and pool
10   tables in there, as well?
11       A      Yeah.
12       Q      And you keep those up-to-date?
13       A      We have 3D televisions.  It's quite a draw.
14   We have like sporting events.  You know what I mean?
15   We have 3D televisions.
16       Q      So you keep it like pretty new?  Everything
17   up-to-date?
18       A      Yes.
19       Q      But you explained to us to believe that
20   there's no requirements on how the women look?
21       A      No.

84

1       Q      So you have new televisions, new pool
2   tables, a nice club, but you don't have any
3   requirements as to how the dancers look?
4       A      It's a very -- this place attracts, you
5   know, a lot of gentlemen in Baltimore.  It's the
6   only -- it's the best club in Baltimore, you know what
7   I mean, because of our reputation.
8              These girls are making so much money, that
9   they like to dress pretty and buy expensive bags and --
10      Q      No.  I mean, not the way they dress.  But I
11  mean --
12      A      They want to look nice.
13      Q      I mean the way that they look.
14      A      We don't tell them to look any certain way.
15      Q      No, I mean as far as when you bring them
16  on, they don't -- so somebody could be 600 or 1,000
17  pounds?
18      A      I got some girls that you might like that,
19  you know.  Some men like things like that.  You know
20  what I mean?  It's not my place to judge what you like
21  to be entertained by.

85

1              MR. THEMELIS:  Okay.  Try not to make it
2   personal.  I mean, he's not saying he likes that.
3        A    Oh, no.  I'm not saying "he".  I'm not
4   saying you.  I'm saying some men like that.
5              MR. THEMELIS:  Okay.
6        Q    And you said that Miss Ireland is the only
7   one that could fire you?
8        A    Yes.
9        Q    So, in essence, she's your supervisor?
10       A    Yes.
11       Q    And she gives you guidance when necessary?
12       A    If she feels necessary, yes.  She gives me
13   instruction.
14       Q    And the dancers, they don't benefit from
15   any -- you say you guys sell a lot of liquor.  They
16   don't benefit --
17       A    They don't benefit from the alcohol sale.
18       Q    All right.
19              EXAMINATION BY MR. THEMELIS:
20       Q    Now, has Mrs. Ireland ever told you to do
21   something that Mac -- strike that.  To do something

86

1   different than whatever Mac told you are your

2   responsibilities?

3        A     Not really with the dancers.  You know,

4   I've changed things in policy for employees.  You know,

5   they've grown a lot since then, you know.  But as far

6   as the dancers are involved, no.

7        Q     Okay.  But it is true that when she was

8   contacted by Asia -- is that a better way to --

9        A     That's her entertainer name.

10       Q     Yeah.

11       A     I believe her first name is Keyna.

12       Q     Yes.  That's who I'm talking about.

13       A     I know who you're talking about.

14       Q     Now, what did Mrs. Ireland tell you to do

15   with regard to the request from Asia related to

16   Miss Butler?

17       A     I didn't hear much about Asia in this.  I

18   just had heard that, you know, maybe this whole thing

19   wasn't necessary.  You know what I mean?  And that, you

20   know, she wanted to come back to work.

21             These girls make thousands of dollars a

87

1   day.  She'd probably make more money back at work.  You

2   know what I mean?  So I was -- you know, my boss tells

3   me what to do.  So I would be happy to do it.

4       Q    Now, what did she tell you in this case?

5       A    She said, there might be a meeting; you

6   might have to meet this girl and explain to her that we

7   don't fire nobody, you know.  She thinks she's fired.

8            But I haven't spoken to her since the day

9   that she left.

10      Q    Okay.  Were there any other instances

11  besides that that Mrs. Ireland contacted you about what

12  you were doing or not doing with respect to the

13  employees and independent contractors at the club?

14      A    No.  Not both, no.

15      Q    Okay.  Did she ever call you about what you

16  were doing with regard to the independent contractors?

17      A    No.

18           MR. THEMELIS:  Witness with you, if you

19  have anything.

20           Actually, that was your re-direct a couple

21  of minutes ago and that was my re-cross, right?

88

1            MR. WIGGS:  I don't have any more
2    questions.
3            MR. THEMELIS:  Walt, you have a right to
4    review --
5            THE WITNESS:  What I said?
6            MR. THEMELIS:  -- what you said.  Or you
7    can waive it, give up that right.
8            Do you want to look at you what --
9            THE WITNESS:  Can I like clarify something
10   that I said?
11           MR. THEMELIS:  No.
12           THE WITNESS:  You can't change anything?
13           MR. THEMELIS:  No.
14           THE WITNESS:  Then I'll waive.
15               (Deposition concluded at 1:35 p.m.)
16
17
18
19
20
21

89

1  State of Maryland

2  City of Baltimore, to wit:

3           I, Janet A. Colman, a Notary Public of the

4  State of Maryland, City of Baltimore, do hereby certify

5  that the within-named witness personally appeared

6  before me at the time and place herein set out, and

7  after having been duly sworn by me, according to law,

8  was examined by counsel.

9           I further certify that the examination was

10 recorded stenographically by me and this transcript is

11 a true record of the proceedings.

12          I further certify that I am not of counsel

13 to any of the parties, nor in any way interested in the

14 outcome of this action.

15          As witness my hand this 12th day of

16 August, 2013.

17          _____  *Janet A. Colman*

18                       Janet A. Colman

19                       Notary Public

20 My Commission Expires:

21 August 2, 2016

## $

**$20 (4)**
  55:20;81:21;82:6,14
**$40 (3)**
  25:17;50:11,12
**$45 (8)**
  25:12;26:8,15,18,20;
  27:3;28:19;29:16
**$5 (3)**
  48:11,14,15
**$500,000 (2)**
  39:6,11
**$60 (2)**
  25:6,8
**$7 (1)**
  82:9

## A

**ability (4)**
  23:14,21;24:2;31:8
**able (5)**
  32:18;48:2,5;77:9;80:14
**absolutely (1)**
  15:11
**access (1)**
  42:18
**according (2)**
  59:17;89:7
**accrued (1)**
  43:5
**accrues (1)**
  43:3
**accurate (1)**
  80:16
**across (1)**
  44:12
**Act (5)**
  42:17;43:1,2,2;78:3
**action (7)**
  42:19,20;43:3,4,5,7;89:14
**actually (2)**
  52:6;87:20
**adding (1)**
  49:11
**admit (1)**
  64:21
**Adult (6)**
  51:9;62:2,7;63:6;64:15;
  69:10
**advantage (1)**
  53:14
**advertising (3)**
  30:17;42:3,7
**aesthetics (2)**
  30:18;42:13
**afford (1)**
  33:10
**again (13)**
  11:17,18,19,21;21:11;
  23:19;32:20;34:1,6;37:4;
  38:1;42:5;62:18
**against (1)**
  64:13
**agency (1)**
  62:6
**ages (2)**
  72:12;79:11
**ago (4)**
  44:11;60:8;64:6;87:21
**agreed (1)**
  4:2
**Agreement (1)**
  65:12
**ahead (1)**
  67:9
**alcohol (10)**
  56:21;77:2,3,5,6;82:8,10,
  11,13;85:17
**ALEXANDER (2)**
  4:9;5:14
**allow (2)**
  13:15,19
**allowed (1)**
  79:1
**almost (1)**
  64:6
**always (1)**
  26:20
**amended (1)**
  43:1
**amenities (2)**
  32:18;33:3
**amount (7)**
  8:4;35:11,13;55:14,16,
  18;77:10
**angry (1)**
  78:2
**answered (3)**
  41:18;55:6;79:10
**Anthony (2)**
  67:11,15
**appeared (1)**
  89:5
**appears (2)**
  62:16,20
**Approximately (2)**
  5:12;19:19
**area (1)**
  61:8
**arguing (1)**
  13:4
**argument (1)**
  52:11
**arguments (1)**
  78:5
**arising (1)**
  43:5
**around (1)**
  81:1
**arrives (1)**
  25:5
**Asia (3)**
  86:8,15,17

