IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNIQUE S. BUTLER | * | |
| PLAINTIFF | * | |
| v. | * | CIVIL ACTION NO. WMN-13-430 |
| PP & G, INC. | * | |
| DEFENDANT | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant by and through undersigned counsel, submits the following Memorandum of Points and Authorities in Response to Plaintiff's Second Motion for Partial Summary Judgment ("Motion") against Defendant on the issue of whether the Plaintiff was an employee or an Independent Contractor under both the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. Sec. 201 et seq. ("FLSA") and under the Maryland Wage Payment and Collection Law ("MWPCL"), a Maryland Code, Labor and Employment Article Sec. 3-501 et seq.

### I. PLAINTIFF'S STATEMENT OF FACTS

Plaintiff has filed suit against the Defendant to recover damages under the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. Sec. 201 et seq. ("FLSA") and to recover damages under the Maryland Wage Payment and Collection Law ("MWPCL"), a Maryland Code Labor and Employment Article Sec. 3-501 et seq. Defendant owns and operates "NORMA JEAN'S NITE CLUB," a gentlemen's club in Baltimore, Maryland that has an Adult Entertainment License along with a valid Liquor License.  Plaintiff allegedly worked at the

1

Defendant's business at various times from October, 2007 thru August, 2012.  However, Defendant's records reveal she began entertaining on January 24, 2010 and was suspended because of her involvement in a fight with another "Entertainer" on June 11, 2012.

In good faith, the Defendant relied upon the Board of Liquor Commissioners for Baltimore City's Rules and Regulations related to Adult Entertainment and the fact that all similar Clubs located in Baltimore City for many years have operated using Independent Contractors as "Entertainers", and there have never been any prior issues or problems related thereto. However, at all times and with all persons the Defendant exercised no control whatsoever as to when and how and the manner in which the Adult "Entertainers" entertained as set forth below and are truly Independent Contractors, in all ways only obliged to obey all laws related to their business including "criminal statutes" and the "Liquor Board Rules and regulations related to Adult Entertainment.  For all reasons set forth herein, the Defendant, if in fact, did violate the provisions of the FLSA and/or the MWPCL, its conduct was in good faith relying upon the provisions of the "Liquor Board" rules and regulations related to Adult Entertainment ,and  what appeared to be reasonable standards in the business community of like kind businesses in hiring Independent Contractors as "Entertainers  and the since the inception no one had any issue of problem with procedure.

## II. RESPONSE TO MATERIAL FACTS ALLEGED NOT TO BE IN DISPUTE

Item 1,  Item 1 A.  The Defendant denies that Plaintiff ever worked for Defendant but does admit that Plaintiff was engaged as an Independent Contractor for various lengths of time between January 24, 2010 and June 11, 1012.  See Defendant's Exhibit 13,Entertainer's Application dated January 24, 2010.  See Defendant's Exhibit 10,Item 14 of Affidavit of Anthony Blount, Defendant's Exhibit 4, August 9, 2013, Deposition of Walter Robinson III, at Page 16 Lines 20-21,  Page 17 Lines 1-11, and Page 65 Lines 11-21, and Page 66 Lines 8-18, and Page 67 Lines 3-7, (Introduction of Entertainer's Application dated January 24, 2010 as Exhibit 2 for the Deposition), Defendant's Exhibit 5, August 9. 2013 Deposition of Lisa Ireland at Page 7 Lines 9-20 and Page 19 Lines 20-21 and Page 19 Lines 1-6.

1  B. The Plaintiff refers to herself as an exotic dancer at Defendant's exotic dance Club.  The Defendant denies this and states that it is a Bar that serves alcohol with an Adult Entertainment License issued by the Board of Liquor License Commissioners for Baltimore City.  See Defendant's Exhibit 5, August 9, 2013, Deposition of Lisa Ireland Page 7 Lines 12-13, Defendant's Exhibit 14, Board of Liquor License Commissioners for Baltimore City Rules and Regulations Governing the Operation of Adult Entertainment Establishments and Licenses in Baltimore City (marked as Exhibit 1 in the August 9, 2013 Deposition of Walter Robinson III) at Page 1, Rule 1(a)(1) (a)Adult Entertainment Defined, Page 2 Rule 1(a)(2) definition of Adult Entertainment business, Page 3, Rule 1(b)(1)(a) and Page 3, Rule 1(b)(1)(b) definitions of dancer, Defendant's Exhibit 4, August 9, 2013 and include Independent Contractor, Exhibit 4,August9,2013,Deposition of Walter Robinson, III, Page 15 Line 21, Page 16 Lines 1-10, Page 80 Lines 19-21, Page 81 Lines 1-2.  See also Defendant's Exhibit15, Answer to Complaint Item 2 Page 1-2.

Defendant's Exhibit 4, August 9, 2013, Deposition of Walter Robinson III, Page 15 Line 21, Page 16 Lines 20-21, Page 17 Lines 1-11, Page 16 Lines 1-10, Page 17 Lines 1-11, Page 65 Lines 11-21, Page 66 Lines 8-18, Page 67 Lines 3-7, Page 80 Lines 19-21, and Page 81 Lines 1-2, Defendant's Exhibit 5, August 9, 2013, Deposition of Lisa Ireland, Page 7 Lines 9-20, Page 7 Lines 12-13, Page 19 Lines 1-6, and Page 19 Lines 20-21.

The Plaintiff testified even though she admitted signed the "Entertainer's Application", Defendant's Exhibit 13, she testified that she did not know anything as to her status either as an Independent Contractor or an hourly employee ,she testified that  "it wasn't explained to me", but at the end of 2010, when she did not get a W-2 she neither requested one from the Defendant nor complained to IRS that she was not issued a W-2.  Plaintiff was getting public assistance benefits for her and medical assistance for her children ,based on her testimony while being engaged as an Independent Contractor at PP & G, Inc. but she claims she was an employee even though she clearly stated she did not know and never followed up with any source.

See Defendant's Exhibit 7, August 9, 2013, Deposition of Unique Butler at Page 17
Lines 8-21.

Plaintiff claims at her deposition that no one explained it to her although she did
not explain why she did not ask IRS to force the Defendant to give her a W-2 form,
See Plaintiff's Exhibit  5, August 9, 2013, Deposition of Plaintiff at Page 18 ,Line 9-12.
She kept insisting throughout her deposition that she was an employee even though
initially she testified that she did not know but never followed up to clarify  but did
admit that it was her signature on her "Entertainer's Application form".  However she
testified that she does not remember reading it because "quite a few years passed"
but she insists thereafter that she remembered and knew in fact that she was not
advised or given the opportunity or option to be a minimum wage tipped employee.
See Defendant's Exhibit 5, August 9, 2013, Deposition of Plaintiff Page 35 Lines 7-10.
See also Page 33 Lines 16-19 and Page 34 Lines 2-6.

The Plaintiff testified at her deposition that she signed the Application, showed her
ID, did not know if she was an employee and then she danced but was never given the
option to be an employee Id. Plaintiff's Exhibit 4, See Page 17 Lines 5-21 and Page 18
Lines 1-2.

Lisa Ireland testified at her deposition that the "Entertainers Application" is only used if
the individual elects to be an Independent Contractor, otherwise the individual must be given
tax forms if she wants to be an employee.  Exhibit 5, August 9, 2013, Deposition of Lisa
Ireland at Page 8 Lines 14-20 and Page 9 Lines 1-2 and Lines 16-21.

On cross examination in Plaintiff's deposition, the Plaintiff testified that she was
forced to sign the "Entertainers Application" that stated she was an Independent
Contractor and that it was given to her by Anthony Blount who threatened her, and
others, at a meeting that if they did not sign the document they could not work at the
Club anymore Id. Page 43 Lines 11-21.  There was no mention of the threat by
Anthony Blount on the signing of the form after she started at PP & G, Inc.  In fact

4

earlier in her deposition as noted above, she testified " she signed it, didn't know her status and then danced". NO MENTION OF A THREAT until later in the deposition when her Attornet questioned her. Prior thereto there was not a hint of a Threat.  See also Defendant's Exhibit 10, Affidavit of Anthony Blount Page 5 item 23.

The specific basis for labeling the Plaintiff as an Independent Contractor and not an employee shall be set out in detail in Item 5 below comparing the degree of control that the alleged Employer has in comparison to the control exerted by the Employee. The focal point is whether the worker "is economically dependent on the business to which he renders services or is ,as a matter of economic reality ,in business for himself."See Schultz v Capital Intern. Sec., Inc., 466 F. 3rd 298 at 304 and 305(4th Cir. 2006).

ITEM 2.  Defendant admits that it is a duly organized Maryland Corporation with its principal place of business in Baltimore City, Maryland.  See Exhibit 15.  Answer to Complaint, Item 2, Page 1-2.

ITEM 3.  Defendant admits that it is in the business of operating a night Club and Bar known as Norma Jean's Nite Club but denies that it "features semi nude exotic dancers".  The Plaintiff's reference to the August 9, 2013, Deposition of Walter Robinson, III testimony was that the semi nude "Exotic Dancers" are but one (1) of the features of the Nite Club.  See Page 16 Lines 4-10.

Mr. Robinson again said that it is a part of the business, not an integral part.  See Defendant's Exhibit 4, August 9, 2013, Deposition of Walter Robinson, at Page 18 Lines 17-21 and Page 19 Lines 1.

Walter Robinson continued to testify at his deposition that Norma Jean's Nite Club is a Sports Bar and has pool tables and there are lots of different draws and that the "exotic dancers" is but one of them Id.  at Page 19 Lines 2-18.

However, Walter Robinson did testify thereafter that there are hundreds of "Entertainers". Some of them work today and some work six (6) months or more from now and that they are all over the Country. 1d. at Page 20 Lines 2-8.

Mr. Robinson continued and testified that on the day of the deposition, he knew that 30 to 40 "Entertainers" would show up to dance during that evening, and that the hours of operation of the Club were from 12:00 p.m. until 2:00 a.m. and "exotic dancing" is available the whole time the Club is open, but included that the pool tables are also open all day. 1d. Page 21 Lines 1-17 along with television sets. Mr. Wiggs then asked again if the "Entertainers" were an integral part of Defendant's business after explaining that there can be more than one integral part.   Mr. Robinson asked for clarification of the word "integral" and requested that he use another word. Mr. Wiggs responded "Relevant" and Mr. Robinson testified that "she was relevant to it Yes". Here, Relevant was not an appropriate explanation of integral.  Relevant is defined as "Logically connected and tending to prove or disapprove a matter in issue; having appreciable probative value- that is rationally tending to persuade people of the probability or possibility of some alleged fact.  See Black's Law Dictionary, Seventh Edition, 1999.

