| | | |
|---|---|---|
| UNIQUE S. BUTLER | * | IN THE UNITED STATES DISTRICT COURT |
| PLAINTIFF | * | FOR THE DISTRICT OF MARYLAND |
| V. | * | |
| PP & G, INC. | * | CIVIL ACTION NO. WMN-13-430 |
| DEFENDANT | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### AFFIDAVIT OF ANTHONY BLOUNT

I, Anthony Blount, am a competent person to be a witness and based on my personal knowledge, certify, swear, or affirm, under penalties of perjury, to the following:

1. I was the General Manager of PP & G, Inc. dba Norma Jean's Nite Club at 10 Custom House Avenue located in Baltimore City, Maryland from September, 2009 thru May, 2011.

2. While General Manager I set policy, hired and fired employees (Bartenders and Security), engaged Independent Contractors as "Entertainers", and suspended the Independent Contractors, for periods of a couple of days to a couple of months, for violating any criminal and/or rules and regulations of Liquor Board of Commissioners for Baltimore City as to the sale of alcohol and as to Adult Entertainment, that were the only conditions at employment. I do not remember any Entertainer being fired, while I was General Manager.

3. "Entertainers" were free to entertain whenever they wished and free to leave whenever they wished. There were no set shifts for entertainers unlike employees who have scheduled shifts and set hours to come and leave work at PP & G, Inc. dba Norman Jean's Nite Club.

4. "Entertainers", as Independent Contractors, were allowed not to Entertain at PP & G, Inc. for a substantial period of time and at their option to resume entertaining at PP & G, Inc. During any periods that are desirable to them, and on any basis that they wish while an employee is not allowed to work for a competitor while not working for PP & G, Inc., without the expressed approval of the General Manager.

5. "Entertainers" as Independent Contractors are allowed to work for competitors during the same period in which they are actively entertaining at PP & G, Inc. while an employee is prohibited from working for a competitor when not working at PP & G, Inc. without the approval of the General Manager.

6. PP & G, Inc. was a Maryland Corporation in Good Standing while I worked there as General Manager.

7. I as General Manager or anyone else in Management:

   7(a) Did not require that the "Entertainers" come into PP & G at any specific time, on any day, on any specific shift or require that they stay for any specific time period. The "Entertainers" were free to go and come as they please.

7(b)  Did not require that the "Entertainers" purchase or have given any specific outfits to wear while entertaining and in fact the "Entertainers" could wear whatever they wished to work and could also wear the same outfit while working for a competitor.

7(c) No "Entertainer" as Independent Contractor was required at any time to dance.

7(d) No "Entertainer" as an Independent Contractor was required at any time to participate in a "lap dance."

7(e) No one controlled or designated what shift any particular Independent Contractor "Entertainer" would be entertaining.  That was entirely in the sole discretion of the "Entertainer", as an Independent Contractor.

7(f) At all times, "Entertainers", as Independent Contractors, came and went as they wished.

7(g) No control over the method and manner in which each "Entertainer" performed except could not violate any criminal statute or any Rule or Regulation of the Liquor Commissioners for Baltimore City as to the sale of alcohol or as to Adult Entertainment.

7(h) There were never any penalties, fines, or "tip out" or charges of any sort including "tip in" or "tip out" payments except maintenance fee as set out below.

7(i) No "Entertainer" as an Independent Contractor was required to drink non alcoholic or alcoholic beverages.

8. I relied on all of the rules and regulations of the Board of Commissioners for Baltimore City as to the sale of alcohol and as to Adult Entertainment  that were effective in 1999

especially as to the hiring of Independent Contractors as "Entertainers" and the fact that all

other Clubs that were licensed for Adult Entertainment were also doing the same or similar

methods of engagement that PP & G, Inc. utilized with respect to the engaging of Independent

Contractors as "Entertainers" but because of the absence of any control over the "Entertainers"

and the absence of any penalty, fine or other sanction except, when and if there is a violation of

a criminal statute or a violation of the Board of Liquor License Commissioners for Baltimore City

as to the sale of alcohol or live entertainment in which a suspension would immediately follow,

and the lack of any "tip in" and/or "tip out", except for a maintenance/cleaning fee as discussed

below.  PP & G, Inc. intentionally kept every aspect of the relationship with Independent

Contractors at an arms length basis so that it truly was an Independent Contractor relationship

allowing the "Entertainer" complete control over all aspects of the method and manner of their

performance without limitation or exception.  Further, I worked in the Industry for years both

before I came to PP & G, Inc. and after I left, and there were never any problems as to engaging

Independent Contractors as "Entertainers".