**aspect (1)**
  17:1
**assaulted (1)**
  51:21
**assaults (1)**
  13:9
**association (1)**
  48:13
**assuming (1)**
  75:8
**attention (1)**
  62:10
**attitude (7)**
  13:11;24:13,15,17;72:16,
  16;79:19
**attorney (1)**
  4:16
**attracts (1)**
  84:4
**August (2)**
  89:16,21
**authority (2)**
  8:9;39:1
**authorized (1)**
  39:16
**authorizing (2)**
  37:9;41:21

## B

**b1 (1)**
  62:13
**back (27)**
  8:17,18;10:3,3,4;11:17;
  13:15,20;14:3;26:16;52:14;
  53:4,20;54:2,9,13;56:9,18;
  66:18;73:7;78:5,11,11;
  81:16;82:7;86:20;87:1
**Bacon (1)**
  43:2
**bags (1)**
  84:9
**Baltimore (5)**
  15:18;84:5,6;89:2,4
**bar (10)**
  8:7,7;16:1,5;19:5;31:2,4,
  7;34:15;81:15
**bartender (7)**
  27:13;56:8,15;62:16,20;
  70:21;74:21
**bartenders (8)**
  6:6;8:1,4,4;24:9;48:21;
  49:8;70:16
**based (5)**
  14:1;32:13;55:20;57:19;
  79:15
**basically (6)**
  6:8;31:2,7;53:17;59:4;
  75:12
**basis (2)**
  10:8;45:8
**became (1)**
  76:12

**becoming (1)**
  48:11
**beginning (1)**
  52:5
**behavioral (2)**
  51:18;78:14
**benefit (4)**
  60:20;85:14,16,17
**besides (1)**
  87:11
**best (2)**
  13:13;84:6
**better (5)**
  30:3;59:9;60:16;66:5;
  86:8
**beverages (2)**
  30:18;42:13
**birth (1)**
  5:15
**bloody (1)**
  52:9
**Blunt (7)**
  67:11,12,15;68:1,2,3,5
**Board (8)**
  14:1;51:9;62:8,9;69:8,9;
  80:20;81:4
**body (1)**
  79:11
**book (1)**
  64:3
**bookkeeper (2)**
  50:1,2
**boss (2)**
  17:11;87:2
**both (5)**
  52:2,9,9,15;87:14
**bottles (1)**
  77:10
**break (4)**
  13:6,18,21;14:4
**briefly (1)**
  83:1
**bring (1)**
  84:15
**bringing (1)**
  13:12
**bunch (1)**
  78:13
**business (29)**
  15:18,21;16:4;17:17,21;
  18:20,21;21:15;30:17;33:8,
  8,20;34:3,11;35:5;36:3,4;
  42:10;47:19;63:6;64:4,14;
  65:18;73:10,18,21;74:1;
  75:3;77:7
**businesses (1)**
  64:15
**Butler (13)**
  4:17,17;8:15,16;10:19;
  14:13;16:11;29:11,19;
  39:16;53:4;56:10;86:16
**Butler's (3)**
  9:5;10:11;77:18

Case 1:13-cv-00430-WMN   Document 21-2   Filed 08/20/13   Page 92 of 100
Unique Butler, ex rel.                                      Warren Alexander Robinson, III -  Vol. 1
PP&G, Inc., et al.                                                                            August 9, 2013

**buy (3)**
  81:18;82:9;84:9

## C

**call (4)**
  12:2;29:7;54:8;87:15
**called (6)**
  4:10;6:19;7:4;53:3;
  54:11;82:5
**came (4)**
  10:2;11:9,17;30:14
**can (31)**
  15:2;17:18;21:18,20;
  22:14;24:11;26:14,16;
  28:19;32:20;40:9;41:18;
  46:19;47:14,15;49:12;55:2;
  56:2,3;58:8;68:8;71:8,9;
  75:4;78:3;80:5;82:8;83:1,4;
  88:7,9
**carpets (2)**
  48:8;59:5
**carried (1)**
  81:1
**case (5)**
  9:5;53:12;61:16;64:7;
  87:4
**cases (5)**
  37:16;64:16,17,19;80:6
**cause (5)**
  42:20;43:2,4,5,7
**central (3)**
  33:20;34:3,7;35:5,6;
  36:21
**certain (5)**
  46:8;72:10;79:4,4;84:14
**certification (1)**
  33:14
**certify (3)**
  89:4,9,12
**change (5)**
  47:15;72:3,8;74:18;88:12
**changed (2)**
  44:12;86:4
**changing (1)**
  35:20
**charge (9)**
  23:2;25:6,8,10,11;56:2,3;
  71:21;76:1
**charged (4)**
  23:1;29:13;69:1;81:12
**charges (2)**
  39:21;40:5
**charging (1)**
  55:21
**choice (4)**
  43:14,19,20;44:1
**choose (3)**
  47:14,15;56:4
**chooses (2)**
  74:18;81:17
**chose (2)**
  43:18;46:12

**chosen (1)**
  47:11
**Circuit (1)**
  38:10
**City (3)**
  62:5;89:2,4
**claims (2)**
  43:9,10
**clarify (3)**
  4:21;34:16;88:9
**class (1)**
  33:15
**classified (1)**
  59:9
**classify (1)**
  59:8
**clean (10)**
  11:20;23:3;25:13;48:8;
  59:4,15;60:21;61:1,5,11
**cleaning (7)**
  48:7;59:9,10,12,14;60:17,
  18
**clear (1)**
  12:11
**client (2)**
  44:1;45:5
**close (1)**
  36:10
**club (25)**
  8:17;12:5,10;14:10,13;
  17:8,9,11;18:11;24:5,14,18;
  25:10;36:10;49:6;51:5;
  60:1,3;71:6;76:4,12;81:8;
  84:2,6;87:13
**clubs (3)**
  44:10;58:19;59:19
**coats (1)**
  71:8
**code (3)**
  51:13;71:4;82:16
**collect (1)**
  74:11
**collected (1)**
  27:10
**Collection (1)**
  43:10
**collects (1)**
  27:14
**Colman (2)**
  89:3,18
**comfortable (1)**
  72:18
**coming (2)**
  14:3;54:13
**commenced (3)**
  42:19;43:4,6
**Commission (1)**
  89:20
**common (1)**
  28:20
**company (1)**
  15:17
**compensating (1)**

  22:19
**compensation (1)**
  42:21
**completely (4)**
  46:17;69:5;71:21;76:1
**completion (1)**
  33:15
**complication (1)**
  80:18
**compound (1)**
  30:5
**concerned (1)**
  71:19
**concluded (1)**
  88:15
**conduct (1)**
  64:3
**considered (1)**
  46:11
**consistent (1)**
  26:2
**contact (1)**
  54:5
**contacted (5)**
  11:21;12:1;52:20;86:8;
  87:11
**contacting (2)**
  12:9;15:5
**contract (9)**
  9:2;24:17;29:2;45:7;
  65:12;72:15;73:4,7;77:15
**contracted (2)**
  31:20;70:5
**contracting (1)**
  82:1
**contractor (11)**
  17:7;50:13;57:3;63:5;
  70:3,18;71:6;72:14;74:6;
  81:4,13
**contractors (21)**
  6:7,12,14;10:8;13:6;
  16:18;20:19;24:9;29:2;
  31:17;43:15;46:4,18;56:16;
  57:15;64:12;73:14,17;
  78:21;87:13,16
**contracts (1)**
  76:13
**control (2)**
  23:8;75:15
**controlled (1)**
  17:1
**conversation (1)**
  82:15
**convictions (1)**
  5:17
**cool (1)**
  78:19
**copy (2)**
  61:15;66:5
**corporate (2)**
  47:19,21
**correctly (1)**
  29:11