Mr. Wiggs attempted to come back and clarify integral again and asked Mr. Robinson if Plaintiff performed a duty that is central and integral to Defendant's business explaining that integral meant "an important part of Defendant's business" to which Mr. Robinson responded "We don't make money from...." and further stated that the Club does not make money from the dancers.  We make our money from pool tables  We make our money from sporting events.  We make our money from liquor. Mr. Wiggs then asked if the dancers were a draw and if they draw more customers than you would if you didn't have them and that is why you have them. Mr. Robinson answered "Yes".  Immediately thereafter Mr. Wiggs asked "So Plaintiff performed a duty that is central and integral to Defendant's business.  Mr. Robinson answered "No, it's not central it's not integral" and if we didn't have them we would still be open.

6

Mr. Wiggs asked if they would make the same amount of money without them, and Mr. Robinson answered "Yes". Mr. Wiggs asked what's the purpose of having them and Mr. Robinson answered "entertainment". Mr. Wiggs asked if it was important to the business and Mr. Robinson answered that it's not important to the business. Mr. Robinson continued testifying we only make money from the liquor and the pool tables, and added, if we didn't have dancers we would still make money and that the Club doors would not close if there were no dancers.

Mr. Wiggs asked "Okay, but you make more money; you use them to make more money. Mr. Robinson answered "We use the TV's to make more money, too, because they watch football games ....." Mr. Wiggs then asked "So you use them to make more money?" Mr. Robinson answered "Yes" but they are not the central reason why we're at work" See Defendant's Exhibit 4, August 9, 2013 Deposition of Walter Robinson III. Page 34 Lines 2-21, Page 35, Page 36, and Page 37 Line 1.

When one considers that many of the "Entertainers" leave the Baltimore Metropolitan area and often go to other States to perform for as long as they wish, and then return, when they wish, and entertain as they wish, and leave again to work elsewhere as they wish. The concept of this loose group of people not being Independent Contractors, under any definition especially when one considers the specific instance of the complete lack of control as shall be set out in Item 5 hereinafter set out. Clearly, given the facts there is a genuine dispute about material fact s. Also, from Mr. Robinson's testimony, it is impossible to reasonably infer that a significant or substantial increase in gross sales results from the present of the "Entertainers". In fact he testified that the Club makes money from the pool tables and sporting events and that the Club could continue to exist, without them. All he testified to was that they are a draw and that the Club does make more money with them but did not testify to anything specific. As a result, the Defendant has presented sufficient evidence to the Court to demonstrate the existence at an issue of fact. Pension Ben. Guar. Corp. v Beverley, 4043d243, 246-247(4th Cir. 2005)

7

ITEM 4.  Defendant admits that while Plaintiff was engaged as an Independent Contractor for purposes of being an "Entertainer" at Norma Jean's Nite Club, the Defendant did not pay the Plaintiff any monies. And, as a result, Plaintiff did not get either a W-2 or a 1099.

ITEM 5.  The Defendant denies that it controlled every aspect of Plaintiff's work relationship with Defendant and submits as genuine disputes of material facts the following:

   A.  Exhibit 7, August 9, 2013, the Deposition of Plaintiff, Unique Butler:

   a)  At page 14 lines 3 thru 17, I asked Plaintiff if she paid the $45.00 maintenance fee, that has been referred to as the cleaning fee, and she responded I paid the $45.00 "tip out" fee nightly and that she never paid a cleaning fee.  Further she testified that if she was late, she paid a late fee of $15.00 in addition to the $45.00 (total $60.00) up front (when she arrived). She also testified she paid $60.00 but she "wouldn't say it was that often", and that she testified that she never left without paying.

   b) At page 16, lines 4 thru 15, I asked the Plaintiff to define "tip out" and she testified that a "tip out" is basically what "you pay to work there".  It's not optional at all.  You must pay it to work there".  She also testified that everybody (i.e. "Entertainers") pays that fee and everybody is still paying that fee to work there.

   c)  Page 16 lines 16-21 and Page 17 lines 1-4.  She testified that she went to work prior to 9:00 p.m. and would leave between 1:45 a.m. and 2:00 a.m.

   d)  Page 17 lines 5 thru 21 and Page18 lines 1 and 2.  She testified that she was never given the option to be an employee instead of an Independent Contractor but she also testified that she did not know if she was an employee of an Independent Contractor because it was not explained to her.  "I signed….. I showed my ID…… and I danced.  That was it."

   e)  Page 18 lines 9 thru 12.   She testified that she never contacted IRS to force PP & G, Inc. to give her a W-2.

8

f) Page 18 lines 13 thru 21.  She testified that, all the time, she saw people leave through the rear door so as not to pay the Management or cleaning fee.  She further testified that they had to pay a fine or penalty, when they came back the next day.

g) Page 19 lines 1 thru 7.  She testified that she knew about paying a penalty if left by the back door, because she spoke to other people when she and the others were leaving outside by the rear door even though at page 19 lines 4-5, she testified that she always paid the fee.

h) Page 19 lines 13 thru 19.  I asked the Plaintiff if she was ever told that she had to dance and she responded "if it was my turn to get on stage, I was told it was my turn to dance" at lines 15-16 ,and a manager or bartender or DJ would call out her name to dance.

i) Page 19 lines 20 thru 21 and page 20 lines 1 thru 13.  Plaintiff testified at p. 20 line 2-3 that she did not have to order songs to dance.  "When I asked how the DJ would know what to play for you?" (Page 20 lines 4-7)  She responded that "at the beginning of the shift or whatever time, we had to notify the DJ what we wanted to play "She testified that" she had to pay the DJ or I could not go up" page 20 lines 9-13.

j) Page 21 lines 3 thru 11.  She testified that "typically" that she worked a seven (7) work week and danced every time she was at the Club.

k) Page 28 lines 5 thru 13, I asked in the Production of Documents, I "asked for copies of her 2010, 2011 and 2012 tax returns and she answered "No such documents" (at p. 28 line 3) and I asked her is that because she never filed income tax for 2010, 2011, and 2012 and she responded that during 2010, 2011 and 2012 she was a student and as a result was not liable for taxes. (at  p. 28 lines  11-13).

l) Page 30 lines 11-17 and page 31 lines 1-9.  She testified that she was fined for coming at 10:00 p.m. or 11:00 p.m. (late) and had to pay $60.00 to the bartender up front or security at the door on less than ten (10) times because she always came to work on time (lines 8-9 on page 31).

9

m) Page 31 lines 10-21 and page 32 lines 1-6. I asked her if the Defendant withheld monies from her and she responded yes and referred to the "payout" she had to pay the Club to work ($45.00 or $60.00 based on whatever time she came in) and the monies she paid to the DJ ($10.00 or $15.00 depending on the day) and the money she had to pay to the house mom. Clearly the Defendant did not withhold any monies from her and she was referring to money she alleged that she paid.

Page 9 lines 1-6. She testified that she entertained at PP & G, Inc. on Christmas evening while in the Defendant's Exhibit 10, Affidavit of Anthony Blount in item 16 stated that the Club was always closed Christmas  Day and evening..

p) Page 34 lines 2-6. I asked her if she was given the option to be an employee or an Independent Contractor in 2010 and she testified that she wasn't given that option or any other option.

q) Page 36 lines 1-6. I asked the Plaintiff if the DJ fee was paid directly to the DJ and not the Defendant and she admitted it but testified that "the managers would say something to us about not paying him. It wasn't a tip. It was a payment."

r) Page 37 lines 1-19. She testified that the maintenance fee was not a cleaning fee there were no clean towels or wash cloths (line 14), no soap was provided, no toiletries only toilet tissue.

s) 1) Page 39 lines 1-10. Mr. Wiggs asked her if she was required to pay "tip outs" and "tip ins" and she responded yes, and was advised of that by the manager.

ITEM 5 B. (a) Page 39 lines 11-21. Mr. Wiggs asked her if she was required to sign a document that showed you were an Independent Contractor.  She responded yes and it was at a meeting and Anthony Blunt said if we did not sign the document we could not work at the Club anymore. This was omitted during my direct examination when she testified that it was so long ago that she did not remember and that she testified "I signed …. I showed my ID…… and I danced.  That was it" See 5(d) above.

b) Page 44 lines 20-21. Mr. Wiggs asked if there were any other fines other than for being late or failing to pay your "pay out" and she answered "No " at page 45 line 1, Page 45 lines 2-21.

c) Mr. Wiggs asked "did they tell you when to go on stage"/ she answered yes lines 4-5.

d) Mr. Wiggs asked "so they told you when to dance". She answered "yes" lines 6-7.

e) Mr. Wiggs asked 'and they told you the rules and regulations". She answered "yes" lines 8-10.

f) Mr. Wiggs asked "and they told you what fines or "tip in" or fees you had to pay". She answered "yes" lines 13-15).

g) Mr. Wiggs asked "and they told you that it's a possibility…. they could change your shift or suspend you or terminate you." She answered "never offered to suspended but terminated yes" lines 16-21.

ITEM 5C a) Page 47 lines 8-9. I asked did "they ever tell you to work day shift" and she answered "yes" lines 8-9.

b) Page 47 lines 13-16. I asked "were you paid anything by the Club to work day shift or night shift. She answered "no" and further testified "if I had to work day shift, I had to pay a fee as well" Whereas on page 33 lines 6 thru 15. I asked did the Club dictate what shift and she answered "If we were sanctioned for any matter we could be told to work day shift" I asked "how many times did it happen to you (lines 12-13) and she answered (lines 14-15) "None because I wasn't going to work day shift".

c) Page 47 lines 17-21 and page 48 lines 1-3. I asked "isn't it a fact that all "Entertainers" don't dance" She answered "I don't know what all "Entertainers" do" line 19. I then asked "Did you ever notice that …." She answered "No" before I asked the entire question. She then testified "I didn't pay attention to anybody but myself".

11

ITEM 5 D :Defendant's Exhibit 10, Affidavit of Anthony Blount who set policy as General Manager

a) Item 3.  "Entertainers were free to entertain whenever they wished and free to leave whenever they wished, and there were no set shifts for "Entertainers" unlike employees who have scheduled shifts and set (fixed hours) to come and leave work at PP & G, Inc. dba Norma Jean's Nite Club.

b) Item 4. "Entertainers" as Independent Contractors, are allowed to entertain away from PP & G, Inc. and return to PP & G, Inc., as the "Entertainer" wishes, while an employee is not allowed to work for a competitor while not working for PP & G, Inc. without the approval of their General Manager.

c) Item 2.  Not violating any criminal law and/or rules and regulations of Liquor Board as to the sale of alcohol and as to Adult Entertainment, were the only conditions of employment and the only basis for suspension.

d)  Item 3.  "Entertainers" were free to entertain whenever they wished and free to leave whenever they wished and there were no set shifts for "Entertainers" unlike employees who have set days and hours to come and leave the Club.

e)  (1) Item 7(a) were not required to wear any specific outfits and could wear those same outfits while working for a competitor.