   9.  There were never "tip in" and/or "tip out" fees charged or paid for the right to work at PP

& G, Inc. dba Norma Jean's Nite Club while I was the General Manager.

   10.  The rules and regulations of the Liquor Commissioners for Baltimore City as to Adult

Entertainment, relied upon by me, are attached hereto and made a part of this Affidavit by

Incorporation by Reference herein.

   11.  The Maintenance fee charged while I was there was $45.00 for "Entertainers" who

Independent Contractors and $5.00 for employees (i.e. Bartenders, Security and Management).

The maintenance fee should be better classified as a cleaning fee.  It was applied to the

purchase and cleaning of Towels, wash cloths, soaps, toiletries, cleaning the two (2) dressing

areas, cleaning the rugs in the dance area, bar area, pool tables area, cleaning the top of the

pool tables, Clorox wipes/Windex and paper towels to disinfect the pole and the dance,

toiletries, female products, facial cream, and other cleaning and personal hygiene items.  The

difference of $40.00 ($45.00 for entertainers and $5.00 for employees) (i.e. Bartenders,

Security and Management) is that "Entertainers" use substantially all of the items while the

employees use only a few.  The maintenance fee is not mandatory in that if it is not paid, then

no penalty, fee, charge or sanction follows.  Some "Entertainers" leave by the rear door without

paying same.  The maintenance fee is paid to the Bartender on duty before the "Entertainer"

leaves the Club.

12.  While I was there as General Manager, even if an "Entertainer" or any employee failed

to pay the maintenance fee, the supplies were still available for their use upon return.

13.  Before 2010, if an "Entertainer" wished to dance, she would put $1.00 into the Music

vending machine for each song she wanted and would get on one of the two stages

coordinating the purchase with space on a stage.  Two (2) "Entertainers" could dance on one (1)

stage if they wished.  After 2010, a DJ was available to take requests from the "Entertainers"

and place them on the dance card, and it was suggested to tip the DJ because the music

vending machine that cost each "Entertainer" a dollar to play each song was discontinued.

However, even if the "Entertainer" did not tip the DJ, she was still placed on the dance card and

her song selections were still played.  While I was General Manager there was no penalty, fine,

or other sanction for not tipping the DJ. Any payments to the DJ went to the DJ and not the Club.

14. Unique Butler AKA "Dior" was engaged as an "Independent Contractor" three (3) or four (4) months after I started as General Manger at PP & G, Inc.

15. I do not remember her working  during the day time.

16. While I was General Manager the Club closed every Christmas day.

17. While I was General Manager of PP & G, Inc. dba Norma Jean's Nite Club, the "Entertainers":

(a) If they did lap dances they retained the entire fee and any tips related thereto at their own income.

(b) If they had a non alcoholic beverage purchased by a patron at a cost of $20.00, the entire $20.00 was held for them by the bartender until such time as the "Entertainer" retrieved it from the bartender.  This money was part of the "Entertainers" income.  If however, alcohol was also paid for by the patron, it would be placed in a shot glass next to the non alcoholic beverage but the cost of $7.00 for the shot of alcohol remained as income for the Club.

(c) If they elected to dance then all of the tips that were given to her by patrons during and after, belonged entirely to the "Entertainer" as income.

(d) If they received any additional tips, 100% of the tips remained with each "Entertainer" as additional income.

(e) If they elected the bartender could hold any monies they had earned while entertaining at the Club or each "Entertainer" could put their money in a small basket supplied by the Club and hold it themselves.  When they decided to leave if the bartender was holding any money that belonged to them, they would retrieve it before they left.

18. The maintenance fee was paid to the bartender on duty when they left the Club.

19. "Entertainers" as Independent Contractors were not paid any monies by PP & G, Inc. dba Norma Jean's Nite Club.