**cost (3)**
  37:9;41:16;42:1
**counsel (4)**
  4:3;80:6;89:8,12
**country (1)**
  20:8
**couple (1)**
  87:20
**Court (3)**
  38:10,14;40:10
**cover (1)**
  61:14
**creating (1)**
  13:4
**credit (6)**
  45:6;47:17;48:3,18;49:3,
  12
**criminal (2)**
  5:17;69:14
**cross (4)**
  15:1,3;66:6;82:20
**cross-examine (1)**
  63:18
**customer (3)**
  52:12;82:3,8
**customers (6)**
  26:12;31:9;32:14;34:21;
  41:4,9

## D

**damages (1)**
  42:21
**dance (11)**
  33:15;51:1,2;55:13;56:3,
  6;70:9,11;74:7;81:12;83:8
**danced (1)**
  70:13
**dancer (17)**
  14:14;15:9;16:12,21;
  17:15;18:7,18;19:2;21:13;
  24:11;31:8;55:15;62:13,15,
  19;63:4;83:4
**Dancers (30)**
  6:11;13:5;16:9;19:9,10,
  16;20:16;26:14;31:5,7;
  34:15,17,20;36:8,11,18;
  43:14;44:18;46:10;47:10;
  61:3;64:9;65:15;71:3;
  72:15;83:1;84:3;85:14;
  86:3,6
**dances (6)**
  26:13;56:7;75:3,4,6;81:9
**dancing (4)**
  19:17;21:8;74:7;82:2
**darn (1)**
  59:21
**date (8)**
  5:15;44:3,4,8,8,14;47:12;
  74:15
**Davis (1)**
  43:2
**day (11)**

Unique Butler -v- Warren Alexander Robinson, III - Vol. 1
Case 1:13-cv-00430-WMN   Document 21-2   Filed 08/20/13   Page 92 of 100
PP&G, Inc., et al.
August 9, 2013

21:3,16;46:15;56:7,16;
57:5;68:18;77:3;87:1,8;
89:15
**days (2)**
51:16;79:4
**dealt (1)**
14:9
**decided (1)**
68:17
**decision (5)**
37:13,20;38:6,10,14
**Deduction (2)**
22:14,15
**deductions (9)**
22:11,13;37:9;39:17,20;
40:4,16,20;41:21
**Defendant (59)**
15:13,16,21;16:4,12,13,
21,21;17:2,15;18:7,18;
21:13;22:6,11,18;23:14;
24:5;25:1,1;29:20;30:16;
31:15;32:17;33:2,7,13;37:2,
5,9,12,19;38:9,13,17;39:6,8,
10,17,20;40:1,2,4,5,6,16,17,
18,20;41:3,8,10,14,21;42:3,
6,9,12;73:9
**Defendant's (13)**
18:20;21:15;32:14;33:7,
8,20;34:3;35:5;63:16;65:3,
4;67:6;73:21
**defending (1)**
52:16
**Defense (2)**
67:4,5
**define (1)**
59:1
**defines (1)**
62:13
**Definitely (1)**
57:1
**definition (3)**
57:8;58:17;59:17
**Department (7)**
37:13,17,20;38:2,19;
39:2;79:21
**dependent (3)**
32:17;33:2,7
**depending (1)**
73:5
**deposition (3)**
4:4;67:5;88:15
**described (1)**
60:16
**desired (1)**
69:21
**details (1)**
75:16
**determination (1)**
72:14
**difference (2)**
50:12,12
**different (5)**
17:18;19:6;55:21;64:14;

86:1
**difficulty (1)**
40:12
**direct (1)**
72:9
**directly (2)**
56:18;81:16
**disciplinary (1)**
25:2
**discipline (2)**
23:15,21
**DJ (5)**
51:11;70:12,14,15,17
**document (10)**
37:8;38:17;41:21;45:4,
12;50:7;61:20;65:8;66:10,
16
**documentation (1)**
9:16
**documents (4)**
44:7,9,17;61:15
**dollar (1)**
56:3
**dollars (4)**
25:18,19;82:6;86:21
**done (3)**
14:6;58:2;79:7
**doors (2)**
33:9;36:10
**double (1)**
29:16
**down (4)**
15:7;36:10;40:13;69:18
**draw (3)**
34:20,21;83:13
**drawing (2)**
41:3,9
**draws (1)**
19:6
**dress (5)**
51:13;71:4;82:16;84:9,10
**dressing (2)**
52:14;61:7
**drink (8)**
70:16;74:9;81:18,19,21;
82:6,6,8
**drinks (2)**
70:20;81:15
**duly (2)**
4:10;89:7
**during (1)**
80:19
**duties (8)**
6:4,5;7:12,20;16:14;
22:20;32:18;33:3
**duty (3)**
33:19;34:2;35:4

**E**

**earlier (2)**
35:19;77:13
**early (1)**

10:3
**earnings (1)**
30:13
**easy (1)**
54:7
**education (1)**
33:14
**effect (6)**
15:6;63:12,20,21;64:2,3
**eight (1)**
75:20
**eighteen (1)**
24:10
**Either (1)**
24:1
**elected (1)**
74:14
**else (3)**
9:19,20;65:17
**elsewhere (1)**
79:1
**employed (3)**
5:19;11:2;67:16
**employee (3)**
48:11;50:13;63:5
**employees (22)**
6:6;7:21;8:10,11,13;24:8;
43:15;46:5,11,12;47:11;
48:4,13,20;49:9,10;53:10;
72:20,21;73:1;86:4;87:13
**employment (2)**
10:11;33:6
**end (2)**
25:12;60:16
**enforce (1)**
42:19
**engaged (2)**
71:5;72:10
**enjoy (2)**
17:16,20
**enough (1)**
5:9
**entertain (2)**
70:3;83:8
**entertained (2)**
79:18;84:21
**entertainer (14)**
60:19;62:16,20;65:12;
74:5;75:4;81:9,13,19,20;
82:7,12,17;86:9
**entertainers (16)**
61:5;69:4,6;71:2,5,19;
72:10;73:2,13,16;74:13;
76:14;78:21;79:4,11;82:18
**entertainer's (2)**
73:20;74:1
**Entertainment (6)**
35:17;51:10;62:2,7;63:7;
69:10
**entice (1)**
31:9
**envelope (1)**
27:14

**essence (1)**
85:9
**essentially (1)**
57:17
**established (1)**
69:3
**establishes (1)**
42:17
**even (3)**
70:21;79:17;80:1
**events (2)**
34:19;83:14
**Everywhere (1)**
61:11
**evidence (1)**
38:18
**exactly (2)**
53:1;68:20
**EXAMINATION (9)**
4:13;55:10;63:19;65:6;
66:7;68:14;82:21;85:19;
89:9
**examined (2)**
4:12;89:8
**example (1)**
33:15
**except (1)**
43:5
**excluding (1)**
42:15
**exhibit (3)**
63:16;65:4;67:6
**exotic (16)**
16:9,12,21;17:15;18:7,
18;19:2,9,10,16;20:16;21:8,
13;24:11;31:4,8
**expensive (1)**
84:9
**Expires (1)**
89:20
**explain (10)**
10:20;20:5;22:14;28:21;
29:8,10;53:4;58:4;59:3;
87:6
**explained (4)**
31:18;65:16;81:21;83:19
**extra (2)**
29:14;35:18

**F**

**facilities (1)**
42:13
**facility (3)**
30:18;32:17;33:2
**fact (1)**
53:12
**failure (3)**
38:20;39:3,4
**Fair (2)**
42:16;43:1
**familiar (9)**
31:12;39:13;44:13;49:19,

Case 1:13-cv-00430-WMN   Document 21-2   Filed 08/20/13   Page 94 of 100
Unique Battle, et al. v.                                          Walter Alexander Robinson, III -  Vol. 1
PP&G, Inc., et al.                                                                        August 9, 2013