(2)  Item 7(b), 1(c), and 7(d).  No Independent Contractor was required to "Dance" or do "Lap Dance" or told what to wear while "Entertaining"

(3)  Item 7(g).  "Entertainers" came and went as they wished and no one else had any control over "Entertainers" except they could not violate any criminal statute as any rule or regulation of the Liquor Board.

(4) Item 7(h)  There were never any fines or "tip out" or "tip in" or charges of any fee charged or paid for the right to work while the maintenance fee/cleaning fee that were not

12

mandatory had no bearing on the use of the facilities, if not paid.  See also Items 8,9,11 and 12.

(5)  Item 7(i) No "Entertainer" was required to drink any non alcoholic or alcoholic beverage.

(f)  Item 13.  If DJ not tipped, the DJ still put the Entertainer and the dance card and played her songs.  There was no penalty, fine, or other sanctions for not tipping the DJ.

(g)  Item 14.  Unique Butler was engaged as an "Independent Contractor" three or four months after I started as General Manager in September, 2009.

(h)  Item 8 lines 9-10.  Mr. Blount relied on the rules and regulations of the Liquor Board as to the hiring of "Entertainers" as Independent Contractors and, based on my personal knowledge that other Adult Entertainment Clubs in Baltimore City engaged Independent Contractors as "Entertainers" using their own methods and rules, but PP & G, Inc. intentionally, in all ways, kept Independent Contractors at arm's length allowing the "Entertainers" complete control over all aspects of the method and manner of their performance with (limitations) and without any "tip in", "tip out" or other fines, penalties or sanctions.  Further, Mr. Blount worked in the industry for years and there were never any problems related to "Entertainers" as Independent Contractors.

(i)  See Item 15.  Unique Butler, the Plaintiff, only worked at night and would not come in before 9:00 p.m. and left before 1:00 a.m. and that she normally performed three (3) to four (4) evenings per week.

(j)  See Item 16.  The Club was not open Christmas Day or Christmas Evening.

(k)  See Item 20.  When engaged as Independent Contractors "Entertainers" were explained that they could at any time change to an employee and receive a W-2, but no "Entertainer" elected to change, and no "Entertainer" was ever paid any monies from PP & G,

13

Inc., and no deductions whatsoever and as such no W-2 or 1099 was ever given to any "Entertainer".

(l) Item 21. In hiring "Entertainers" I hired women of all body types, races and ages and used positive people skills and personality to be governing factors.

(m) See Item 22. Most, if not all of our "Entertainers" including Unique Butler dance elsewhere, and based on my observations, wore the same outfits they wore at Norma Jean's Nite Club.

(n) See Items 23 and 24. The Club did not make any money from "lap dances", from any "Entertainer" dancing on stage, from any non alcoholic drink purchased for an "Entertainer" and we had more than ten (10) television units set up around the bar and pool room area and two (2) pool tables and both were major draws during all types of sports events. The pool tables were active day and night. 100% of all alcoholic sales were retained by PP & G, Inc. As such, even without any "Entertainers" at all, PP & G, Inc. would still have significant alcohol sales accounting for a majority of the gross receipts by PP & G, Inc. This was true for all day shifts from 12:00 noon to 8:00 p.m. until 11:00 or 11:30 p.m.

3. Defendant's exhibit 12, Affidavit of Shaquetta Doughtery

(a) First and Second paragraphs of the preamble of Affidavit, when Shaquetta Doughtery was first engaged as an "Entertainer"/Independent Contractor more than thirteen (13) years ago and within the last six (6) months, Ms. Doughtery rejected the offer to become an employee and remained an Independent Contractor.

(b) Item 2. No one required her to dance or demanded what outfits she must wear or when and on what days she was to entertain or how long she had to remain once she arrived or that she had to remain once she arrived or that she had to do "lap dances" or otherwise control the method and manner in which she entertained as long as I did not violate any Maryland Law. The Plaintiff and other "Entertainers" during the evening discussed the

14

freedom to do what was wanted when we wanted including working for competitors, if we wished.

(c) Item 3.  There were no mandatory meeting, but if anyone violated any criminal laws or any rules or regulations of the Liquor Board of Commissioners for Baltimore City often management would have a non mandatory meeting to again explain what was done that violated any Maryland Law and   to   explain the criminal laws related to our work and the rules of the Liquor Board.  Also, I was advised several times during the year that about the option of becoming an employee and that Unique Butler AKA Dior that she was also advised and told me that she could become an employee ,if she wished.

(d) Item 5.  There were no fines whatsoever, no sanctions, and no penalties related to entertaining as an Independent Contractor, and the only limitation was obeying all criminal laws and the rules of the Liquor Board.

(e) Item 7.  No one is required to dance, there is no pre arranged schedule to dance designed by any Manager or anyone else, no dress code and no one is expected or required by law to dance nude or to expose any parts of their body to the patrons, and I discussed this with other "Entertainers" including the Plaintiff, Unique Butler.

(f) Item 10.  There are no late fees, fines or penalties related to an "Entertainer" and I have never gotten a late fee, fine or penalty, and I have discussed this with other "Entertainers" who came in during the evening and none of them, including the Plaintiff, have ever said anything about ever receiving a penalty, fine, or sanction of any kind.  As an "Entertainer," I set out own schedule and the method and manner in which I perform.

(g) 1st paragraph of preamble, I perform in the evening and I work twenty (25) hours or more but not more than thirty nine (39) hours but Unique Butler entertained with me in the evening but come in between 9:00-9:30 p.m. or latter and left before midnight.

   4. Defendant's Exhibit 11, Affidavit of Kevin Klein

(a) Item 5.  Unique Butler entertained in the evening which is the shift that I am assigned as Security as an employee.

(b) Item 6.  She normally came in between 9:00-9:30 p.m. and left between midnight and 1:00 a.m.

(c) Item 10.  Two weeks before Unique Butler was suspended Mr. Klein heard and saw Ms. Butler arguing with other "Entertainers" and I saw her damage other "Entertainers" property and this conduct continued until the physical fight with Daneylle Toomer on June 11, 2012.

(d) Item 11.  Before the fight I saw and heard the General Manager, Walter Robinson, tell Unique Butler that if her conduct continues she could be suspended indefinitely.

(e) Item 10.  Mr. Klein saw the adverse reaction by patrons who were nearby during her arguments with other "Entertainers".

(f) Item 14.  Mr. Klein never met an "Entertainer" who was not an Independent Contractor who could come and go as she pleased during any shift she preferred and leave whenever she pleased.

(g) Item 15.  Mr. Klein had seen "Entertainers" who were Independent Contractors of PP & G, Inc. entertaining at a competitor's business.

(h) Mr. Klein never heard a General Manager tell an "Entertainer".

1) That she had to dance or if she wanted to dance, when she could dance, or

2) That certain clothing had to be worn, or

3) That she could or could not do lap dances, or

4) That she could not come or leave as she pleased, or

16

5) That she had to pay a penalty, find, or submit to any sanction except a violation of a criminal law or a violation of a rule or regulation of the Liquor Board that resulted in an immediate suspension.

i) Item 18. That as an employee he received a W-2 statement from PP & G, Inc. for filing his income tax in a timely manner.

j) I ,Kevin Klein,know based on my personal knowledge and observations that Larelle Little, the bartender on the evening shift was an "Entertainer" for three (3) years and then became a bartender and an employee working a specific shift.

ITEM 5E.  Defense Exhibit 4, August 9, 2013 deposition of Walter Robinson, III

a) At Page 16 Lines 20-21 and Page 17 lines 1-11.  Mr. Wiggs ask "Okay".  And at all times the Plaintiff worked as an exotic dancer for the Defendant.  Defendant controlled every aspect of Plaintiff's work relationship with the Defendant.  Mr. Robinson responded that the question Mr. Wiggs was asking was not true, and she didn't work for us, but worked for herself.  She's an Independent Contractor.

b) Page 22 Lines 6-17.  Mr. Wiggs asked was she ever fined.  Mr. Robinson testified" No, never."  Mr. Wiggs asked if Defendant deducted anything from her tips, and Mr. Robinson answered "No."

c) Page 23 Lines 8-13.  Mr. Wiggs asked if Mr. Robinson set and controlled the Plaintiff's work schedule. He answered "no."  Mr. Wiggs asked if Plaintiff could come in any time, and Mr. Robinson answered yes and that is why  100 girls could show up tonight if they wanted to.

d) Page 23 Line 21 and Page 24 Line 1-2.  Mr. Wiggs asked if Mr. Robinson, as General Manager had the ability to discipline Plaintiff by taking her off the schedule, and  ended with either you had the ability or you ………  Mr. Robinson answered yes.(but only if they violate and laws as set forth above)

e)  Page 24 Lines 5-21.  Mr. Wiggs asked if Mr. Robinson set the Club rules and standards for who could and could not be hired to work at Norma Jean's Nite Club.  Mr. Robinson answered as far as Security and Bartenders, Yes but as to "Entertainers"/Independent Contractors, it is governed by State Law so if you are eighteen and older, and you are a female and you have a positive attitude answered Mr. Robinson.  Mr. Wiggs then asked "So you set the Club rules and standards for who could and could not be hired and work for Norma Jean's Nite Club and Mr. Robinson answered yes.

f)  Page 25 Lines 4-9.  Mr. Wiggs asked if someone arrives at 10:00 p.m. isn't there a $60.00 charge to work.  Mr. Robinson answered" No $60.00 charge".

g)   Page 39 Lines 20-21 and Page 40 Lines 1-7.  Mr. Wiggs asked if the Defendant made deductions from Plaintiff's pay by way of charges, fees and fines mandated by the Defendant to be paid by Plaintiff to the Defendant.  Mr. Robinson answered "No".  Then Mr. Wiggs asked if the Defendant made deductions from Plaintiff's pay by way of charges mandated by Defendant to be paid by Plaintiff to Defendant.  Mr. Robinson answered "No".

h)  Page 40 Lines 20-21 and Page 41 Lines 1 & 2.  Mr. Wiggs asked if the Defendant made deductions from Plaintiff's pay without the written permission from the Plaintiff.  Mr. Robinson answered "No".

i)  Page 44 Lines 17-19.  Mr. Wiggs asked do you have any documents stating that you give options to dancers to be either an Independent Contractor or an employee.  Mr. Robinson answered "Yes".

j)  Page 45 Lines 15-20.  Mr. Wiggs asked if he had a sign in sheet and sign out sheet showing that she's worked.  Mr. Robinson testified "No. Girls come in whenever they please." Mr. Wiggs then asked if you don't keep track of the number of hours that they work.  Mr. Robinson answered "No".

k) **Page 45 Lines 15-20.** Mr. Wiggs asked and you don't have a sign in sheet and sign out sheet that shows sheets worked. Mr. Robinson answered "No" girls come and go as they please. It is up to them.

l) **Page 46 Lines 3-13.** Mr. Robinson testified that we have no work schedules for Independent Contractors but do for employees. Employees have to be in at a certain time and wear a uniform.

m) **Page 47 Lines 8-9.** No sheets for tip in and tip out.

n) **Page 47 Lines 10-12.** None of the dancers chose to be employees to date.

o) **Page 48 Lines 20-21.** The employees are "Bartenders and Security" according to the testimony of Mr. Robinson at the Deposition.

p) 1) **Page 51 Lines 8-10.** I asked what are the rules that she must follow and Mr. Robinson answered the Maryland State Liquor Board and Adult Entertainment Laws.