20. When engaged as Independent Contractors after rejecting the terms of being a minimum wage tipped employee were explained that they could at any time change from Independent Contractors status to that of a minimum wage tipped employee but with the monies paid for lap dances and the non alcoholic beverages paid for by patrons would belong to the Club but all tips would belong to the employee but taxes would be deducted and they would receive a W-2 and I reminded the newly hired and existing "Entertainers" from time to time about their right to change.  While I was there I reminded each of the Independent Contractors that they could change to an employee upon notice to any General Manager. However, while I was General Manager no "Entertainer" elected to be an employee.  The

Independent Contractors/"Entertainers" were not paid any monies by PP & G, Inc. and no deductions were ever taken by PP & G, Inc. from any of its employees for any reason at any time. The maintenance fee (cleaning fee) set forth above was paid by the employee out of their income to the bartender on duty before they left the premises. No W-2 or 1099 was ever issued by PP & G, Inc. to any "Entertainer" because PP & G, Inc. while I was General Manager never paid anything to any "Entertainer" and made no deduction there from.

21. While I was General Manager, I hired all of the "Entertainers" and Employees (bartenders and security). As "Entertainers" I hired women of all body types, races, and ages and used as my primary guideline, was positive people skills and personality as governing factors that would allow each patron to feel welcomed and relaxed in a friendly atmosphere, and furthers harmonious relationships between "Entertainers".

22. Any outfits or garments that each "Entertainer" purchased to wear at the Club could also be worn at any other Club at which they performed including Unique Butler. Further, I have seen "Entertainers", Independent Contractor, entertaining at competitors clubs, wearing the same outfits that they wore at Norma Jean's Nite Club, during the period in which I was General Manager and afterward.

23. While I was General Manager at PP & G, Inc. dba Norma Jean's Nite Club, PP & G, Inc.:

(a) Did not make any money if the "Entertainer" did lap dances.

(b) Did not make any money from the "Entertainer" dancing, if she elected to dance.

(c) Did not make any money from the purchase of non alcoholic drinks by patrons for any "Entertainer", unless a shot of alcohol was also purchased as set forth above.

24. When I was General Manager, there were more than ten (10) television units set up around the bar and pool table areas and two (2) pool tables that were both major draws during all types of sports events that were televised and ordered for the patrons. The pool tables were always active both day and night and so were the televisions except after 11:00 p.m. in the evening. 100% of all alcohol sales were retained at all times by PP & G, Inc. while I was General Manager. As such, even without any Entertainers, PP & G, Inc. would still have significant alcohol sales accounting for a majority of the gross receipts by PP & G, Inc.. This is true for each day shift that ran from 12:00 noon to 8:00 p.m. and for each evening shift from 8:00 p.m. until 11:00 p.m. or 11:30 p.m.

25. The Plaintiff, Unique Butler AKA "Dior" and all other "Entertainers were given the opportunity before and after the initial election to be Independent Contractors or Employees. If anyone elected to be an employee tax forms were prepared by the accountant immediately and no "Entertainment Application " was signed. If not and the individual elected to be an Independent Contractor, then the "Entertainment Application" was signed. No one was ever threatened that if they did not elect to be an Independent Contractor that they could not stay at PP & G ,Inc. and entertain as an employee .

26. The Independent Contractors and the Employees(Bartenders and Security) both did not have the opportunity to share in the profits or losses of the Defendant's business, and neither were allowed the opportunity to  invest in the Defendant's business ,but Independent

Contractors were free to work whenever they wished and could retain all tips, lap dance fees, nonalcoholic drinks purchased for them, and were free to work for competitors unlike employees who need approval by their General Manager before working for a competitor whenever not working at the Defendant's business.

27. At no time, while I was General Manager during the evening, at PP & G, Inc. was Unique Butler or any other Independent Contractor/"Entertainer" or any employee or any one in Management:

1) Enjoy the opportunity for profit or loss dependent on the financial success of PP & G, Inc. dba Norma Jean's Nite Club, or

2) Have the opportunity to make any financial investments into Norma Jean's Nite Club, or

3) Allowed to hold any membership or ownership in Norma Jean's Nite Club.

This applied to both employees and "Entertainers" as Independent Contractors.