21;64:7;67:11;76:20;77:2

**far (6)**
24:8,9;46:13;71:19;
84:15;86:5

**feature (1)**
16:8

**features (1)**
16:10

**Federal (2)**
42:16;69:11

**fee (25)**
18:13,14;28:20;29:1,4,5,
6,16;48:14;57:11,12,14;
58:19,20;59:1,9,10;60:9,11,
16,17,18;80:16;81:11,14

**feel (1)**
72:17

**feels (1)**
85:12

**fees (7)**
23:1;39:21;51:1,2,2,4;
81:14

**fell (1)**
54:20

**female (1)**
24:12

**fight (7)**
8:21;9:1;51:16,21;52:3,
10;78:17

**fighting (3)**
12:20,21;52:2

**fights (2)**
9:2;78:5

**file (1)**
31:18

**filed (1)**
44:1

**filled (1)**
14:18

**financial (3)**
18:8,14;33:7

**financially (2)**
18:10;33:9

**find (1)**
80:10

**Fine (3)**
4:15;28:5;67:2

**fined (2)**
22:6,9

**fines (8)**
39:21;40:17;47:6;68:21;
71:11,12,14;79:7

**fingertips (1)**
80:3

**finish (1)**
68:12

**fire (8)**
8:9,11,16;9:1;68:8;72:21;
85:7;87:7

**fired (7)**
8:15,21;9:10,11;10:20;
68:5;87:7

**firing (1)**

72:19

**firings (1)**
25:2

**first (4)**
4:10;9:7;52:13;86:11

**five (3)**
5:21;6:1;14:11

**floor (2)**
52:8,12

**FLSA (1)**
42:18

**follow (3)**
42:18;51:8;64:2

**followed (1)**
74:4

**following (1)**
78:8

**follows (1)**
4:12

**food (6)**
30:19,20,21;42:14,15;
76:21

**football (1)**
36:17

**forever (1)**
11:15

**forget (2)**
6:20;52:19

**form (2)**
14:18;23:20

**formed (1)**
15:17

**forth (1)**
78:5

**Forty (1)**
21:5

**Forty-five (2)**
25:18,19

**Fourth (1)**
38:10

**free (1)**
74:19

**fresh (3)**
23:4;61:2;78:11

**friend (1)**
82:4

**full (2)**
6:20;60:20

**fun (1)**
35:18

**fur (1)**
71:8

**further (2)**
89:9,12

---

## G

**games (1)**
36:17

**Garrett (1)**
7:2

**gave (1)**
59:18

**general (6)**
6:3;43:11;57:14;61:8;
75:8;76:12

**gentlemen (1)**
84:5

**gets (2)**
74:6;82:14

**girl (9)**
11:10;55:21;56:1,9,11;
58:5;81:17;82:7;87:6

**girls (41)**
9:2,6;11:13;13:7;18:13;
20:6,6,6,10,11,15;21:3,5;
23:5,12,13;26:13,17;28:21;
43:16,17;45:17;52:9,9;
55:19;56:2,13;57:11;58:2;
60:5;65:13;70:13;71:7;
77:21;78:4,7;82:1;83:7;
84:8,18;86:21

**given (3)**
56:18;78:18;81:16

**gives (3)**
56:8;85:11,12

**giving (1)**
43:21

**glass (1)**
52:8

**glasses (1)**
52:7

**goes (2)**
59:3;82:6

**governed (2)**
43:10;68:16

**gratuity (2)**
23:3;26:11

**gross (3)**
39:7,11,13

**grown (1)**
86:5

**guess (2)**
63:16;80:2

**guidance (3)**
38:19;39:3;85:11

**guy (3)**
6:16;7:11;27:1

**guys (3)**
42:6;44:14;85:15

---

## H

**hand (1)**
89:15

**handout (1)**
80:20

**happen (2)**
10:18;54:20

**happened (4)**
10:15,16;12:9;74:20

**happens (2)**
56:17;76:2

**happy (1)**
87:3

**hard (1)**

80:9

**head (2)**
5:2;38:12

**Healey (1)**
43:2

**hear (5)**
11:19;40:8,9;50:18;86:17

**heard (3)**
31:13;64:13;86:18

**hearing (1)**
40:13

**help (1)**
25:12

**helps (1)**
25:13

**hereby (2)**
4:5;89:4

**herein (1)**
89:6

**herself (3)**
17:7,11;52:17

**hire (7)**
6:6;7:20,21;8:3,13;72:14;
79:15

**hired (13)**
6:13,16;7:13,17;24:6,19;
27:1;28:21;67:20;71:15;
76:9,13;79:11

**hold (2)**
29:20;30:9

**holds (2)**
56:8,15

**home (1)**
13:11

**hostess (2)**
62:15,20

**hours (9)**
19:13;21:6;30:17;37:3,6;
42:10;45:19;46:15;68:16

**hundred (1)**
20:4

**Hundreds (6)**
19:20,21;20:1,5,20;23:12

**hustle (1)**
31:12

**hustling (1)**
31:10

---

## I

**ice (1)**
59:6

**idea (2)**
11:3,5

**identification (2)**
65:5;67:7

**III (2)**
4:9;5:14

**illegal (1)**
31:13

**immature (1)**
78:3

**important (9)**

Case 1:13-cv-00430-WMN   Document 21-2   Filed 08/20/13   Page 95 of 100
Unique Butler vs.                                                Warren Alexander Robinson, III - Vol. 1
PP&G, Inc., et al.                                                                    August 9, 2013

29:10;34:9,10,11;35:20;
36:3,4,5;75:16
**imposed (1)**
79:6
**impression (1)**
54:4
**Inc (4)**
4:18;15:14;73:9;78:21
**incident (1)**
11:16
**included (1)**
25:2
**includes (2)**
62:15,19
**income (3)**
32:12;43:17;77:6
**incorrect (1)**
76:11
**Independent (25)**
16:18;17:7;20:19;29:2;
43:15;45:7;46:18;50:13;
56:16;57:2,15;63:5;64:11;
70:3,18;71:6;72:14;73:13,
17;74:6;78:21;81:4,12;
87:13,16
**indicated (1)**
77:13
**indicating (4)**
15:2;49:14;55:2;61:14
**industry (2)**
31:10;57:10
**information (1)**
54:5
**informed (2)**
10:13,18
**informing (1)**
45:13
**informs (1)**
45:5
**initially (1)**
52:11
**Inn (3)**
11:1;53:3;54:16
**instance (2)**
58:13,16
**instances (3)**
72:2;73:6;87:10
**instead (2)**
78:15;82:2
**institute (1)**
51:13
**instructed (2)**
28:16,17
**instruction (1)**
85:13
**integral (16)**
18:19,21;19:2;20:3;
21:14,18,19;33:20;34:3,5,6,
7,8;35:5,6;36:1
**interaction (1)**
70:12
**interest (2)**
29:21;30:10

**interested (1)**
89:13
**Internet (1)**
80:2
**Interrogatories (1)**
8:21
**into (2)**
30:6;78:9
**introduce (3)**
63:17;66:4;67:4
**introducing (1)**
15:1
**inventory (3)**
8:8;30:18;42:13
**invested (3)**
18:10;29:20;30:6
**investment (3)**
18:8,15,16
**investments (1)**
73:10
**invitee (1)**
63:6
**invoices (1)**
77:11
**involved (3)**
18:4;78:13;86:6
**IRELAND (15)**
7:3,6,16,18;11:9;41:10;
49:19;50:1,7;72:3;75:21;
85:6,20;86:14;87:11
**issue (1)**
72:13
**issued (1)**
62:4
**issues (2)**
51:18;78:14

**J**

**Janet (2)**
89:3,18
**jealous (1)**
78:1
**Jean's (29)**
5:20;15:14;16:1,6;17:17,
21;18:5,8;24:7,20;25:3;
29:21;30:7,10,14;32:13,19;
33:4,11,16;37:10;39:10;
41:14,16;42:1,4,10,14;
67:16
**job (7)**
7:12,19;8:3;11:12;32:18;
33:3;71:17
**joke (1)**
71:7
**judge (1)**
84:20