2) **Page 51 Lines 11-12.** Mr. Robinson was asked "how much does she have to pay DJ". Mr. Robinson testified "As much as she likes".

3) **Page 51 Lines 13-14.** Mr. Robinson was asked "Did you institute a dress code?" He testified "No".

4) **Page 51 Lines 15-18.** Mr. Robinson was asked "And then, why was ….. You said that she was suspended because of the fight. He testified "The …. And also some….. like some other behavior issues prior to this" Questions asked by Mr. Wiggs.

q) **Page 52 Lines 2-18.** Mr. Robinson testified that he saw the fight but not from the beginning but did see them throwing glasses at each other and saw glass all over the floor and both girls were bloody. He further testified that he saw and heard the argument on the main floor in the presence of a customer. Mr. Robinson didn't see who threw the first punch, but when he got to the dressing room they were both punching each other, and it's possible she was defending herself. Questions asked by Mr. Wiggs.

r) Page 55 Lines 13-21. And Page 56 Lines 1-20 and Page 57 Lines 2-5.

1) I asked who sets the amount to be paid for a lap dance, and Mr. Robinson testified "the dancer" (Page 55 Lines 13-15)

2) I asked if there was an amount that is suggested. Mr. Robinson answered "Yeah most girls use like a $20.00 persons ...... (Page 55 Lines 18-20)

3) However he added that "Girls can charge what they like". (Page 56 Line 2)

4) During the day, the lap dance fee is normally given to the Bartender to hold for the "Entertainer" until she leaves and at night, the "Entertainers" for the most part hold their own monies for lap dances" but all monies for lap dances are returned to the "Entertainers" if held by the Bartender.  (Page 56 Lines 13-18)

5) All monies belonging to each "Entertainer" is segregated from the Club's monies if held by a Bartender until returned to the "Entertainer".  (Page 56 Lines 19-20)

6) All (lap dance fees) held by a Bartender are paid to the Independent Contractor when they're ready to leave for the day of night per the testimony of Mr. Robinson.  (Page 57 Lines 2-5).

s) Page 57 Lines 6-11 Page 57 Lines 14-18 Page 58 Lines 2-3 Page 58 Lines 8-11 Page 58 Lines 12-16.

1) Mr. Robinson was asked for his definition of what a payout, a "tip payout is".  Mr. Robinson answered "Usually, clubs will ask you to pay a fee and on your way out you pay this fee (Page 58 Lines 17-20)

2) Mr. Robinson was asked "Now that you referred to a maintenance fee" define what that is related to? Explain where the money goes? Mr. Robinson testified basically it cleans the carpets, restocks soap, ice machine maintenance you know everything"  Then he was asked "Okay would you classify – it is better classified as a cleaning fee? He answered "Yeah a cleaning fee". (Page 59 Lines 1-10)

20

t (1)  He was then asked "has the money ever been used for maintenance of the premises as opposed to cleaning?.... Mr. Robinson then responded "Yeah it's just for cleaning (Page 59 Lines 11-14)

   2)  Mr. Robinson was asked relating to the maintenance fee that it is not a mandatory fee and is better described as a cleaning fee. (Page 60 Lines 9-18)

   3)  Then asked "does the "Entertainer" get full benefit with regard to towels and ....  Mr. Robinson answered "Clean showers (Page 60 Lines 19-21) and he continued Towels, fresh soap, dressing room and general area (Page 61 Lines 1-12)

   4)  Referring to the Adult Entertainment License Laws and Rules Defendant's Exhibit 14,

Page 62 Lines 2-11 (Marked as Defendant's Exhibit 1 from ,the August 9, 2013, Deposition of Walter Robinson) and Page 62 Lines 2-11, Page 62 Lines 13-14, Page 63 Lines 14-17, Page 63 Lines 11-13, Mr. Robinson was asked to read Page 3 Item 1(b)(1)(a) Page 62 Items 13-14.

He read "Dancer means any person, whether as an employee, an Independent Contractor or an invitee of the business provides adult entertainment". Page 63 Lines 4-7  Mr. Robinson further testified that he has a copy in the Office and knew it was in effect while being trained at  Page 63 Lines 11-13.

   5)  Page 63 Lines 20-21, Page 64 Lines 1-6, Page 64 Lines 7-12, Page 64 Lines 13-16 and Page 64 Lines 17-19.  Mr. Wiggs asked what do you mean, it had been in effect (Page 63 Lines 1-2) Mr. Robinson answered everything affects how we conduct business, and he first saw the rules "almost six (6) years ago. (Page 64 Lines 1-6).  Mr. Wiggs then asked Mr. Robinson if he was familiar with case law that came out in last three (3) years about dancers not being Independent Contractors. (Page 64 Lines 7-12).

   Mr. Robinson testified that he heard of law suits in other states but "our business is very different than a lot of these types of adult businesses that I've read about in these cases".

(Page 64 Lines 13-16.  Mr. Wiggs asked if he read the cases and Mr. Robinson clarified that he had seen news reports but haven't read the cases. Page 64 Lines 17-19.

  6)  Page 65 Lines 11-20, Page 66 Lines 8-17, Page 66 Lines 18-21, and Page 67 Line 1.  Mr. Robinson identified the "Entertainers Contract Agreement for Unique Butler, the Plaintiff and further testified that at the signing a General Manager testifies about the law and that it was part of the business records of the Club and it was the original. (Page 65 Lines 11-20).

  Mr. Wiggs asked how he knew she signed the Agreement.  Mr. Robinson testified that he was in the Office and saw her sign the Agreement and that he had her sign it. (Page 66 Lines 8-17)

  Mr. Wiggs if he was a manager in 2010 , did he also do Security, and Mr. Robinson said "Yes" and that he still also does Security. (Page 66 Lines 18-21 and Page 67 Line 1) and I introduced the Agreement as Defense for the Deposition of Walter Robinson. (Page 67 Lines 4-7)

  7)  Page 68 Lines 15-20, Page 68 Line 21, and Page 69 Lines 1-8 and Page 69 Lines 3-5, Page 69 Lines 6-14, Page 70 Lines 2-7, Page 70 Lines 8-10.

  I asked what governs the Plaintiff's hours, and Mr. Robinson answered "her own will" and that "She could come in and leave on any day and at any time she wished. Page 68 Lines 15-20.

  I asked were there any fines whatsoever that were charged to or paid by Plaintiff, and Mr. Robinson answered "No" (Page 68 Line 21 and Page 69 Lines 1-2).

  I asked who if anyone, established the work schedule for the "Entertainers".  Mr. Robinson answeréd "It's completely up to them". Page 69 Lines 3-5.

  I asked "what rules are the "Entertainers required to obey? Mr. Robinson answers "Only the State Liquor Board, the rules in the Liquor Board and Adult Entertainment Licensing, and State and Federal Laws". Page 69 Lines 6-11.

22

I asked did they "entertain as an Independent Contractor whenever they wished to come in and leave when they wanted".  Mr. Robinson answered that one elected Independent Contractor status there's "no limitation on when they could come or go or anything like that".  Page 70 Lines 2-7.

I asked "who was required to dance".  Mr. Robinson answered "No one" Page 70 Lines 8-10.

8)  Page 70 Lines 17-21, Page 71 Lines 1-3, Page 71 Lines 4-9, Page 71 Lines 10-14, Page 72 Lines 13-18, Page 72 Lines 20-21, Page 73 Lines 2-8.

a.  I asked "If they didn't, the DJ were the songs that were required by the Independent Contractor still played".  Mr. Robinson answered "Oh yeah, just like drinks still get served, even if you don't tip the Bartender".  Page 70 Lines 17-21.

b.  I asked "Is there any type of dress code required while the "Entertainers" are engaged as Independent Contractors at the Club ".  Mr. Robinson answered "No" "They can wear whatever they like".  Page 71 Lines 4-9.

c.  I asked "And it's your testimony that there were no fines whatsoever.  Mr. Robinson answered "No fines whatsoever".  Page 71 Lines 10-14.

d.  I asked "What is the paramount issue used in your determination to hire an Independent Contractor.  Mr. Robinson answered "I'm mostly looking for attitude.  You know positive attitude..... Someone who makes you feel comfortable." Page 72 Lines 13-18.

e.  I asked who is the person who fires an employee.  Mr. Robinson testified that "he is the person who fires employees" and I asked what about "Entertainers" and her answered "we usually just suspend their contract but took the person back every time. Page 73 Lines 2-8

23

9) Page 74 Lines 5-11, Page 74 Lines 12-21, Page 75 Line 1, Page 75 Lines 2-6, Page 78 Lines 12-14, Page 78 Lines 15-19, Page 78 Lines 20-21, Page 79 Lines 1-2, Page 79 Lines 3-5, Page 79 Lines 6-9.

a. All of the tips that an "Entertainer" gets whether it's dancing, as a lap dance, or a drink are all kept by them.  Page 74 Lines 5-11.

b. None of the "Entertainers" to date have elected to change to an employee unless they decide to become a Bartender. Page 74 Lines 12-21, Page 75 Line 1

c. "There is no limitation on how many lap dances or songs or anything like that". Page 75 Lines 2-6.

d. The primary source of income is the sale of alcohol for the Club.  Page 77 Lines 5-7.

e. The Plaintiff, Unique Butler, was suspended for fighting, along with Ms. Toomer, "but the Plaintiff had already been involved with a bunch of .... Behavioral issues." Page 78 Lines 12-14 "so ..... instead of normal two week suspension ... "She was given a month ..... to cool off". Page 78 Lines 15-19.

f. I asked while "Entertainers" are with PP & G, Inc. are they allowed to work elsewhere? Mr. Robinson answered "Yes", they do all the time".  Page 78 Lines 20-21 and Page 79 Lines 1-2.

g. I asked "Were any schedules retained obliging the "Entertainers" to work on certain days and certain times?" Mr. Robinson answered "No". Page 79 Lines 3-5.

h. I asked "Were there any penalties imposed or any fines or anything that was done if someone did not come in for a period of time?" Mr. Robinson answered "No". Page 79 Lines 6-9.