28. No deduction by PP & G, Inc. were ever taken from monies that were income to the "Entertainers" as Independent Contractors whereas the employees (Bartenders and Security) did have deduction taken from their pay as required by law.

29. I had nothing to do with the accounting of gross receipts except preparing the monies for Deposit.

30. The hours of operation are governed by the Liquor Board (ie 12 noon to 2:00 am).

31. The "Entertainers" as Independent Contractors and the Employees were not allowed to cash in any tips but instead took their money with them when they left.

32. The "Entertainers" as Independent Contractors kept as income all "lap dance" fees, all non alcoholic beverages purchased for them, all tips related thereto, if they dance, any tips related thereto, and all other tips remain with the "Entertainer"/Independent Contractor as her income including Unique Butler, the Plaintiff.

33. No deductions whatsoever, from any monies held by the Bartenders, for the "Entertainer", are withheld from the "Entertainer" for any reason at any time.  100% of all monies are given to the "Entertainer" at all times.

34. "Entertainers" are not paid any monies by PP & G, Inc. all their income comes from lap dances, non alcoholic drinks and tips retained solely by them as income and as such there are no records retain related to monies paid to Unique Butler from either PP & G, Inc. or from any other source except from the testimony of other "Entertainers" and/or myself and/or employees who observed her during the evening at Norma Jean's Nite Club.

35. I am a competent witness able to testify to the above based on my personal knowledge, experience, and observations.

| | | |
|---|---|---|
| UNIQUE S. BUTLER | * | IN THE UNITED STATES DISTRICT COURT |
| PLAINTIFF | * | FOR THE DISTRICT OF MARYLAND |
| V. | * | |
| PP & G, INC. | * | CIVIL ACTION NO. WMN-13-430 |
| DEFENDANT | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### VERIFICATION OF ATTACHED AFFIDAVIT FROM, ANTHONY BLOUNT

I, ANTHONY BLOUNT, do hereby certify, swear, or affirm that the contents of the Attached Affidavit, are true and accurate, under the penalties of perjury, based on my person knowledge.

Anthony Blount

## TO ALL ADULT ENTERTAINMENT
## LICENSEES

This book is published by the Board of Liquor License Commissioners for Baltimore City to acquaint all adult entertainment licensees, their employees and the public with the Rules and Regulations governing the operation of adult entertainment establishments in Baltimore City

Study these Rules carefully
and make sure that all employees are familiar with them.
All adult entertainment licensees and their employees are responsible for abiding by these Rules

**Stephan W. Fogleman**
**Chairman**

**Elizabeth C. Smith**
**Commissioners**

**Harvey E. Jones**
**Commissioner**

**Samuel T. Daniels, Jr.**
**Executive Secretary**

**Jane M. Schroeder**
**Deputy Executive Secretary**

**BOARD OF LIQUOR LICENSE COMMISSIONERS
FOR BALTIMORE CITY**

231 E. Baltimore Street, 6th Floor
Baltimore, Maryland 21202

| | |
|---|---|
| **General Information** | **396-4377** |
| Executive Secretary | 396-4380 |
| Deputy Executive Secretary | 396-4385 |
| Chairman | 396-4380 |
| Commissioners | 396-4380 |
| Chief Inspector | 396-4381 |
| Assistant Chief Inspector | 396-4379 |
| Inspectors | 396-4384 |

NOTICE

**Baltimore City Ordinance 99-417, effective May 26, 1999, revised the City laws governing the licensing and regulation of certain adult-entertainment establishments.  The new law is codified at Article 15, §§ 150 through 187 of the City Code, under the Subtitle Adult-Entertainment Businesses.  As authorized by Article 2B, § 12-203.1 of the Maryland Code, the new law transfers the regulatory authority over these businesses to the Board of Liquor License Commissioners for Baltimore City and, among other things, authorizes the Board to adopt rules and regulations to carry out its provisions.  Pursuant to that authority, the following rules and regulations have been adopted for adult-entertainment establishments.**

**Rule 1.  Definitions.**

(a) *Terms defined in Code.*

In these rules and regulations, the following terms have the meanings stated in the Article 15, § 150 of the City Code:

(1) *Adult entertainment.*

{**Editor's Note:** Article 15, § 150(b)(2) defines "adult entertainment" as follows:

"Adult entertainment" means live entertainment:

(i)  in which individuals appear for public view in a state of nudity or partial nudity;

(ii)  that is intended to provide sexual stimulation or sexual gratification;

(iii)  that is distinguished or characterized by an emphasis on material that depicts, describes, or relates to:

1.  human genitals in a discernible state of sexual stimulation or arousal; or

2.  acts of human masturbation, sexual intercourse, sodomy, or physical contact with an individual's clothed or unclothed genitals, pubic area, buttocks, or, if the individual is female, breast; or

(iv)  that, applying contemporary standards, the average individual would find, taken as a whole, appeals to the prurient interest.}

(2) *Adult-entertainment business.*

{**Editor's Note:** Article 15, § 150(c) defines "adult-entertainment business" as follows:

"Adult-entertainment business" means any cabaret, lounge, night club, modeling studio, or other establishment that offers its customers adult entertainment.}

(3) *Board.*

{**Editor's Note:** Article 15, § 150(d) defines "Board" as follows:

"Board" means the Board of Liquor License Commissioners for Baltimore City.}

(4) *Includes; including.*

{**Editor's Note:** Article 15, § 150(e) defines "includes; including" as follows:

"Includes" or "including" means by way of illustration and not by way of limitation.}

(5) *Nudity.*

{**Editor's Note:** Article 15, § 150(b)(1)(ii) defines "nudity" as follows:

"Nudity" means:

1.   the showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering;

2.   the showing of the female breast with less than a fully opaque covering over any part below the top of the nipple; or

3.   the depiction of covered male genitals in a discernibly turgid state.}

(6) *Partial nudity.*

{**Editor's Note:** Article 15, § 150(b)(1)(iii) defines "partial nudity" as follows:

"Partial nudity" means a state of dress in which opaque clothing covers no more than:

1.   the human male or female genitals, pubic area, or buttocks;

2.   the female breasts below the top of the nipples; and

3.   portions of the body covered by supporting straps or devices.}

2

(b) *Other terms defined.*

In these rules and regulations, the following additional terms have the meanings indicated:

   (1) *Dancer.*

      (a) "Dancer" means any person who, whether as an employee, an independent contractor, or an invitee of the business provides adult entertainment.

      (b) "Dancer" includes any hostess, entertainer, bartender, or patron who appears nude or partially nude.

   (2) *Patron.*

   "Patron" means any customer, client, or other invitee on the premises of an adult-entertainment business.

(c) *Mandatory, prohibitory, and permissive terms.*

   (1) "Must" and "shall" are each mandatory terms used to express a requirement or to impose a duty.

   (2) "Must not", "may not", and "no ... may" are each mandatory negative terms to establish a prohibition.

   (3) "May" is permissive.

## Rule 2.  Minimum Age of Dancer.

All dancers in an adult-entertainment establishment must be at least 18 years old or older.

## Rule 3.  Location of Performance.

(a) A dancer may not perform or otherwise appear nude unless the dancer;

   (1) is on a stage that is raised at least 18 inches above floor level; and

   (2) except as provided in subsection (b) of this rules, is at least 3 feet from the nearest patron.

(b) An adult-entertainment business lawfully operating on the effective date of these rules need not modify its current layout to conform to the requirement of subsection (a)(2) of this rule. However, if that business renovates or substantially alters the layout of the licensed premises, the new layout must be made to conform to the requirement of subsection (a)(2).

**Rule 4.  Seclusion with Patrons Prohibited.**

No dancer may enter any separate room, enclosure, or screened area with any patron, unless the area is in public view at all times.

**Rule 5.  Prohibited Touching.**

(a) *By Patrons*.

No patron may touch a dancer's:

    (1)  breast or chest;

    (2)  genitals or genital area; or

    (3)  anus, anal area or buttocks.

(b) *By Dancers*.

No dancer may touch:

    (1) any other dancer's

        (i)  breast or chest;

        (ii) genitals or genital area; or

        (iii) anus, anal area, or buttocks; or

    (2) a patron's:

        (i)  breast or chest;

        (ii) genitals or genital area; or

        (iii) anus, anal area, or buttocks.