**K**

**keep (14)**
11:14;25:13,14;27:8;
28:8,10;33:8,9;45:18;

50:19;56:13;79:18;83:12,
16
**keeping (2)**
55:6;61:4
**keeps (3)**
23:3,7;56:6
**kept (1)**
56:19
**Keyna (3)**
10:6;11:2;86:11
**kill (1)**
14:7
**kind (2)**
10:14;53:17
**knew (1)**
53:12
**know-how (1)**
33:8
**knowledge (1)**
26:3
**known (3)**
16:1,5;31:9
**knows (1)**
58:6

**L**

**Labor (9)**
37:13,17,20;38:3,19;
39:2;42:16;43:1;80:1
**lady (1)**
59:6
**lady's (2)**
81:21;82:6
**language (1)**
81:4
**lap (11)**
51:1,2;55:13;56:6,7;74:7;
75:2,4,5;81:9,12
**large (1)**
31:9
**last (3)**
15:5;38:3;78:6
**law (14)**
13:21;14:5;24:10;37:14,
21;38:11,15,21;39:4;43:10;
64:8;69:14,15;89:7
**laws (12)**
6:9;14:1;15:17;37:16;
51:10;62:3;65:17;69:8,10,
11;71:18;79:21
**lawsuit (1)**
44:1
**lawsuits (2)**
44:11;64:13
**lawyer (1)**
12:10
**learn (1)**
76:6
**leave (7)**
11:14;26:16;57:4,5;
68:18;70:4;81:17
**left (1)**

87:9
**legal (3)**
12:12;38:18;39:1
**level (1)**
33:14
**liability (1)**
15:16
**License (2)**
62:2;64:1
**Licensing (1)**
69:10
**lights (2)**
23:7;25:14
**liked (1)**
70:16
**likes (2)**
51:12;85:2
**limit (1)**
75:3
**limitation (2)**
70:6;75:5
**limitations (2)**
42:18;43:11
**limited (1)**
15:16
**liquidated (1)**
42:21
**Liquor (14)**
14:1;28:6;34:19;36:7;
51:9;62:8,9;64:1;69:8,9;
76:18;80:20;81:3;85:15
**LISA (17)**
7:3,6,16,18;10:12,12;
15:5;41:10;49:19;50:1,7;
52:21;53:1;68:8,9;71:15;
72:2
**listen (1)**
26:2
**little (3)**
5:21;13:18;40:11
**location (2)**
30:17;42:10
**lockers (1)**
59:16
**long (7)**
5:19;9:9,9;44:2;73:5;
74:4;75:18
**look (10)**
8:7;24:16;80:1,5;83:20;
84:3,12,13,14;88:8
**Looking (2)**
65:8;72:16
**loss (2)**
17:16,21
**losses (2)**
18:3,5
**lot (9)**
19:16;43:18;64:14;75:15;
77:5,5;84:5;85:15;86:5
**lots (2)**
19:6;27:18
**loud (1)**
5:8

Case 1:13-cv-00430-WMN   Document 21-2   Filed 08/20/13   Page 96 of 100

Unique Butler v.                                                    Warren Alexander Robinson, III - Vol. 1
PP&G, Inc., et al.                                                                              August 9, 2013

**louder (1)**
40:11

---

**M**

**Mac (9)**
6:19;7:4;27:2;68:10;
75:7;76:7;80:21;85:21;86:1
**machines (1)**
59:6
**MacMillion (5)**
7:2,3,4;63:12;75:8
**M-A-C-M-I-L-L-I-O-N (1)**
7:6
**main (2)**
79:15,17
**maintenance (13)**
18:12;28:20;29:1,6,7,16;
30:17;42:12;59:1,7,12;60:9,
16
**makes (2)**
71:1;72:17
**Making (2)**
59:15;84:8
**man (2)**
26:11;28:13
**manage (2)**
6:7;60:4
**managed (1)**
8:7
**Management (1)**
49:2
**manager (12)**
6:3;8:7,10;57:14;58:13;
66:18,21;67:19,20;75:9;
76:12,12
**mandated (3)**
40:1,5,17
**mandatory (5)**
59:20;60:5,11,14;82:16
**many (12)**
9:6,6;19:13,19;29:11;
44:6,10,10;46:10;55:5;75:4,
5
**mark (2)**
63:15;65:2
**marked (2)**
65:4;67:6
**Maryland (12)**
6:8;15:17,19;37:20;38:2,
4,14;43:9,11;51:9;89:1,4
**matter (3)**
9:3;25:20;78:17
**matters (1)**
12:12
**May (4)**
42:19;43:3,3,6
**maybe (4)**
10:13,15,18;86:18
**mean (68)**
6:16;8:8;9:7;10:4;11:8,
13,14;12:18,20;14:2;17:10;
18:9,14;21:2,16;25:13;

26:10;27:9;28:4,15;34:12;
35:3,17,18;36:9,13;43:13;
44:9,11,15;53:11,13,19,21;
54:7;57:19;58:2,7,9,11,15;
59:15;63:21;64:10;67:18;
69:15;70:13,13,14;72:4,11,
17;74:2;77:9,18;78:3,9;
80:2;83:14;84:7,10,11,13,
15,20;85:2;86:19;87:2
**meaning (6)**
22:14,16;34:5,9;39:10;
41:10
**means (3)**
21:20;34:8;63:4
**meet (4)**
10:19;53:9;75:7;87:6
**meeting (4)**
10:17;11:3;52:20;87:5
**membership (2)**
29:21;30:10
**men (2)**
84:19;85:4
**met (1)**
54:15
**micromanager (1)**
50:3
**might (7)**
15:6;53:2;58:5;82:3;
84:18;87:5,6
**mind (1)**
74:18
**minds (1)**
47:15
**minimum (3)**
42:20;48:16;55:16
**minute (1)**
60:7
**minutes (1)**
87:21
**Miss (16)**
8:15,16;10:5,11,19;11:2,
9;14:13;29:11,19;39:16;
56:10;75:21;76:16;85:6;
86:16
**misunderstanding (3)**
10:14;11:11;53:7
**mitigate (2)**
38:20;39:3
**money (36)**
22:16;27:18;28:5,19;
29:20;30:6;34:14,17,18,18,
19;35:11;36:7,9,14,15,16,
18;43:18;49:5;56:5,6,8,13,
16,17,20,21;57:19;59:3,11;
74:11;81:16;82:11;84:8;
87:1
**month (10)**
8:19;9:12,13;10:4;11:17,
18,19;48:8;77:12;78:18
**months (3)**
20:7;75:19,20
**more (12)**
6:1;16:3;21:18;34:21;

36:14,15,16,18;73:15;82:3;
87:1;88:1
**morning (2)**
19:15;21:7
**Most (2)**
43:18;55:19
**mostly (1)**
72:15
**move (1)**
74:16
**Mrs (4)**
9:5;85:20;86:14;87:11
**much (6)**
6:5;8:2;51:11,12;72:1,4;
77:11;84:8;86:17
**music (2)**
71:1,3
**must (2)**
51:8;53:7
**myself (2)**
37:18;38:8

---

**N**

**name (9)**
5:13,14;6:19,20,20;7:1;
10:6;86:9,11
**named (1)**
68:3
**necessary (4)**
33:17;85:11,12;86:19
**need (2)**
53:3;78:10
**needed (1)**
13:6
**negative (3)**
13:4,5,11
**negativity (1)**
78:8
**new (4)**
14:8;83:16;84:1,1
**news (1)**
64:18
**nice (3)**
79:19;84:2,12
**night (4)**
19:11,12;25:12;57:5
**nightclub (29)**
16:1,2,5,6;17:17;18:1,8;
24:7,20;30:1,7,11,14;32:13,
19;33:4,11,16;37:10;39:11;
41:4,9,14,16;42:1,4,10,14;
67:17
**Nightclub's (1)**
25:3
**nighttime (3)**
56:11,12,13
**nobody (1)**
87:7
**Nodding (1)**
38:12
**None (6)**
46:12,12;47:10;48:3;