10) Page 80 Lines 19-20, Page 81 Lines 1-7, Page 81 Lines 8-10, Page 81 Lines 11-13, Page 81 Lines 18-21 and Page 82 Lines 1-15, Page 82 Lines 16-18, Page 82 Lines 9-21, Page 84 Lines 8-14, Page 85 Lines 14-17.

a. I asked did Mr. Robinson "rely on that Liquor Board handout while you were being trained". Mr. Robinson replied "Yes", .... I carried it around with me for quite a while". However he never "asked the Liquor Board about the Independent Contractor Language but we've ..... had no .... no one's ever had a problem with it before". Page 80 Lines 19-20, Page 81 Lines 1-7.

b. The Defendant doesn't require any "Entertainer" to share her tips while doing lap dances. Page 81 Lines 8-10.

c. The Defendant does not require any payment of the fee charged for a lap dance from any "Entertainer". Page 81 Lines 11-13.

d. All the money for a non alcoholic drink "lady's drink" that a patron purchaser for $20.00 is given to the "Entertainer" when she chooses to leave. If alcohol is required for "Entertainers" 21 years or older, then the cost for a shot of alcohol is paid by the patron and the $7.00 charge is retained by the Club. Page 81 Lines 18-21 and Page 82 Lines 1-15.

e. There is no mandatory dress code with regard to an "Entertainer". Page 82 Lines 16-18.

f. Mr. Wiggs asked with all television and pool tables that are kept up to date, is there no requirement on how women look? Mr. Robinson answered "No". Page 82 Lines 9-21. Mr. Robinson added "These women are making so much money that they like to dress pretty..... They want to look nice. We don't tell them to look a certain way. Page 84 Lines 8-14.

g. Mr. Wiggs asked, "They don't benefit from any ..... you say you guys sell a lot of liquor. They don't benefit:. Mr. Robinson answered "they don't benefit from alcohol sale:. Page 85 Lines 14-17.

ITEM 5F Page 7 Lines 3-8, Page 7 Lines 9-11, Page 7 Lines 14-15, Page 9 Lines 8-11. The August 9, 2013, Deposition of Kenya Oduyoye at Page 7 Lines 3-8, Page 7 Lines 9-11.

a)  Mr. Wiggs asked who worked for Norma Jean's Nite Club the entire time for the past nine (9) years.  Ms. Oduyoye answered "Yeah, Off and .... I mean, just whenever I want.  So it's not like any everyday thing, but yes I've been a contractor, Independent Contractor for nine years".

b)  Mr. Wiggs asked "you're familiar with my client Unique Butler?"  Ms. Oduyoye answered "Yes".  Page 7 Lines 9-11.

c)  Mr. Wiggs asked "and how many years has she worked there?"  Ms. Oduyoye answers "Maybe about three years to my knowledge".  Page 7 Lines 12-15.

d)  Ms. Oduyoye testified that "no one gets fired from Norma Jean's Nite Club.  Every time you get time off everybody is always allowed to come back.  No one gets fired.  Page 9 Lines 8-11.

ITEM 5F  Plaintiff's Answer to Defendants Interrogatory #10

INTERROGATORY NO. 10  During the time period you allege that you were an exotic dancer at the Defendant's place of business at 10 Custom House Avenue explain why you did not file any Federal or State Income tax returns.

Answer:  Norma Jeans did not provide a W-2 form to do so.( In her deposition the Plaintiff testified that she was a student and exempt from filing)

a)  As discussed above, in her August 9, 2013 Deposition of Unique Butler, she first testified that she did not know if she was an employee or Independent Contractor even though she admitted signing the Application.  She said that it was not explained to her and she testified "I signed it - showed my ID - and I danced.  That was it".  Page 17 Lines 17-21 and Page 18 Lines 1-2.

b)  But latter during cross examination by Mr.Wiggs, she was certain that she was an employee even though she did not ask anyone including IRS about Norma Jean's failure to provide W-2.  Page 19 Line 5 and Page 18 Lines 9-11.

c)  She also claimed she worked at Norma Jean's in 2009.  Page 42 Line 18 and she claimed that she worked at Norma Jean's as an employee since 2007.  Page 44 Lines 6-7.  See also Page 46  Line 11.  If truthful, she would have five (5) years to get a W-2.

d)  Unique Butler claimed she worked for "Greek Pete for 1-2 years after she started work, then there was Anthony Blount who stayed for some time and then there was Walter Robinson.  Page 39 Lines 2-7.

e)  Unique Butler did not file Income Taxes for 2010, 2011, and 2012 because she was a student and as such not liable for taxes.  Page 28 Lines 5-13.

f)  It must be noted that Plaintiff's Answers to Defendant's Interrogatories were sent on August 6, 2013 before the Deposition on August 9, 2013 of Unique Butler according to the Certificate of Service.

g)  Even though she originally did not know if she was either an employee or Independent Contractor she specifically remembered that she was not advised that she had an option to be an employee at any time.  Page 35 Lines 6-10.

There is ample direct positive evidence contradicting the alleged control the Plaintiff argues  that the Defendant had over all aspects of her employment with PP & G, Inc.

10.  Yes ,Mr. Robinson had the ability to remove "Entertainers" from the schedule, if any only if, they violated Maryland Law (i.e. any criminal statutes) and any rule or regulation of the Liquor Board or a violation of a criminal statute. See Defendant's Exhibit 4 ,August 9,2013, Deposition of Walter Robinson, III at Page 51 lines 8-10,and  Page 69 lines 6-15,and item 2 of the Affidavit of Anthony Blount Defendant's Exhibit 10

Employees would be fired.  Independent Contractors were suspended as set forth above but were allowed to come back.  The Club rules for hiring were established by Walter Robinson and Mac who trained him, a previous manager had a rational and legitimate purpose as set

forth above.  People skills made the "Entertainer" more likely to relate to the customers but also to each other in a positive non aggressive manner as set forth above.

As set forth above, the Defendant did not control every aspect of Plaintiff's performance, in fact, the Defendant only required what the law already required:

1)  Obey all criminal laws, and

2)  Obey all rules and regulations of the "Liquor Board"

Their work was not of a transient nature such as "seasonal employees" but was open ended so that the "Entertainers" could work elsewhere for a competitor, while engaged at PP & G, Inc., (See August 9, 2013 Deposition of Kenya Oduyoye at Page 7 Lines 3-8, and Page 7 Lines 9-11) unlike an employee who has set schedules and hours and could not appear at Norma Jean's for extended periods of time.  "Entertainers" were free to not appear for extended periods and then resume entertaining as, and when, and how they each wanted unlike employees.

There is  a genuine dispute as to material facts related to the intent and control that the Defendant had over any "Entertainer" including the Plaintiff, and labeling them as Independent Contractor has nothing to do with the lack of control set forth above, based on "specific non speculative evidence ..." See Bouchat v Balt. Ravens Football Club, 346 F. 3d. 514,526 (4th Cir. 2003)

ITEMS  6 & 7   Material Facts  allegedly not in dispute .  Plaintiff alleges our facts are not in dispute.  At no time while Plaintiff, entertained at PP & G, Inc. did she enjoy any profit or loss dependent on the financial success of Norma Jean's Nite Club and at no time, while Plaintiff worked, did Plaintiff ever make a financial investment in the Club.

a)  See Affidavit of Anthony Blount.  Items 26 and 27 below:

" 26. The Independent Contractors and the Employees(Bartenders and Security) both did not have the opportunity to share in the profits or losses of the Defendant's business, and

neither were allowed the opportunity to  invest in the Defendant's business ,but Independent Contractors were free to work whenever  they wished and could retain all tips, lap dance fees, nonalcoholic drinks purchased for them, and were free to work for competitors unlike employees who need approval by their General Manager before working for a competitor whenever not working at the Defendant's business.

27.  At no time, while I was General Manager during the evening, at PP & G, Inc. was Unique Butler or any other Independent Contractor/"Entertainer" or any employee or any one in Management:

1) Enjoy the opportunity for profit or loss dependent on the financial success of PP & G, Inc. dba Norma Jean's Nite Club, or

2) Have the opportunity to make any financial investments into Norma Jean's Nite Club, or

3) Allowed to hold any membership or ownership in Norma Jean's Nite Club.

This applied to both employees and "Entertainers" as Independent Contractors."

b) See Affidavit of Kevin Klein.  Items 15 and 21 below:

1.  15. as Independent I have seen "Entertainers" who are engaged Contractors at Norma Jean's Nite Club going into a competitors business to entertain.  On several occasions ,I went into the competitors business to verify in fact that the" Entertainers "were dressed in the same clothing/outfits that they wore while entertaining at Norma Jean's Nite Club.

2.  I , as a longtime employee of PP & G, Inc., have:
    a)   Never shared in the profits of Norma Jean's Nite Club and I am at the Club during each evening shift, on time every day not just when I want to be there and
    b)  Never have had the opportunity to invest monies into PP & G, Inc. and
    c)  Never have shared in the profits or losses in the Club, and

d) Never invested in any equipment or material that can be used elsewhere such as my clothing that is worn when I am on the street and not at work, or elsewhere, and

e) Never used forced unless absolutely necessary even though I have skills in disarming and subduing violent individuals, but instead try to diffuse any situation by using "people skills" talking to the individuals involved so as to prevent anyone from getting hurt.

No one, neither any employee (Bartender, Security) nor any "Entertainer" (Independent Contractor) shared in the profits or losses in the Club, and no one, neither any employee (Bartender, Security) nor any "Entertainer" had the opportunity to invest monies into PP & G, Inc. nor own any membership or interest in PP & G, Inc. dba Norma Jean's Nite Club.