**Rule 6.  Prohibited Conduct on Premises.**

An adult-entertainment business may not permit any of the following on the premises, whether by dancers, patrons, or otherwise:

(1) any acts of sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, or any sexual acts that are prohibited by law; or

(2) caressing, fondling, or touching the breast or chest, genitals or genital area, or anus, anal area, or buttocks of any other person, whether clothed or unclothed.

**Rule 7.  Attire.**

No dancer may mingle with patrons while the dancer is nude.

**Rule 8.  Employee Records.**

(a) *Required.*

An adult-entertainment business must keep on its premises records of the legal name, address, date of birth, and social security number of all persons employed by them or under contract with the business.

(b) *Form.*

(1) For each Maryland resident, these records must include a copy of a valid Maryland Driver's License or Age of Majority Card.

(2) For each non-resident of Maryland, these records must include a valid government-issued identification card or driver's license.

(c*) Inspection.*

These records must be available for inspection at all times by authorized representatives of the Board, the Police Department, or any other governmental agency.

**Rule 9.  Codes Compliance.**

The premises of every adult-entertainment business must be maintained in compliance with all applicable health, fire, building, zoning, police, and alcoholic beverage codes and regulations.

**Rule 10.  Lighting.**

The premises of every adult-entertainment business must be illuminated with sufficient natural or artificial lighting to permit clear visibility at all times.

**Rule 11.  Visibility from Exterior Prohibited.**

(a) *In general.*

Adult entertainment may not be visible at any time from the exterior of the premises.

(b) *Exterior doors and windows.*

In addition to the requirements of Article 15, § 170, whenever adult entertainment is being provided, all exterior entrance or exit doors must be closed and all windows must be covered, except in exigent circumstances.

**Rule 12.  Posting Prices.**

The prices of all alcoholic beverages must be posted in a visible area.

**Rule 13.  Posting License.**

Every adult-entertainment business must frame its adult-entertainment license under glass and display it on the premises so that it is at all time conspicuous and easily read.

**Rule 14.  Other Standards of Operation.**

Every adult-entertainment business must comply with all standards of operation set forth in Article 15, § 150 through 187, including:

(1) *§ 169.  Hours of Operation.*

{**Editor's Note:** Article 15, § 169 provides:

(a) *In general.*

Except as provided in subsection (b) of this section, no live adult entertainment may be conducted between the hours of 2 a.m. and noon.

(b) Exception.

If the State changes the closing time for holders of alcoholic beverage licensees, that closing time will apply to adult-entertainment businesses.}

## (2) § 170. Entrances and Exteriors.

{**Editor's Note:** Article 15, § 170 provides:

(a) *Exterior entrance doors.*

Exterior entrance doors:

(1)  must be kept closed so that adult entertainment activities are not visible from the exterior of the building; and

(2)  may be opened only:

(i)   to permit entry and exit; or

(ii)  for cleaning or ventilation during nonoperational hours.

(b) *Entertainment not to be visible from exterior.*

The conduct of adult entertainment may not be visible at any time from the exterior of the premises in which it is conducted.

(c) *Enclosed vestibule or lobby.*

The premises of each adult-entertainment business must have a vestibule or lobby enclosed by immobile walls and consisting of a passage, hall, or room between the outer door facing the street and the part of the premises where the adult entertainment is conducted.}

## (3) § 171. "Barking".

{**Editor's Note:** Article 15, § 171 provides:

Any attempt to urge, invite, or entice people to enter the premises of an adult-entertainment business is prohibited anywhere within 50 feet of the premises.}

## (4) § 172. Preventing Nuisances.

{**Editor's Note:** Article 15, § 172 provides:

Every owner, operator, and manager of an adult-entertainment business must exercise proper care and control to prevent the business or its operations from becoming or creating a public nuisance, whether by the generation of noise, the blocking of public ways, or otherwise.}

**Note:**  These rules and regulations and all other matters relating to the licensing and operation of an adult-entertainment business will be enforced as provided in Ordinance 99-417 and Article 15, §§ 150 through 187 of the City Code.


## Adopted this 14th day of October 1999

by the

## Board of Liquor License Commissioners for Baltimore City