74:15,17
**nor (2)**
29:20;89:13
**Norma (29)**
5:20;15:14;16:1,5;17:17,
21;18:5,8;24:7,20;25:3;
29:21;30:7,10,13;32:12,19;
33:4,10,16;37:10;39:10;
41:14,16;42:1,4,10,14;
67:16
**normal (2)**
53:9;78:15
**Notary (2)**
89:3,19
**nude (6)**
16:8;62:16,17,21,21;83:6
**number (2)**
45:18;46:15
**numerous (1)**
13:3

---

**O**

**oath (1)**
5:6
**obey (1)**
69:7
**obeyed (1)**
71:18
**object (2)**
23:20;30:4
**Objection (1)**
41:17
**obliging (1)**
79:3
**obtained (1)**
56:5
**obviously (1)**
53:13
**occasions (1)**
13:3
**Oduyoye (1)**
10:6
**off (7)**
11:14;23:15;24:1;28:5;
50:5,6;78:19
**offer (1)**
21:8
**office (3)**
9:21;63:10;66:17
**often (1)**
71:7
**older (3)**
24:10,12;82:7
**once (3)**
15:6;16:13;70:5
**one (22)**
6:21;8:14,15;9:19;16:3,
10;19:8;20:11,12,16;21:2,3,
18;36:1;38:3;49:20;55:21;
66:4;67:21;70:10;73:15;
85:7
**one's (1)**

81:6

**only (16)**
20:10;23:17;30:14;36:6,
6,6;51:20;67:19,21;68:8,10;
69:8;72:9;79:17;84:6;85:6

**open (8)**
21:9,16;27:19;28:2,3,8;
33:9;35:10

**operating (2)**
16:1,5

**operation (1)**
21:6

**opinion (9)**
37:13,20;38:3,10,14,18,
19;39:2,2

**opinions (1)**
37:17

**opportunity (6)**
17:16,20;33:10;43:16;
63:8,18

**opposed (1)**
59:12

**option (1)**
48:11

**optional (2)**
27:4,5

**options (1)**
44:18

**original (1)**
65:21

**otherwise (1)**
22:19

**out (13)**
11:15,18,20;14:18;26:18;
43:5;53:18;58:20;60:6;
64:8;80:10;82:10;89:6

**outcome (1)**
89:14

**over (7)**
15:2;20:7;39:6,11;52:8;
75:19;82:13

**overtime (1)**
42:21

**own (5)**
17:11;31:18,19;45:9;
68:17

**ownership (2)**
29:21;30:10

---

**P**

**package (1)**
62:11

**page (1)**
62:10

**paid (17)**
16:13,16,19;22:20,21;
37:2,5;40:1,5,18;48:15;
51:1;55:14;57:2,13;69:1;
81:19

**paper (1)**
59:5

**paramount (1)**

72:13

**Pardon (1)**
26:1

**part (15)**
7:19,20;18:19,21;19:1,2;
20:3;21:14,18;34:9,10,11;
35:20;65:18;79:13

**partially (2)**
62:17,21

**particular (3)**
9:5;77:3,4

**parties (2)**
4:3;89:13

**passed (1)**
68:11

**past (2)**
64:8,9

**patron (3)**
62:16,20;81:18

**patrons (1)**
55:13

**pay (39)**
18:13;25:12;26:8,12,15,
17;27:6,17;28:2,5,12,14,16,
19;29:11,14,17;37:13,21;
38:6,11,14,20;39:3,4,21;
40:5,17;48:11,13,14,15;
51:11;57:11;58:7,9,10,19,
20

**paying (4)**
22:19;45:6,13;51:4

**Payment (2)**
43:10;81:11

**payout (2)**
58:18,18;59:18;60:8

**pays (3)**
23:4;27:15;59:4

**penalties (1)**
79:6

**people (12)**
7:20;8:9;28:4,18;48:7,8;
72:10,12;79:13,14,15,18

**per (1)**
55:20

**percent (1)**
76:1

**perform (2)**
32:18;33:3

**performed (5)**
16:14;22:20;33:19;34:2;
35:4

**period (3)**
11:15;15:9;79:8

**permission (1)**
40:21

**person (5)**
63:4;68:8;72:20,21;73:7

**personal (1)**
85:2

**personality (1)**
79:13

**personally (2)**
38:8;89:5

phone (1)
80:5

**place (16)**
10:21;15:18;23:3;25:13;
27:19;28:1,2,8,10;50:4;
53:3;59:16;83:6;84:4,20;
89:6

**Plaintiff (45)**
4:17;16:11,13,20;17:14,
16;18:6,7,17;21:12;22:7,9,
19;23:15;24:1;29:19,20;
30:6,9;31:16,21;32:3,6,9,
16;33:1,10,19;34:2;35:4;
37:2,5,8,14,21;38:11,15;
40:1,6,18;41:1,15,20;69:1;
77:19

**Plaintiff's (13)**
17:1;18:18;21:13;23:8;
30:13;32:12;33:6;39:21;
40:4,17,21;68:15;77:15

**played (1)**
70:19

**please (9)**
4:20;5:1,2;26:6;30:3;
41:7;45:17;50:19;62:18

**pm (4)**
19:14;21:7;25:5;88:15

**point (1)**
13:19

**pole (1)**
33:15

**policy (4)**
13:8;72:3,8;86:4

**pool (7)**
19:5;21:16;34:18;36:7;
83:9;84:1

**portion (2)**
81:19;82:13

**position (1)**
6:2

**positive (4)**
24:13,15,17;72:16

**positivity (1)**
79:19

**possible (2)**
52:16,18

**pounds (1)**
84:17

**PP&G (7)**
4:18;15:14;57:12;58:14;
73:9;78:21;81:11

**premises (2)**
59:12;61:5

**present (2)**
9:19,20

**Pretty (6)**
6:5;8:2;72:1,4;83:16;84:9

**previous (1)**
33:14

**previously (1)**
61:14

**price (2)**
55:21;82:10

**primary (1)**
77:6

**principal (1)**
15:18

**prior (2)**
51:18;53:9

**probably (4)**
15:1;66:4,5;87:1

**problem (1)**
13:5,11;36:1;81:6

**problems (1)**
9:6

**proceeding (1)**
12:12

**PROCEEDINGS (2)**
4:7;89:11

**produce (1)**
38:17

**products (1)**
59:6

**profit (2)**
17:16,21

**profits (4)**
18:3,4;73:14,17

**prove (1)**
43:17

**provide (7)**
31:16,21;32:3,6,9,17;33:2

**provided (1)**
41:15

**provides (1)**
63:6

**public (6)**
80:9,11,13,16;89:3,19

**punch (1)**
52:13

**punching (1)**
52:15

**purpose (1)**
35:16

**put (2)**
9:14;27:15

**puts (1)**
27:14

---

**Q**

**qualifications (1)**
8:5

**quite (2)**
81:2;83:13

**quote (3)**
60:15,16,17

---

**R**

**races (1)**
79:12

**raincoat (1)**
71:9

**read (5)**
62:14,18;64:15,17,19

**reading (4)**

4:3;62:15,19;63:4
**ready (3)**
   57:4,5;75:12
**real (1)**
   6:20
**really (7)**
   10:7;11:8;43:13;55:9;
   80:8,16;86:3
**reason (2)**
   12:19;36:21
**reasons (2)**
   77:14,16
**recall (1)**
   66:14
**receipt (1)**
   32:13
**receipts (2)**
   48:7;77:11
**receive (1)**
   74:14
**received (1)**
   74:10
**recognize (2)**
   61:19;65:7
**record (5)**
   22:18;80:10,12,13;89:11
**recorded (1)**
   89:10
**records (5)**
   14:17;27:8,9;65:19;80:16
**re-cross (1)**
   87:21
**re-direct (1)**
   87:20
**refer (2)**
   15:13;62:10
**referred (3)**
   57:6;58:21;80:6
**referring (2)**
   6:10;60:15
**reflecting (1)**
   41:15
**regard (11)**
   60:20;61:5;68:15;70:8;
   73:2;74:12,20;75:2;82:17;
   86:15;87:16
**regards (2)**
   10:10;24:16
**regular (1)**
   8:7
**related (2)**
   59:1;86:15
**relating (1)**
   60:10
**relationship (1)**
   17:2
**Relevant (5)**
   21:21;22:1,4,5;42:17
**relied (1)**
   38:18
**rely (9)**
   37:12,16,19;38:2,9,13;
   39:1;79:21;80:19