ITEM 8  Plaintiff's work related services were an integral part of Defendant's business.

a) See Items 22, 23, 24 and 26 of Defendant's Exhibit 10,  Affidavit of Anthony Blount:

"22.  Any outfits or garments that each "Entertainer" purchased to wear at the Club could also be worn at any other Club at which they performed including Unique Butler.  Further, I have seen "Entertainers", Independent Contractor, entertaining at competitors clubs, wearing the same outfits that they wore at Norma Jean's Nite Club, during the period in which I was General Manager and afterward."

" 23.  While I was General Manager at PP & G, Inc. dba Norma Jean's Nite Club,  PP & G, Inc.:

(a) Did not make any money if the "Entertainer" did lap dances.

(b) Did not make any money from the "Entertainer" dancing, if she elected to dance.

(c) Did not make any money from the purchase of non alcoholic drinks by patrons for any "Entertainer", unless a shot of alcohol was also purchased as set forth above."

30

" 24.  When I was General Manager, there were more than ten (10) television units set up around the bar and pool table areas and two (2) pool tables that were both major draws during all types of sports events that were televised and ordered for the patrons.  The pool tables were always active both day and night and so were the televisions except after 11:00 p.m. in the evening.  100% of all alcohol sales were retained at all times by PP & G, Inc. while I was General Manager.  As such, even without any Entertainers, PP & G, Inc. would still have significant alcohol sales accounting for a majority of the gross receipts by PP & G, Inc..  This is true for each day shift that ran from 12:00 noon to 8:00 p.m. and for each evening shift from 8:00 p.m. until 11:00 p.m. or 11:30 p.m.  "

"26. The Independent Contractors and the Employees(Bartenders and Security) both did not have the opportunity to share in the profits or losses of the Defendant's business, and neither were allowed the opportunity to  invest in the Defendant's business ,but Independent Contractors were free to work whenever  they wished and could retain all tips, lap dance fees, nonalcoholic drinks purchased for them, and were free to work for competitors unlike employees who need approval by their General Manager before working for a competitor whenever not working at the Defendant's business."

b)  The Plaintiff's reference to the August 9, 2013, Deposition of Walter Robinson, III testimony was that the semi nude "Exotic Dancers" are but one (1) of the features of the Nite Club.  See Page 16 Lines 4-10.

 Mr. Robinson again said that it is a part of the business, not an integral part.  See Defendant's Exhibit 4, August 9, 2013, Deposition of Walter Robinson, at Page 18 Lines 17-21 and Page 19 Lines 1.

 Walter Robinson continued to testify at his deposition that Norma Jean's Nite Club is a Sports Bar and has pool tables and there are lots of different draws and that the "exotic dancers" is but one of them Id.  at Page 19 Lines 2-18.

31

However, Walter Robinson did testify thereafter that there are hundreds of "Entertainers". Some of them work today and some work six (6) months from now and that they are all over the Country. 1d. at Page 20 Lines 2-8.

Mr. Robinson continued and testified that on the day of the deposition, he knew that 30 to 40 "Entertainers" would show up to dance during that evening, and that the hours of operation of the Club were from 12:00 p.m. until 2:00 a.m. and "exotic dancing" is available the whole time the Club is open, but included that the pool tables are also open all day. 1d. Page 21 Lines 1-17, along with television sets. Mr. Wiggs then asked again if the "Entertainers" were an integral part of Defendant's business after explaining that there can be more than one integral part.   Mr. Robinson asked for clarification of the word "integral" and requested that he use another word. Mr. Wiggs responded "Relevant" and Mr. Robinson testified that "she was relevant to it,   Yes". Here, Relevant was not an appropriate explanation of integral.   Relevant is defined as "Logically connected and tending to prove or disapprove a matter in issue; having appreciable probative value- that is rationally tending to persuade people of the probability or possibility of some alleged fact. See Black's Law Dictionary, Seventh Edition, 1999.

Mr. Wiggs attempted to come back and clarify integral again and asked Mr. Robinson if Plaintiff performed a duty that is central and integral to Defendant's business explaining that integral meant "an important part of Defendant's business" to which Mr. Robinson responded "We don't make money from...." and further stated that the Club does not make money from the dancers. We make our money from pool tables.   We make our money from sporting events.   We make our money from liquor.   Mr. Wiggs then asked if the dancers were a draw and if they draw more customers than you would if you didn't have them and that is why you have them. Mr. Robinson answered "Yes".   Immediately   thereafter, Mr. Wiggs asked "So Plaintiff performed a duty that is central and integral to Defendant's business. Mr. Robinson answered "No, it's not central , it's not integral" and if we didn't have them we would still be open. Mr. Wiggs  asked if they would make the same amount of money without them, and Mr. Robinson answered "Yes".  Mr. Wiggs asked what's the purpose of
32

having them and Mr. Robinson answered "entertainment". Mr. Wiggs asked if it was important to the business and Mr. Robinson answered that it's not important to the business. Mr. Robinson continued testifying , we only make money from the liquor and the pool tables and sports events , and added, if we didn't have dancers we would still make money and that the Club doors would not close if there were no dancers.

Mr. Wiggs asked "Okay, but you make more money; you use them to make more money. Mr. Robinson answered "We use the TV's to make more money, too, because they watch football games ....." Mr. Wiggs then asked "So you use them to make more money?" Mr. Robinson answered "Yes" but they are not the central reason why we're at work" See Defendant's Exhibit 4, August 9, 2013 Deposition of Walter Robinson III. Page 34 Lines 2-21, Page 35, Page 36, and Page 37 Line 1.

c) Defendant's Exhibit 10, Affidavit of Anthony Blount, at items 23 & 24 . " The Club did not make any money from "lap dances", from any "Entertainer" dancing on stage, from any non alcoholic drink purchased for an "Entertainer" and we had more than ten (10) television units set up around the bar and pool room area and two (2) pool tables and both were major draws during all types of sports events. The pool tables were active day and night. 100% of all alcoholic sales were retained by PP & G, Inc. As such, even without any "Entertainers" at all, PP & G, Inc. would still have significant alcohol sales accounting for a majority of the gross receipts by PP & G, Inc. This was true for all day shifts from 12:00 noon to 8:00 p.m. until 11:00 or 11:30 p.m." This weighs heavily with respect to the volume of alcohol sales attributable to the Entertainers based on the period during the day and evening that alcohol sales were substantially attributable to other areas. The Plaintiff did not give any basis to measure the extent to which the "Entertainers " contributed to alcohol sales .No quantum analysis or evidence was solicited with regard to that very important issue of " Integral Part . When one considers that many of the "Entertainers" leave the Baltimore Metropolitan area and often go to other States to perform for as long as they wish, and then return, when they wish, and entertain as they wish at PP&G ,Inc, and thereafter ,free to leave again to work elsewhere as they wish. The concept of this loose group of people not being Independent

33

Contractors, under any definition   especially when one considers the specific instance of the complete lack of control ,on the part of  the Defendant, as  presented in Item 5 hereinbefore set out. It is  the degree of control  the alleged Employer has in comparison to the control exerted by the "entertainer". See Schultz v. Capital Intern. Sec.,Inc.,466 F3rd 298,at 305,(4th Cir. 2006).  Given the facts, there is a genuine dispute about   material facts as to these people being  truly in business for themselves maximizing income by working elsewhere while retaining a base at Norma  Jean's . See August 9, 2013, deposition of Walter Robinson, III at page 84 line  8-12 "These girls are making so much  money that they like to dress pretty and buy expensive bags...They like to look nice".    Also, from Mr. Robinson's testimony, it is impossible to reasonably infer that a significant or substantial increase in gross sales results from the present of the "Entertainers".  In fact,   he testified that the Club makes money from the pool tables and sporting events and that the Club could continue to exist, without them. All he testified to was that they are a draw ( among others) and that the Club does make more money with them but did not testify to anything specific.  As a result, the Defendant has presented sufficient evidence to the Court to demonstrate the existence at an issue of fact.  See   Pension Ben. Guar. Corp. v Beverley, 4043d243, 246-247(4th Cir. 2005)

ITEM 9  Material Facts alleged not to be in dispute. Defendant did not pay   Plaintiff   and Defendant made deductions from Plaintiff's pay by way of a $45.00 fee out of her tips  , regardless of when she came to work ,and the $45 fee is mandated to be paid by the Plaintiff to the Defendant.

1. Exhibit 7, August 9, 2013, the Deposition of Plaintiff, Unique Butler:

    a) At page 14 lines 3 thru 17, I asked Plaintiff if she paid the $45.00 maintenance fee, that has been referred to as the cleaning fee, and she responded I paid the $45.00 "tip out" fee nightly and that she never paid a cleaning fee.  Further she testified that if she was late, she paid a late fee of $15.00 in addition to the $45.00 (total $60.00) up front (when she arrived). She also testified she paid $60.00 but she "wouldn't say it was that often", and that she testified that she never left without paying.

34

b) At   page 16, lines 4 thru 15, I asked the Plaintiff to define" tip out" and she testified that a "tip out" is basically what "you pay to work there". It's not optional at all.  You must pay it to work there".  She also testified that everybody (i.e. "Entertainers") pays that fee and everybody is still paying that fee to work there.

c) Page 18 lines 13 thru 21.  She testified that, all the time, she saw people leave through the rear door so as not to pay the Management or cleaning fee.  She further testified that they had to pay a fine or penalty, when they came back the next day.

d) Page 19 lines 1 thru 7.  She testified that she knew about paying a penalty   when she left by the back door because she spoke to other people when she and the others were leaving outside by the rear door  to avoid paying the maintenance fee /cleaning fee even though at page 19 lines 4-5, she testified that she always paid the fee.

e)  Page 31 lines 10-21 and page 32 lines 1-6.  I asked her if the Defendant withheld monies from her and she responded yes and referred to the "payout" she had to pay the Club to work ($45.00 or $60.00 based on whatever time she came in) and the monies she paid to the DJ ($10.00 or $15.00 depending on the day) and the money she had to pay to the house mom. Clearly the Defendant did not withhold any monies from her and she was referring to money she alleged that she paid.

f) Page 37 lines 1-19.  She testified that the maintenance fee was not a cleaning fee there were no clean towels or wash cloths (line 14), no soap was provided, no toiletries only toilet tissue.

g) Page 44 lines 20-21.  Mr. Wiggs asked if there were any other fines other than for being late or failing to pay your "pay out" and she answered No at page 45 line 1.

h) Mr. Wiggs asked "and they told you what fines or "tip in" or fees you had to pay".  She answered "yes" lines 13-15).