**remainder (1)**
   55:5
**remember (2)**
   14:15,15
**reminder (1)**
   5:5
**repairing (1)**
   59:7
**repeat (2)**
   26:5;41:6
**rephrase (1)**
   80:15
**REPORTER (1)**
   40:10
**reports (1)**
   64:18
**represent (1)**
   4:16
**reputation (1)**
   84:7
**request (1)**
   86:15
**require (6)**
   26:9;33:13;57:12,14;
   81:8,11
**required (20)**
   26:8,12,12;27:20;28:7;
   33:18;37:14,21;38:7,11,15,
   20;39:4;58:3;69:7;70:9,11,
   18;71:5;80:17
**requirements (2)**
   83:20;84:3
**respect (3)**
   69:12;72:19;87:12
**respective (1)**
   4:3
**responses (1)**
   5:1
**responsibilities (2)**
   76:7;86:2
**responsible (9)**
   30:16;31:19;42:3,6,9,12;
   45:9;49:11;73:10
**re-stock (1)**
   59:5
**result (1)**
   56:5
**retain (1)**
   74:17
**retained (1)**
   79:3
**retention (1)**
   82:13
**retrieve (1)**
   80:17
**return (3)**
   47:16,18,21
**returns (1)**
   49:16
**revenue (3)**
   39:7,11,13
**review (2)**
   63:9;88:4

**Right (25)**
   5:4;8:4,4,5;20:10;46:10;
   48:6;51:19;52:16;53:6;
   54:8,9;61:10;62:8;67:3;
   68:7;72:7;75:13,17;76:21;
   78:10;85:18;87:21;88:3,7
**ROBINSON (4)**
   4:9;5:14;55:11;67:5
**role (5)**
   41:3,8;73:20;74:12;75:8
**room (1)**
   52:15;61:7;66:15
**rule (2)**
   74:1,3
**rules (10)**
   14:1;24:5,18;25:3;51:8;
   62:3;64:2,2;69:6,9
**running (1)**
   28:10

# S

**Safe (1)**
   59:16
**sale (2)**
   77:2;85:17
**sales (2)**
   57:1;76:18
**same (5)**
   4:5;10:8;35:11,13;72:4
**save (1)**
   55:9
**savvy (1)**
   33:7
**saw (2)**
   52:11;66:10
**saying (14)**
   9:9;14:4;17:5;28:1;
   35:21;45:11,12;47:10;
   59:14;63:2;85:2,3,4,4
**schedule (6)**
   23:9,16;24:1;25:2;46:14;
   69:4
**schedules (4)**
   46:2,3,5;79:3
**security (6)**
   6:6;8:1;24:8;48:21;
   66:21;67:1
**segregated (1)**
   56:19
**select (1)**
   71:3
**selection (1)**
   71:1
**sell (4)**
   30:21;76:21;77:5;85:15
**semi-nude (2)**
   16:8;83:6
**served (1)**
   70:21
**service (1)**
   10:15
**services (2)**

18:19;21:14
**set (8)**
   23:8;24:5,14,18;25:2;
   26:18;75:3;89:6
**sets (1)**
   55:13
**several (2)**
   10:2;12:2
**shake (1)**
   5:2
**shapes (1)**
   72:11
**share (4)**
   73:14,17;77:16;81:9
**sheet (2)**
   45:16;76:17
**sheets (2)**
   47:6,8
**shift (1)**
   56:7
**short (1)**
   7:5
**shot (1)**
   82:9
**show (6)**
   23:13;47:17;48:2,5;
   49:12;83:7
**showed (1)**
   69:9
**showers (2)**
   60:21;61:1
**showing (1)**
   46:15
**shows (1)**
   45:16
**sign (7)**
   50:6,7;65:13,16;66:8,10,
   16
**signed (6)**
   37:8;41:20;45:5,7,10,12
**significant (3)**
   41:3,8;79:12
**sign-in (1)**
   45:15
**signing (1)**
   4:4
**sign-out (1)**
   45:16
**signs (1)**
   50:5
**situation (2)**
   9:7;12:9
**six (3)**
   20:7;64:6;75:19
**sizes (1)**
   72:11
**skill (2)**
   33:17,17
**skills (1)**
   79:14
**small (1)**
   62:14
**smooth (1)**

Uniques Butler, v. Document 21-2 Filed 08/20/13 Walter Alexander Robinson, III - Vol. 1
Case 1:13-cv-00430-WMN Document 21-2 Filed 08/20/13 Page 99 of 100
PP&G, Inc., et al.
August 9, 2013

53:18

**soap (4)**
23:4;48:8;59:5;61:2

**sold (1)**
77:3

**solely (1)**
73:10

**somebody (3)**
14:8;58:13;84:16

**someone (8)**
13:9,10,20;14:3;25:5;
28:16;72:17;79:7

**sometimes (5)**
18:13;77:21;78:3,4,10

**song (1)**
55:20

**songs (2)**
70:18;75:6

**sorry (16)**
5:12;7:4;16:3;24:4;34:1;
37:4;38:1;39:9;42:5;50:20;
55:17;63:3;67:5;68:13;
70:2;73:15

**sound (1)**
33:9

**source (1)**
77:6

**speak (6)**
5:8;10:5,7,8,10;11:16

**spoke (2)**
9:15;10:12

**spoken (1)**
87:8

**sporting (2)**
34:19;83:14

**sports (2)**
19:5;31:7

**stage (1)**
71:8

**standards (5)**
24:6,14,19;42:16;43:1

**start (4)**
29:8;43:21;52:11;78:7

**started (6)**
14:19;16:15;44:14;50:16;
52:10;72:5

**State (15)**
6:8;8:20;14:1,5;15:17;
24:10;51:9;62:5,5;69:8,10;
74:3;79:21;89:1,4

**states (1)**
64:14

**stating (2)**
44:7,17

**statute (1)**
42:17;43:11

**stay (3)**
27:19;28:1,3

**stenographically (1)**
89:10

**still (5)**
35:10;36:8;67:1;70:19,20

**stipulated (1)**

4:2

**STIPULATION (1)**
4:1

**stopped (1)**
14:3

**story (2)**
12:16,18

**strictly (1)**
56:1

**Strike (4)**
51:17;57:13;59:2;85:21

**stuff (1)**
80:3

**suggested (1)**
55:18

**suing (1)**
12:10

**suit (1)**
83:4

**supervisor (5)**
7:10;68:3,10,11;85:9

**supplied (1)**
61:15

**supposed (3)**
10:17,21;76:6

**supposedly (1)**
57:10

**sure (6)**
8:3,6;59:15;69:17;71:18;
80:9

**suspend (4)**
9:3;13:8,17;73:4

**suspended (11)**
9:2,11,15;12:11,15,17;
51:16;73:7;76:13;77:14;
78:12

**suspension (2)**
78:16,18

**Sweeping (1)**
59:15

**sworn (2)**
4:10;89:7

**T**

**tables (6)**
19:5;21:16;34:18;36:8;
83:10;84:2

**talk (11)**
82:3

**talking (4)**
15:14;60:3;86:12,13

**tax (10)**
31:16;32:1,4,7,10;47:16,
18,21;49:16;50:7

**taxes (5)**
31:18,19;45:9;49:4;50:4

**televisions (4)**
83:9,13,15;84:1

**tells (1)**
87:2

**ten (1)**
75:20

**tenure (1)**
80:19

**term (2)**
31:12;60:10

**terms (1)**
31:13

**testified (2)**
4:12;79:20

**testimony (3)**
5:5;71:10;79:12

**THEMELIS (45)**
5:8;7:1,7;14:21;15:10;
23:20;24:4;26:1,5;30:4;
40:8;12;41:6,12,17;45:1;
49:13;50:18;55:1,4,8,10;
61:13,18;63:15;65:2,6;
66:3;67:3,9;68:12,14;69:17,
19;76:16,19;82:20;85:1,5,
19;87:18;88:3,6,11,13