35

i) Page 47 lines 13-16.  I asked "were you paid anything by the Club to work day shift or night shift. She answered "no" and further testified "if I had to work day shift, I had to pay a fee as well" Whereas on page 33 lines 6 thru 15.  I asked did the Club dictate what shift and she answered "If we were sanctioned for any matter we could be told to work day shift"  I asked "how many times did it happen to you (lines 12-13) and she answered (lines 14-15) "None because I wasn't going to work day shift".

j) Page 44 lines 20-21.  Mr. Wiggs asked if there were any other fines other than for being late or failing to pay your "pay out" and she answered No at page 45 line 1.

2.  Defendant's Exhibit 10, Affidavit of Anthony Blount who set policy as General Manager

a)  Item 7(h)  There were never any fines or "tip out" or "tip in" or charges of any fee charged or paid for the right to work while the maintenance fee/cleaning fee that were not mandatory had no bearing on the use of the facilities, if not paid.  See also Items 8,9,11 and 12

b)  See Item 20  of Exhibit 10, Affidavit of Anthony Blount " When engaged as Independent Contractors "Entertainers" were explained that they could at any time change to an employee and receive a W-2, but no "Entertainer" elected to change, and no "Entertainer" was ever paid any monies from PP & G, Inc.,  and no deductions whatsoever and as such no W-2 or 1099 was ever given to any "Entertainer".  "

3) Defendant's exhibit 12, Affidavit of Shaquetta Doughtery

a) Item 5.  There were no fines whatsoever, no sanctions, and no penalties related to entertaining as an Independent Contractor, and the only limitation was obeying all criminal laws and the rules of the Liquor Board.

b) Item 10.  There are no late fees, fines or penalties related to an "Entertainer" and I have never gotten a late fee, fine or penalty, and I have discussed this with other "Entertainers" who came in during the evening and none of them, including the Plaintiff, have ever said

anything about ever receiving a penalty, fine, or sanction of any kind.  As an "Entertainer," I set out own schedule and the method and manner in which I perform.

4) Defendant's Exhibit 4, August 9, 2013 deposition of Walter Robinson, at Page 22 Lines 6-17. a) Mr. Wiggs asked was she ever fined.  Mr. Robinson testified "No, never."  Mr. Wiggs asked if Defendant deducted anything from her tips, and Mr. Robinson answered No.

b)Page 59 lines 1-10 and page 60 lines 9-18  Mr Robinson testified that the maintenance fee is better classified as a cleaning fee and it is not mandatory.

ITEM 10  Material Facts alleged not to be in dispute Defendant: has no record of ever paying wages to Defendant.

There is evidence of the times that the Plaintiff worked based on the Affidavits of the witnesses Co Entertainers / Anthony Blount, General Manager as follows:

a)Defendant's Exhibit 12, Affidavit of Shaquetta Daughtery in the first paragraph states that she worked more than 20 hours but less than 39 hours during the week and knows, based on personal knowledge, working  the same period as Plaintiff in the evening ,that the Plaintiff works less hours than her because she comes in later at 900pm-930pm and leaves before midnight,

b) Defendant's  Exhibit 9, Affidavit of Larelle Little in items 1 and 2  states she is the Bartender in the Evening shift in which Unique Butler entertains  and the Plaintiff entertains not more than twenty hours per week (five days each week beginning after 800 pm and leaving at or before midnight),and

c)  Defendant Exhibit 10, Affidavit of Anthony Blount at  Item 15 as follows:  Unique Butler, the Plaintiff, only entertained at night and would not come in before 900pm and would leave before 100 am entertaining three or four evenings per week.

Although there was no reason to keep records of the "Entertainers" ,who came and went as they pleased, there is the testimony of the above, and other affidavits hereinbefore filed

as exhibits by the Defendant in Plaintiff's First Motion for Partial Summary Judgment , from which her hours can be reconstructed. There are no record of the Defendant ever paying the Plaintiff because no monies were ever paid to the Plaintiff from the Defendant as set forth above. The Plaintiff earned income as previously set forth with none of it being either controlled by or paid by the Defendant to the Plaintiff.

ITEM 11. The Defendant admitted the Gross income , before any deductions of any sort was deducted, was over $500,000 for year 2009.2010,2011,and 2012. See Amended Admissions

ITEM 12. Material Facts alleged not to be in dispute: Plaintiff never signed an authorization for Defendant to take deductions because no deductions from her income were ever taken by the Defendant. See the following:

a) " When engaged as Independent Contractors "Entertainers" were explained that they could at any time change to an employee and receive a W-2, but no "Entertainer" elected to change, and no "Entertainer" was ever paid any monies from PP & G, Inc., and no deductions whatsoever and as such no W-2 or 1099 was ever given to any "Entertainer". " See Item 20 of Exhibit 10, Affidavit of Anthony Blount

b) . Defendant Exhibit 4, August 9, 2013 deposition of Walter Robinson ,at Page 22 Lines 6-17. Mr. Wiggs asked was she ever fined. Mr. Robinson testified "No, never." Mr. Wiggs asked if Defendant deducted anything from her tips, and Mr. Robinson answered" No."

ITEMS 13 thru 17 will be discussed under ITEM 17 of Material Facts alleged not to be in dispute ,herein, as follows: The Defendant acted on the Rules and Regulations of the Board of Liquor Commissioners for Baltimore City ,as to Adult Entertainment Licenses, in effect in Baltimore City since the Club, attached to Defendant Exhibit 10 Affidavit of Anthony Blount and as Defendant Exhibit 14,that allowed "Entertainers" to be Independent Contractors, and relied upon the fact that all of the Clubs in Baltimore City ,with Adult Entertainment Licenses , since 1999 have used Independent Contractors ,as their "Entertainers", as set forth above ,and until now no one has had a problem with it. See also Defendant Exhibit 4,August

9,2013,Deposition of Walter Robinson, III, at page 80 -81.The Defendant did rely on a governmental body(ie Liquor Board live entertainment rules) anf the fact that all similarly situated businesses in  the Greater Baltimore Metropolitan area have used Independent Contractors (but operate completely different from the manner in which PP&G, Inc operates as set forth above) and no one complained as Walter Robinson testified in his August 9,2013 Deposition as noted above.

## III  Standard of Review

Under Federal Rule of Civil Procedure 56, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The purpose of summary judgment is to dismiss claims and defenses that lack evidentiary support. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). When the moving party "will have the burden of

proof at trial, they must show that no material fact remains by pointing to admissible evidence on each of the elements of their claim." Major v. CSX Transp., Inc., 170 F. Supp. 2d 563 (D. Md. 2001). The non-moving party must then point to the record showing an absence of evidence for an essential element of the moving party's claim or present "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324.

All facts and inferences will be drawn in a light most favorable to the non-moving party. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996). The court, however, will not rely on a party's allegations that lack supporting evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "[A] plaintiff may not . . . rest on mere allegations or denials of his pleadings." Id. at 259.

39

(citations omitted). A motion for summary judgment will be denied when there is a "dispute about a material fact [that] is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

"Once the movant has established the absence of any genuine issue of material fact the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue of fact."   Pension Ben. Guar. Corp v. Beverly, 404F.3d243,246-247(4th Cir.2005).  Affidavits are appropriate in defending against a summary judgment motion if the affidavits contain specific facts, admissible in evidence from an affiant competent to testify establishing that there is a genuine issue for trial.  See Rule 56(e).  If the movant has established the absence of any genuine issue of fact, the non moving party must adduce specific, nonspeculative evidence to demonstrate an issue of fact.  See Bouchat v Balt. Ravens Football Club, 346F.3d514,526(4th Cir.2003).

III. DISCUSSION

To recover minimum wage under FLSA and MWPCL, the Court must find that there was an employment relationship between the Plaintiff and the Defendant.  Under FLSA, an employee is "any individual employed by an employer" and to employ is "to suffer or permit to work."  29 U.S.C. Sec. 203(e)(1), (g).  FLSA has been consistently construed liberally to ensure that it "applie(s) even to those who would decline its protections" because "employers might be able to use superior bargaining power to coerce employees to ... waive their protections under the Act."  Tony and Susan Alamo Found. V. Sec. of Labor , 471 U.S. 290, 296 302 91985).  In that case, the alleged employer engaged

recovering drug  addict , criminals ,and derelicts before
their rehabilitation by the Foundation who were  religious
members of the evangelical foundation. The foundation  did
not solicit monies but instead had the "associates"
volunteer at numerous commercial businesses that included
electrical and roofing construction companies ,hog farms,
clothing outlets .The "associates" took the position that
they were volunteering services  based on their religious
and evangelical beliefs and waived any benefits under the
act. As "associates" they were totally dependent upon the
alleged employer for their support that included clothing,
food, shelter and other benefits. This case is not similar.
PP&G, Inc requested that each "Entertainer" make an
election that was revocable to be an Independent Contractor
in which case an "Entertainer's Agreement" was executed
that included the Independent Contractor selection and the
notation that she was responsible for paying her own income
taxes, Workers Compensation Insurance etc. or if the
entertainer decided to be an employee then no application
is signed but instead Federal and Maryland tax forms were
prepared and signed(as with all Bartenders and
Security).Employees are controlled in all respects
Independent Contractors are not except as required by
law(ie Liquor Board rules and criminal statutes).  See
Defendant's Exhibit 5  ,August 9,2013,Deposition of Lisa
Ireland at Page 7 Lines 9-20, Page 7 Lines 12-13,  Page 19 Lines 1-6, and Page 19
Lines 20-21.

There is no evidence of coercion except the deposition
testimony of the Plaintiff herself that was disputed by the
deposition testimony of the General Manager, Walter Robinson,

and the affidavits of Anthony Blount and Kevin Klein and
Shaquette Daughtery, as fully discussed above.

The FLSA defines an employee as "any individual employed by
an employer," 29U.S.C.203(e) and defines "employ" as "to suffer
or permit to work." 29U.S.C.203(g).  Under MWPCL, an employer is
"any person who employs an individual in the State." Md. Code
Ann., Lab. & Empl. Sec. 3-501(b).