**Thirty (1)**
20:11

**though (3)**
18:14;34:20;51:21

**thought (3)**
11:11;53:13;63:2

**thousands (1)**
86:21

**three (3)**
43:6;64:8,9

**three-year (1)**
43:11

**threw (1)**
52:13

**throwing (1)**
52:7

**til (2)**
19:14;21:7

**times (10)**
10:2;11:13;12:3;16:20;
18:17;21:12;29:11;32:16;
33:1;79:4

**tip (24)**
23:2;25:11,16;26:11,18;
29:5,7;45:6,6,13;47:17;
48:3,18;49:3,12;58:18;
59:18;60:5,8;70:14,15,15,
17,21

**tip-in (7)**
48:11;57:7,9,10,16,17,21

**tip-ins (1)**
47:8

**tip-out (7)**
25:15;26:8;27:3,10;
28:19;48:12;57:7

**tip-outs (1)**
47:8

**tips (10)**
22:16;26:13;30:14;31:9;
32:13;49:5,6,11;74:5;81:9

**tissue (1)**
59:5

**today (2)**
5:6;20:6

**toilet (1)**
59:5

**toiletries (1)**
59:6

**told (18)**
6:8,12,13,15;7:11;8:17,
18;10:2,4;11:17,18;26:21;
29:13;54:19;65:15;71:17;
85:20;86:1

**tonight (3)**
20:10,12;23:13

**took (3)**
22:11,13;73:7

**totality (1)**
74:10

**towels (5)**
23:4;48:9;59:6;60:20;
61:2

**track (2)**
45:18;55:6

**trained (5)**
7:11;27:1;63:12;80:20

**training (1)**
6:21

**transcript (1)**
89:10

**true (5)**
17:3;53:16;76:10;86:7;
89:11

**truth (3)**
4:11,11,12

**try (4)**
4:21;10:3;55:8;85:1

**trying (2)**
69:17;76:17

**TVs (1)**
36:16

**Twenty (1)**
82:6

**two (2)**
9:3;43:4

**two-week (3)**
51:20;78:15,18

**type (1)**
71:4

**types (4)**
64:15;72:10,12;79:11

**U**

**Um-hum (18)**
13:1;15:15;21:10;48:1;
63:11;66:11;67:1;70:8;
71:1,20;73:1;75:2,7;76:5;
79:16;82:16,19;83:3

**under (9)**
5:6;15:17;42:18,21;43:9;
53:19;54:3;62:13;75:19

**unh-unh (1)**
5:3

**uniform (1)**
46:9

**Unique (5)**

4:17,17;16:11;53:4;77:18
**unpaid (2)**
42:20,20
**up (10)**
15:3;23:13;46:1;50:19;
56:1;58:8;69:5;80:1,5;88:7
**up-to-date (2)**
83:12,17
**USC (1)**
42:17
**use (6)**
23:5;31:14;36:14,16,18;
55:19
**used (5)**
31:13;57:7;59:11;61:4;
72:13
**usually (5)**
9:3;58:19;73:4;78:16,17

**V**

**verbal (1)**
5:1
**verbatim (1)**
78:16
**versus (1)**
4:17
**violation (2)**
25:3;43:6
**voice (1)**
50:19
**volume (1)**
77:3

**W**

**W-2 (7)**
31:16,21;32:3,6,9;41:15;
45:8
**Wage (2)**
43:9;48:16
**wages (18)**
16:13;22:19,20;37:3,5,14,
21;38:6,11,15,20;39:4,18;
40:21;42:20;45:6,13;74:14
**waive (2)**
88:7,14
**waived (1)**
4:5
**Walsh (1)**
43:1
**Walt (2)**
65:9;88:3
**WALTER (3)**
4:9;5:14;67:5
**wants (5)**
58:6,7,9,10;82:8
**watch (1)**
36:17
**way (17)**
13:21;17:19;33:15;39:21;
40:5,17;55:20;58:3,20;
72:3;75:13,17;84:10,13,14;

86:8;89:13
**wear (4)**
71:8,9;83:2,4
**week (1)**
77:4
**weeks (4)**
9:4;78:6,6,6
**weren't (3)**
66:18;80:11,13
**what's (7)**
5:15;25:10;35:16;49:15;
50:11,11;66:13
**whatsoever (1)**
68:21;71:11,14
**Whenever (4)**
13:10;57:4;70:3;79:1
**Whereupon (1)**
4:8
**whole (4)**
4:11;21:9;43:18;86:18
**wholly (3)**
32:13,16;33:1
**who's (1)**
74:6
**whose (3)**
11:3,5;47:18
**WIGGS (33)**
4:13,16;5:11;7:1,9;15:8,
12;26:7;40:15;45:2,3;
49:16,18,20;50:5,9,10,21;
54:21;55:2,7;61:17;63:19;
64:21;66:3,7;67:2,8,10;
68:13;76:18;82:21;88:1
**willful (1)**
43:6
**Windsor (3)**
11:1;53:3;54:15
**wished (2)**
68:19;70:4
**wit (1)**
89:2
**withheld (1)**
22:16
**within (4)**
8:18;43:4,6;64:8
**within-named (1)**
89:5
**without (2)**
35:13;40:21
**witness (18)**
4:4,10;5:10;7:8;26:4;
40:14;41:13;49:15,17;50:3,
20;87:18;88:5,9,12,14;89:5,
15
**women (3)**
13:8;78:2;83:20
**word (4)**
21:20;34:6;36:1,1
**words (2)**
15:6;59:2
**work (41)**
13:12;16:13;17:1,4,5,6,8,
9,10;20:6,7;22:20;23:8;

24:7,19;25:6,10;26:14;
33:10,15;37:1;45:19;46:2,3,
5;53:5,20;54:2;57:11,11;
58:10;69:3,16,20,21;75:18;
78:9;79:1,4;86:20;87:1
**worked (17)**
14:13;16:12,21;17:6,9,
15;18:6,17,21;12;37:3,6;
45:16;46:15;68:1,2,16;80:8
**working (4)**
14:10;20:15;32:19;33:4
**work-related (2)**
18:19;21:14
**works (1)**
17:10
**worn (1)**
71:8
**writing (2)**
9:14;39:17
**written (4)**
9:16;38:19;39:3;40:21
**wrote (1)**
15:7

**Y**

**year (7)**
31:16;32:1,4,7,10;64:5;
75:19
**years (9)**
5:21;6:1;14:11;43:4,6;
44:11;64:6,8,9

**1**

**1 (4)**
63:16;65:3,4;67:4
**1,000 (1)**
84:16
**1:35 (1)**
88:15
**10/30/1981 (1)**
5:16
**10:00 (1)**
25:5
**100 (2)**
23:13;76:1
**1099 (6)**
31:16;32:1,4,7,10;41:15
**12:00 (2)**
19:14;21:7
**12th (1)**
89:15
**14 (2)**
42:19;43:3
**18 (1)**
24:12
**1938 (1)**
43:1
**1947 (2)**
42:19;43:3

**2**

**2 (3)**
67:5,6;89:21
**2:00 (2)**
19:14;21:7
**2007 (2)**
14:14,16
**2009 (4)**
32:1;39:7,11;46:16
**2010 (6)**
14:15;32:4;39:14;46:21;
47:16;66:19
**2011 (2)**
32:7;47:2
**2012 (3)**
14:14;32:10;47:4
**2013 (1)**
89:16
**2016 (1)**
89:21
**21 (1)**
82:7
**29 (1)**
42:17

**3**

**3 (1)**
62:10
**30 (4)**
20:10,15;21:3;51:16
**35 (1)**
50:11
**3D (2)**
83:13,15

**6**

**600 (1)**
84:16