In order to determine whether an individual is an employee,
courts must look to the "economic reality" of the relationship
by analyzing the following six factors:
(1) The degree of control that the putative employer has
over the manner in which the work is performed;
(2) The worker's opportunities for profit or loss
dependent on his managerial skill;
(3) the worker's investment in equipment or material, or
his employment of other workers;
(4) The degree of skill required for the work;
(5) The permanence of the working relationship; and
(6) The degree to which the services rendered are an
integral part of the putative employer's business.
Schultz v. Capital Intern. Sec., Inc., 466 F.3d 298, 305 (4th
Cir. 2006). "No single factor is dispositive." Id.
Furthermore, "the label that the parties give to their
relationship is not controlling."
Heath v. Perdue Farms, Inc., 87 F. Supp. 2d 454, 457 (D. Md.
2000).
IV. Analysis
a) Degree of Control
The degree of Control that PP&G,Inc. has in comparison to the
control exerted by Unique Butler ,as discussed in Item 5 above
on pages 8 thru 28,and as set out in the attached Table of
42

Contents ,are dipolar. The Plaintiff's position is that PP&G,Inc controlled all aspects of her entertaining while PP&G,Inc as set forth above submitted direct evidence to the contrary creating a genuine dispute as to the issue of "control". The Defendant respectfully requests that this Court finds that a genuine dispute of a material point (ie as to Control) exists

(b)Opportunity for profit or loss and Investment in PP & G,Inc

Both employees(Bartenders and Security) and "Entertainers"/ Independent Contractors both did not have the opportunity to invest in the business of PP & G, Inc. or share in the profits and losses of PP & G, Inc. regardless of their managerial skills.  However, "Entertainers" were allowed to be engaged by competitors while they were Independent Contractors while they were with PP & G, Inc. whereas employees were not allowed to work for a competitor unless they had permission from a manager. Also, neither employees or Independent Contractors were allowed to purchase any membership or stock in PP & G, Inc.  In addition the Plaintiff makes reference to hustling in her memorandum, and there is absolutely no evidence direct or indirect or hustling in this case.  Furthermore, the Plaintiff refers to a waiver of the maintenance fee if the "Entertainer" did not make sufficient funds.  Again, there is absolutely no evidence that the Plaintiff ever failed to pay the maintenance fee because she had not earned sufficient income.  Just the opposite exists. Larelle Little in Item 2 of her Affidavit stated that the Plaintiff never objected to the maintenance fee and never asked for a waiver from paying the maintenance fee.  In addition, see Items 6 & 7 at Pages 28-30 for the contents of the affidavit of Anthony Blount and Kevin Klein related to this issue.  Although the "Entertainers" were a draw for customers, there were other draws and PP & G, Inc. derived substantial income from those

43

sources as will be discussed in Item 6 that discusses services
of an "Entertainer" as an integral part of
PP & G, Inc. business.

(c)  Worker's Investment in equipment or materials

As "Entertainers" they made little if any investment in order to
entertain at PP & G, Inc.  Although they were not required to
wear any specific clothing, although there is no evidence
whatsoever concerning what, if anything the Plaintiff spent in
purchasing clothing to be worn at PP & G, Inc., they were free
to work elsewhere while engaged as an Independent Contractor at
PP & G, Inc. See Page 29 Item 26 Affidavit of Anthony Blount in
which the "Entertainers" were free to work whenever they wished
and were free to work for competitors without anyone's
permission. It is well established that courts look at the
opportunity for profit or loss as the amount realized by a
business over and above capital investment.  See Brock v Mr. W
Fireworks, Inc. 814 F.2d 1042, 1050-51 (5th Cir.), cert. denied,
484 U.S. 924 (1987).  As such, the clothing worn by an
"Entertainer" although not required as discussed above, does
substantially increase the opportunity to earn additional income
such as dancing, and Unique Butler did testify at her Deposition
that she danced and that she worked at other clubs while at
PP & G, Inc. She could therefore wear the same clothing at the
other clubs.

(d)  Degree of Skill required

In hiring both Anthony Blount in his affidavit and Walter
Robinson in his deposition, as set forth above, did not require
any special skills when hiring an "Entertainer" but instead
looked at positive people skills as being a primary factor in
engaging "Entertainers".  People skills and the ability to make
people feel comfortable is an important "special skill" in

44

itself that is either developed or is something that an
individual is born with.  This has bearing in the income that an
"Entertainer" could expect.

(e)  Degree of the Permanence of the Relationship

As discussed above an "Entertainer" at PP & G, Inc. was not only
able to work at competitors locally but was able to travel
outside the state for significant periods of time to entertain
elsewhere and then return back to PP & G, Inc. In the August 9,
2013 deposition of Keyna Oduyoye, she testified on Page 6 Lines
1-2 and on Lines 20-21 and at Page 7 Lines 2-9 that she had
worked for Norma Jean's Nite Club for "off and on" for nine(9)
years and during that time she also entertained at Fuegos and
Green Boat.  Unique Butler testified that she entertained at PP
& G, Inc. from 2007 thru 2012 although her "Entertainers
Application" was dated January 28, 2010 and she was suspended
for fighting on June 11, 2012.  At Ms.Oduyoye's deposition at
Page 7 Lines 14-15 she testified the Plaintiff was with PP & G,
Inc. for about three(3) years.

(f)The Degree to which the services are an integral part of
    of PP & G, Inc. business

A complete discussion of Plaintiff's services being an integral
part of Defendant's business was set forth as one of Plaintiff's
items to which she claimed there was no material dispute. There
is a complete discussion of that topic beginning at Item 8 on
Page 30 and continuing to Page 34 stopping at Item 9 halfway
down the page.  Based on my references to the evidence related
thereto, and after having had the benefit of the depositions, I
respectfully submit that there is a genuine dispute as to this
material fact.  When the lack of any control whatsoever over the
method and manner in which Unique Butler entertained except the
requirement that she obey all Laws of the Liquor Board and all

45

Criminal Statutes and the lack of quantifying what the term
integral meant as set forth in the second and third paragraphs
on Page 32 of Plaintiff's Memorandum continuing to Item c on
Page 33 in which Walter Robinson in his deposition of August 9,
2013 at Page 18 Lines 17-20, Page 19 Lines 1-18 Page 20 Lines 2-
8 and Page 21 Lines 1-17, and Page 34 Lines 2-21 and Page 35,
Page 36 and Page 37 Line 1 and Page 84 Lines 8-12.  Also see
Exhibit 10 Affidavit of Anthony Blount, Items 22,23,24,and 26.
Based on the depositions and the affidavit of Anthony Blount,
I respectfully urge the Court to find a genuine dispute of a
material fact (i.e. the services of the Plaintiff are an
integral part of PP & G, Inc. business).

 The burden is on the moving party to demonstrate that there is
"an absence of a genuine issue of material fact" in dispute.
Celotex Corp. v. Catrett,477 U.S.317,323,106 S.Ct. 2548,91
L.Ed.2d 265(1986)

 V Comparison to other cases that have found exotic dancers to be
              Employees instead of Independent Contractors
a)Reich v. Circle C Invetments,Inc.,998 F. 2d.324(CA5(Tex.)1993)
1)At the end of each night ,all dancers had a mandatory "tip
out" payable to the Defendant regardless of how much they made
in tips characterized as a stage rental. Id at 326
2)The dancers had fixed weekly work schedules and fines were
imposed  for absences or tardiness and Dancers had to pay the
Defendant $10 for table dances and $20 for couch dances.
3)Dancers had to supply their own customs but they were required
to meet standards set by the Defendant to "promote the right
atmosphere", and high heels only. Id at page 327

46

4)The Defendant set rules such as no more than 15 minutes at one
time in dressing room and only one dancer in restroom at a time
and all dancers "must be on the floor" at opening time or fines
were imposed to enforce the rules. The only rule PP&G, Inc
imposed were those required by law. Id at page 328.

b)Thompson v. Linda,779 F.Supp.2d.139(D.D.C.,2011)
1)The Defendant paid the Plaintiff approximately $40 per ten-
hour shift($30 to $50 per shift) id at pages 142 & 148 and the
Defendant took unexplained deductions from Plaintiff's wages
including late fees, fines for calling in sick and stage fees Id
at page 142
2)The Defendant required the dancers to perform 30 minutes on
and 30 minutes off and were expected to follow a schedule set
and posted by the Defendant and the Defendant established rules
and "some violations punished with monetary fines.Id at page 148
None of these policies in this case comes close to what PP&G,Inc
and the Plaintiff herself testified at her deposition that the
maintenance fee that she described as a "tip out" was the only
fee that was in place and PP&G, Inc  did not pay her any monies
even though she described PP&G, Inc as deducting from her income
when in fact Ms Little in her Affidavit testified Ms Butler paid
her the maintenance fee without complaint.

c)Clincy v. Galardi South Enters.,Inc.,18 Wage & Hour
Cas.2d(BNA)245,808 F.Supp.2d.1326(N.D.Ga.,2011)
1)The Defendant set "Rules of Conduct for Contractors and
Employees that it drafted and distributed to the dancers and it
can fine entertainers for violations, and anyone can notify the
house mom of conduct by an entertainer that warrants corrective
action and the house mom can issue a notice of corrective action
47

along with a fine payable the night received, and the Defendant
can fine an entertainer for bring food into the business,
arguing or fighting with customers, breaking the law, and  can
also suspend an entertainer. Id at page 1331

2)There are scheduled nights to work for each entertainer and
the entertainers can be fined for not working without calling
ahead. Each Entertainer is required to work four days per week
and will be fined if they do not. An entertainer can be fined
for working at a competitor when scheduled to work at
Defendant's club sometimes requiring proof of the reason that an
entertainers missed a scheduled shift. The entertainer must work
two slow days per month and if not were fined .The house mom and
management can require that entertainers lose weight ,change
hair style ,use make up to cover scars or be fined if they do
not ,and are forced to wear only high heels or stiletto
platforms. Id at page 1332

3)If a entertainer is called to dance and does not dance or
arrive late orb leaving early  and they must pay the DJ a$20 or
10% of their gross or they may be fined. Id Page 1334

d)Thornton v Crazy Horse, Inc. No.06-251,2012 WL 2175753 (D. AK,
June 14,2012)

1)The Entertainers receive biweekly paychecks from the Defendant
supposedly in the amount of the minimum wage from which
deductions were taken. The Defendant collects a $10 fee for each
dance immediately before or after an entertainer goes into the
VIP room, and each dancer was required to pay $10 for each hour
that they worked each hour or $80 for an 8 hour shift at Crazy
Horse, Inc

2)At Fantasies, the dancers also paid the club $15 per hour or $50 for a standard 5 hour shift, the entertainers were required to sell a certain amount of drinks per night and were paid commissions ,and were required to tip out the DJ, door man and the wait staff ,and the entertainers received a biweekly check from which deductions were taken.

All of these cases that found the entertainers to be employees operate completely differently from PP&G, Inc according to the witnesses Depositions and Affidavits from PP&G ,Inc. submitted to this Honorable Court and raise genuine disputes as to material facts

_____/s/_____
John C Themelis,Esquire
4610 Eastern Avenue
Baltimore,Maryland 21224
Telephone 410-467-3400
 fax 443-438-3000
 jct@themelisfirm.com
Counsel for Defendant